**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| ACCIDENT INSURANCE COMPANY, INC., A SOUTH CAROLINA CORPORATION,<br><br>Plaintiff,<br>v.<br><br>U.S. BANK NATIONAL ASSOCIATION<br><br>Defendant,<br><br>U.S. BANK NATIONAL ASSOCIATION,<br><br>Third-Party Plaintiff,<br><br>v.<br><br>SOUTHPORT LANE ADVISORS, SOUTHPORT SPECIALTY FINANCE, ADMINISTRATIVE AGENCY SERVICES, and ALEXANDER CHATFIELD BURNS,<br><br>Third-Party Defendants. | ) | Civil Action No. 3:16-cv-2621-JMC |

**MEMORANDUM OF DEFENDANT U.S. BANK NATIONAL ASSOCIATION IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON THE CLAIMS OF PLAINTIFF ACCIDENT INSURANCE COMPANY**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....1
FACTUAL BACKGROUND....2
A. Accident and Freestone Enter into a Fronting Program....2
B. Freestone Belatedly Opens the Trust Account at U.S. Bank to Hold Collateral....3
C. Freestone Causes the Trust Account to Acquire the Challenged Assets. ....6
D. Accident's Outside Independent Actuaries Estimate the Total Policy Liabilities to be Paid under the Fronting Program....7
E. Accident Has Not Incurred Any Actual Loss to Date Because the Collateral and Other Amounts Received Exceed the Total Paid Claims. ....10
F. Procedural History. ....13
STANDARD OF REVIEW ....15
ARGUMENT....15
I. ACCIDENT'S CLAIMS ARE TIME-BARRED (All Counts). ....15
A. Accident's Claims Are Subject to the Limitations Period for Breach of Trust. ....16
B. Accident's Claims Are Barred Under the One-Year Limitations Period for Breach of Trust. ....19
II. ACCIDENT'S CIVIL CONSPIRACY CLAIM ALSO FAILS ON ADDITIONAL GROUNDS (Count 5)....23
A. Civil Conspiracy Requires Actionable Underlying Wrongs....23
B. Parent Corporations Cannot Conspire with Wholly-Owned Subsidiaries....25
C. There is No Evidence of a Meeting of the Minds Between U.S. Bank and its Alleged Co-Conspirators to Commit an Unlawful Act. ....26
III. ALTERNATIVELY, U.S. BANK IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON THE AMOUNT OF ACCIDENT'S MAXIMUM ACTUAL DAMAGES, IF ANY....27
A. Accident's Damages Are Limited to Its Out-of-Pocket Losses Resulting From a Lack of Proper Collateral....27
B. Accident's Actual Damages As of Today Are Zero....29

C. Accident Cannot Establish Actual Damages Going Forward Beyond the Amount Set Forth in the Hart Report. ....................................31

CONCLUSION.....................................................................................................................33

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Albert v. Alex. Brown Mgmt. Servs., Inc.*,
2005 WL 2130607 (Del. Ch. Aug. 26, 2005) ....24

*Anderson v. Airco, Inc.*,
2004 WL 2827887 (Del. Super. Ct. Nov. 30, 2004) ....24

*In re Ashe*,
2016 WL 1084282 (Bankr. D.S.C. Mar. 18, 2016) ....16

*Brandywine Smyrna, Inc. v. Millennium Builders, LLC*,
2010 WL 1380252 (Del. Super. Ct. Apr. 8, 2010) ....27

*Clean Harbors, Inc. v. Union Pac. Corp.*,
2017 WL 1175664 (Del. Super. Ct. Mar. 28, 2017) ....27

*Del. Express Shuttle, Inc. v. Older*,
2002 WL 31458243 (Del. Ch. Oct. 23, 2002) ....31

*Ducharme v. Ducharme*,
850 N.W.2d 607 (Mich. Ct. App. 2014) ....16, 18, 23

*Evans v. Rite Aid Corp.*,
452 S.E.2d 9 (S.C. Ct. App. 1994), *aff'd as modified on other grounds*, 478 S.E.2d 846 (S.C. 1996) ....18

*Financial Cas. & Sur., Inc. v. Zouvelos*,
2017 WL 1184106 (E.D.N.Y. Mar. 29, 2017) ....28

*Frontier Oil Corp. v. Holly Corp.*,
2005 WL 1039027 (Del. Ch. Apr. 29, 2005) ....31

*Israel Discount Bank of New York v. First State Depository Co., LLC*,
2013 WL 2326875 (Del. Ch. May 29, 2013) ....28

*Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*,
2014 WL 5192179 (Del. Ch. Oct. 10, 2014) ....32

*Latesco L.P. v. Wayport, Inc.*,
2009 WL 2246793 (Del. Ch. July 24, 2009) ....26

*Lipson v. Anesthesia Servs., P.A.*,
790 A.2d 1261 (Del. Super. Ct. 2001) ....................26

*Medicalgorithmics S.A. v. AMI Monitoring Inc.*,
2016 WL 4401038 (Del. Ch. Aug. 18, 2016) ....................32

*Metro Life Ins. Co. v. Tremont Grp. Holdings, Inc.*,
2012 WL 6632681 (Del. Ch. Dec. 20, 2012) ....................25

*N.K.S. Distribs., Inc. v. Tigani*,
2010 WL 2178520 (Del. Ch. May 28, 2010) ....................23

*NACCO Indus., Inc. v. Applica Inc.*,
997 A.2d 1 (Del. Ch. 2009) ....................24

*OptimisCorp v. Waite*,
2015 WL 5147038 (Del. Ch. Aug. 26, 2015) ....................24, 31

*Poly-Med, Inc. v. Novus Scientific Pte. Ltd.*,
__ F. Supp. 3d __, 2018 WL 4184342 (D.S.C. Aug. 31, 2018) (Childs, J.) ....................15

*Poly-Med, Inc. v. Novus Scientific Pte. Ltd.*,
2018 WL 1932551 (D.S.C. Apr. 24, 2018) (Childs, J.) ....................16

*Prairie Capital III, L.P. v. Double E Holding Corp.*,
132 A.3d 35 (Del. Ch. 2015) ....................26

*Regions Bank v. Reed*,
60 So. 3d 868 (Ala. 2010) ....................18

*Rogers v. Bushey*,
2018 WL 818374 (Del. Super. Ct. Feb. 7, 2018) ....................24

*Smiley v. Daimler Chrysler*,
538 F. Supp. 2d 711 (D. Del. 2008) ....................23

*In re Thomas Lawrence Reeves Irrevocable Tr.*,
2015 WL 1947360 (Del. Ch. Ct. Apr. 29, 2015) ....................18

*In re Transamerica Airlines, Inc.*,
2006 WL 587846 (Del Ch. Feb. 28, 2006) ....................25

*United States v. Walters*,
2012 WL 6681825 (N.D. Okla. Dec. 21, 2012) ....................18

*Wavedivision Holdings, LLC v. Highland Capital Mgmt. L.P.*,
2011 WL 5314507 (Del. Super. Ct. Nov. 2, 2011) ....................23, 25

*Wells Fargo Bank, N.A. v. Cook*,
775 S.E.2d 199 (Ga. Ct. App. 2015) .....18, 22

**Statutes**

10 Del. C. § 8106 .....24

S.C. Code Ann. § 62-7-1001(a) .....16

S.C. Code Ann. § 62-7-1005 .....16

S.C. Code Ann. § 62-7-1005(a)-(b) .....16, 19

**Other Authorities**

Fed. R. Civ. P. 26(a)(1) .....13

Fed. R. Civ. P. 26(a)(2)(D)(ii) .....15

Fed. R. Civ. P. 56 .....15

# INDEX OF EXHIBITS

| Exhibit | Description | Bates Range (if applicable) |
|---|---|---|
| 1 | Trust Agreement between Dallas National as Grantor, Accident as Beneficiary, and U.S. Bank as Trustee (dated Sept. 25, 2013) | AIC ESI 008969-80 |
| 2 | Program Agreement between Accident and Dallas National (effective Mar. 1, 2013) | AIC ESI 070244-57 |
| 3 | Quota Share Reinsurance Agreement between Accident and Dallas National (dated Mar. 4, 2013) | AIC ESI 120688-96 |
| 4 | Dec. 2013 U.S. Bank Account Statement | AIC 01-00000129-33 |
| 5 | Jan. 2014 U.S. Bank Account Statement | AIC 01-00000134-41 |
| 6 | Feb. 2014 U.S. Bank Account Statement | AIC 01-00000142-47 |
| 7 | Mar. 2014 U.S. Bank Account Statement | AIC 01-00000148-53 |
| 8 | Apr. 2014 U.S. Bank Account Statement | AIC 01-00000154-60 |
| 9 | July 2014 U.S. Bank Account Statement | AIC 01-00000173-78 |
| 10 | Aug. 2014 U.S. Bank Account Statement | AIC 01-00000179-84 |
| 11 | Sept. 2014 U.S. Bank Account Statement | AIC 01-00000185-90 |
| 12 | Dec. 2013 to Dec. 2014 Regions Bank Account Statement (Account No. ‘1528) | CB 0038690-94 |
| 13 | Excerpts from Dec. 2013 to Dec. 2014 Regions Bank Account Statement (Account No. ‘1181) | CB 0038715, CB 0038722 |
| 14 | Email from Frank Bradley to Eric Vogelsberg re: “AIC” (Sept. 24, 2013) | USB_00002950-51 |
| 15 | Email from Robbie Robinson to Eric Vogelsberg re: “DNIC Performance” (Dec. 20, 2013) | USB_00008913-18 |
| 16 | Email from Eric Vogelsberg to Michael Morrow re: “Dallas Fronting Collateral Requirement For 12/31” (Dec. 21, 2013) | AIC ESI 075361-62 |
| 17 | Email from Robert Ruby to Frank Bradley re: “Freestone Rehab (Grantor) – Accident Insurance Company (Beneficiary)” (June 16, 2014) | USB_00013046 |
| 18 | Letter from Michael Hunter to Judy Staudermann re: withdrawal of Trust Account assets (July 11, 2014) | AIC ESI 009293 |
| 19 | Email from Judy Staudermann to Michael Hunter re: “Status Update” (July 23, 2014) | USB_00013251-55 |
| 20 | Email from Judy Staudermann to Michael Hunter re: “Accident Transfers” (Aug. 7, 2014) | USB_00013284-85 |
| 21 | Email from Michael Hunter to Duncan McIntosh & Jim Webster re: “Freestone aka Dallas & the Destra Funds” (Oct. 24, 2014) | AIC ESI 041493 |

| Exhibit | Description | Bates Range (if applicable) |
|---|---|---|
| 22 | Email from Cynthia Hegarty to Michael Fisco re: "U.S. Bank" (Mar. 23, 2015) | USB_00092273-74 |
| 23 | Email from Michael Stewart to Thaddeus Weaver re: "Freestone / Dallas National Liquidation, Del. Ch., Requested Meeting with U.S. Bank" (Mar. 26, 2015) | USB_00092268-72 |
| 24 | Email from Michael Hunter to Eric Vogelsberg & Stephen Su re: "Dallas Fronting Collateral Requirement For 3/31/2014" (Mar. 27, 2014) | AIC ESI 009483-85 |
| 25 | Calendar Invitation from Cynthia Hegarty to Michael Stewart re: "AIC v. US Bank" (Mar. 30, 2015) | USB_00092285 |
| 26 | Email from Cynthia Hegarty to Michael Stewart re: "Accident Insurance Company v. US Bank" (Apr. 8, 2015) | USB_00092288-89 |
| 27 | Email from Michael Hunter to Kristin Barret re: "Dallas Ntl Statements" (May 5, 2015) | AIC ESI 009163-78 |
| 28 | Dec. 2015 Regions Bank Account Statement (Account No. '1528) | AIC ESI 13372-81 |
| 29 | Email from Michael Stewart to Cynthia Hegarty re: "Accident Insurance Company v. US Bank" (May 9, 2015) | USB_00092338-44 |
| 30 | Email from Cynthia Hegarty to Michael Stewart re: "Freestone – Accident Ins. Co/Madison Ins Co" (May 10, 2015) | USB_00092345-46 |
| 31 | Email from Michael Krauss to Cynthia Hegarty re: "Accident Insurance Company – U.S. Bank, N.A. – DESTRA funds" (May 20, 2015) | USB_00092211-12 |
| 32 | Letter from Michael Hunter to Casey Hengstebeck of the Florida Dep't of Financial Services (Sept. 9, 2015) | AIC ESI 115042-44 |
| 33 | Direction Letter re: Destra Targeted Income Unit Investment Trust (Dec. 23, 2015) | USB_00084025-40 |
| 34 | Spreadsheet re: 12250 MGA AB Collected (Dec. 31, 2015) | AIC ESI 12290 |
| 35 | Email from James Davis to Robbie Robinson re: "2015.12ITD Dallas Fronting & Premiums Data (AIC)" and attached Journal Entries (Feb. 15 2016) | AIC ESI 000598-601 |
| 36 | Email from Judy Staudermann to Michael Hunter re: Distribution Request (Mar. 24, 2016) | AIC ESI 010590 |
| 37 | Email from Maria Todd to Melva Jones-Singleton re: "Dilworth Paxson Invoice on Freestone Matter" (Oct. 10, 2016) | AIC ESI 023662-67 |

| Exhibit | Description | Bates Range (if applicable) |
|---|---|---|
| 38 | Dallas Fronting Program Detail as of September 26, 2018 | AIC ESI 120553 |
| 39 | Excerpts from Merlinos Actuarial Review of Loss and Loss Expense Reserves as of 12/31/2014 | M&A 646-902 |
| 40 | Excerpts from Merlinos Actuarial Review of Loss and Loss Expense Reserves as of 12/31/2015 | M&A 903-1191 |
| 41 | Merlinos Statement of Actuarial Opinion for the Year Ended December 31, 2015 | M&A 1530-37 |
| 42 | Excerpts from Merlinos Actuarial Review of Loss and Loss Expense Reserves as of 12/31/2016 | M&A 1193-1476 |
| 43 | SIGMA Actuarial Report for Accident Insurance Company as of 12/31/2017 | SIGMA-USB SUBPOENA-00000009-89 |
| 44 | Corporate Documents of U.S. Bank Trust National Association and U.S. Bancorp Fund Services, LLC | |
| 45 | Checks from Regions Bank Account No. 2255 to U.S. Administrator Claims & Dilworth Paxson LLP | AIC ESI 120268, AIC ESI 120319, AIC ESI 120358, AIC ESI 120366, AIC ESI 120428 |
| 46 | October 17, 2018 Robert J. Arowood Deposition Transcript | |
| 47 | October 18, 2018 Michael D. Hunter Deposition Transcript | |
| 48 | October 19, 2018 James Ray Robinson Deposition Transcript | |
| 49 | Accident's Responses to U.S. Bank's Second Set of Interrogatories | |
| 50 | Accident's Responses to U.S. Bank's Third Set of Interrogatories | |
| 51 | Accident's Responses to U.S. Bank's First Set of Requests for Admission | |
| 52 | Email from R. Robinson to K. Jordan re: "2014.09 ITD Dallas Fronting Claims & Premiums Data (AIC)" and attached Spreadsheet | AIC ESI 052761-62 |
| 53 | Email from Judy Staudermann to Michael Hunter re: "Accident Transfers" (July 31, 2014) | USB_00013269-70 |

## INTRODUCTION

In March 2013, Accident Insurance Company, Inc. ("Accident") entered into a fronted insurance partnership with Freestone Insurance Company ("Freestone"). For a fee, Accident allowed Freestone to use Accident's license and issue policies in its name. Payments on the policies were Freestone's responsibility in the first instance. But if Freestone became insolvent, that responsibility fell to Accident. To secure Freestone's obligations for policy liabilities, Accident required Freestone to post collateral in a trust account at U.S. Bank National Association ("U.S. Bank"). Approximately a year into the fronting program, Freestone became insolvent. Accident now claims that some of the collateral deposited in the trust account was deficient—of little value and of impermissible form and quality—and therefore seeks to recover from U.S. Bank.

But Accident has not suffered any losses as of today—and any estimate of future losses that it can offer are purely speculative. Because the trust assets were collateral to secure Freestone's obligation to make payments on the policies, Accident suffers loss only if the assets are insufficient to cover Freestone's obligations and Accident instead must make the payments out-of-pocket. To date, however, there is no collateral shortfall: the trust assets, coupled with other amounts that Accident has received through the fronting program, have more than covered all policy liabilities belonging to Freestone. Accident has incurred no loss. Nor can Accident meet its burden of proving loss going forward. Accident admits that it lacks the expertise to estimate future policy liabilities, so anything it suggests is necessarily speculative. This Court should hold, as a matter of law, that U.S. Bank cannot be liable for an amount in excess of the amount of potential future loss set forth in its expert damages report, [redacted]

The Court need not reach this issue, however, because all of Accident's claims are time-barred. Under the South Carolina Trust Code, a trust beneficiary must commence proceedings

within one year of being sent a report from the trustee that was sufficient to put the beneficiary on inquiry notice of its claims. Accident admits that it knew, "with certainty," of its claims against U.S. Bank no later than July 2014—two years before it filed this suit. Accident's lengthy delay bars its claims. For these reasons, and as further discussed below, this Court should grant summary judgment to U.S. Bank on all claims, or alternatively, grant partial summary judgment to U.S. Bank setting the maximum amount of Accident's actual damages in the event U.S. Bank were found liable.

## FACTUAL BACKGROUND

### A. Accident and Freestone Enter into a Fronting Program.

Accident Insurance Company, Inc. ("Accident") was a South Carolina insurance company supervised by the South Carolina Department of Insurance ("SCDOI"). Effective March 1, 2013, Accident began a fronting reinsurance program with Freestone, formerly known as Dallas National Insurance Company. (*See* Ex. 2 ("Program Agreement" or "PA").) As the fronting program began, Southport Lane, L.P. ("Southport Lane"), a new private equity firm, closed on its purchase of Freestone. (*See, e.g., id.* § 21.)

Accident and Freestone's fronting program (the "Fronting Program") was governed by a Program Agreement. (*Id.*) In exchange for a share of the premiums, Accident let Freestone use its insurance license to issue commercial general liability policies in Accident's name. (PA §§ 2, 5, 15.) [redacted] (*See* Arowood Dep. 45:19-46:8; Hunter Dep. 63:15-64:10.) Freestone underwrote all policies, and administered and paid all claims. (PA §§ 5, 8.)

But Accident was the one ultimately responsible to the policyholders. If Freestone became insolvent—a risk that Accident accepted in return for the fronting fee—and could not pay claims, that responsibility fell to Accident. Accordingly, as long as Accident had any exposure in respect of the policies, Freestone had to maintain collateral sufficient to secure liabilities. (*See, e.g.*, PA § 12.) Accident's CFO, Michael Hunter, explained: [redacted] (Hunter Dep. 40:19-22; *see also id.* 104:24-105:3.) The Program Agreement required Freestone to establish a segregated bank or trust account to secure these obligations. (PA § 12.) Either party could terminate the Fronting Program for any reason on 90 days' notice. (PA § 18.)[1]

### B. Freestone Belatedly Opens the Trust Account at U.S. Bank to Hold Collateral.

Accident and Freestone operated the Fronting Program for over six months before they took any steps to open an account to hold the collateral. [redacted] (Ex. 14.) [redacted] (*Id.*)

---

[1] [redacted] (*E.g.*, Hunter Dep. 86:17-90:4.) Accident subsequently produced a Quota Share Reinsurance Agreement (the "Reinsurance Agreement") [redacted] (Ex. 3.) [redacted] (*Id.*) [redacted] (*Id.*) [redacted] (*Id.* at AIC ESI 120695.) Accordingly, while it does not affect the disposition of the motion, Accident still has not provided evidence that it entered into a reinsurance agreement with Freestone with respect to the Fronting Program.

The relationship between Freestone, Accident, and U.S. Bank is governed by the Trust Agreement, which is under Delaware law. Freestone is the Grantor, Accident is the Beneficiary, and U.S. Bank is the Trustee. The Trust Account serves one purpose: to secure payment of Freestone's reinsurance obligations to Accident. (Ex. 1 ("Trust Agreement or "TA") p. 1.) As grantor, Freestone created the Trust Account and supplied all of the assets. (TA §§ 1(a), 2(a).)

Because the assets were collateral, Accident may use them only to pay certain obligations due from Freestone relating specifically to the Fronting Program. Accident may use the assets only to pay policy claims and related legal expenses that Accident has paid without reimbursement from Freestone, for unearned premiums due to Accident, or to return excess funds to Freestone. (TA § 4.) Accident may not use the trust assets for any other purpose. (*Id.*) The Trust Agreement provides, in relevant part:

> The Beneficiary hereby covenants to the Grantor that it shall undertake to use and apply any withdrawn Assets without diminution because of the insolvency of the Beneficiary or the Grantor, ***for the following purposes only***:
>
> (i) to pay or reimburse the Beneficiary for the Grantor's share under the reinsurance secured hereby for any losses and allocated loss expenses paid by the Beneficiary but not recovered from the Grantor thereunder, or for unearned premiums due to the Beneficiary thereunder not otherwise paid by the Grantor;
>
> (ii) to pay the Grantor any amounts held in the Trust Account that exceed 102% of the amount required to fund the Grantor's entire Obligations (as hereinafter defined). . . ."

(TA § 4(a) (emphasis added).)

Accident vested investment authority in Freestone, which managed the assets and directed the portfolio. As Trustee, U.S. Bank was required to follow direction from Freestone. The Trust Agreement provides that all investments are "as instructed by the Grantor or its designated investment advisor," and "[t]he Trustee shall execute each Investment Order." (TA § 5(a).)

Likewise, Freestone "may direct the Trustee to accept substitute Assets for other Assets held in the Trust Account." (TA § 5(b).)

Also under the Trust Agreement, "[t]he Trustee's duties shall be entirely administrative and not discretionary and determined only with reference to this Agreement and Applicable Insurance Law." (TA § 8(n).) In this vein, the Trust Agreement provides:

> The Trustee shall have no duty or responsibility with respect to the qualification, character or valuation of the Assets deposited in the Trust Account, except to determine whether the Assets are in such form that the Beneficiary, or the Trustee upon direction by the Beneficiary, may whenever necessary negotiate any such Assets without consent or signature from the Grantor or any other person or entity.

(TA § 2(b); *see also id.* § 8(b).)

The Trust Account held no assets until December 2013. [redacted] (Ex. 4.) [redacted] (Ex. 15 at USB_0008913; *see also* Robinson Dep. 53:13-55:15.)[2] Near the end of the month, Robbie Robinson, Accident's Director of Financial Reporting and Compliance, followed up with a series of emails titled [redacted] (Ex. 16; *see also* Robinson Dep. 61:5-63:24; Hunter Dep. 68:8-70:13 (describing Accident's process to ensure that reinsurance trust account is funded with sufficient amount of collateral).) Consistent with the Trust Agreement, none of the communications regarding the amount and type of collateral included input from the Trustee.

---

[2] Freestone's CFO similarly wrote elsewhere in the same email chain: [redacted] (Ex. 15 at USB_0008915.)

### C. Freestone Causes the Trust Account to Acquire the Challenged Assets.

In mid-January 2014, Freestone, through its investment advisor, sold the municipal bonds in the Trust Account and purchased the assets that are the subject of this litigation: units of the Destra Targeted Income Unit Investment Trust (the "Destra UIT"), and to a lesser extent, membership interests in Camelot Assets Holding LLC ("Camelot"). (Ex. 5.) These securities were created, issued, and valued by affiliates of Freestone and its indirect parent, Southport Lane, L.P. (*See, e.g.*, ECF No. 154, First Am. Compl. ("Compl.") ¶¶ 36-40.) [redacted] (Ex. 7.)

Freestone initially purchased $9.4 million of the Destra UIT into the account. [redacted] (Ex. 6.) [redacted] (Ex. 7.) Freestone deposited the additional bonds in March 2014 [redacted] (Ex. 24.) Robinson wrote: [redacted] (*Id.* at AIC ESI 009483; *see also* Robinson Dep. 85:18-86:19.) Again consistent with the Trust Agreement, none of these communications included input from the Trustee.

From the establishment of the Trust Account, U.S. Bank sent monthly account statements to Accident. (*See, e.g.*, Exs. 4-11; *see also* Ex. 50, Resp. to Interrog. 10.) The statement for January 2014 [redacted] (Ex. 5.) With respect to the Destra UIT, the January 2014 statement, and each

one thereafter, reported that [redacted] (*Id.* at AIC 01-00000136.)

In April 2014, Freestone entered receivership with the Delaware Insurance Commissioner as Receiver (the "Receiver" or "Freestone Receiver"). That same month, the Fronting Program was terminated and went into run-off: [redacted] (*See, e.g.*, Robinson Dep. 87:14-88:14.) At the same time, [redacted] (Ex. 8 at AIC 01-00000157.) [redacted] (*Id.*)

Accident did not contact U.S. Bank about the Destra UIT until June 2014—five months after the units entered the Trust Account. (*See* pp. 20-21, *infra*.) [redacted] (Ex. 19.) [redacted] (Ex. 12 at CB 0038691; Ex. 13 at CB 0038722.) But U.S. Bank reported that movement of the Destra UIT and Camelot shares required additional steps and paperwork, so those assets stayed in the Trust Account. (*See* pp. 19-20, *infra*.) Accident has not renewed its withdrawal request, so these assets remain in the account, although Accident since has withdrawn a cash distribution from these assets.

**D. Accident's Outside Independent Actuaries Estimate the Total Policy Liabilities to be Paid under the Fronting Program.**

After the end of each calendar year, [redacted] (*See, e.g.*, Arowood Dep. 55:8-57:22; Robinson

Dep. 127:9-128:7.) Accident incorporates these reserves into its annual statutory basis financial statements that it files with the National Association of Insurance Commissioners ("NAIC"). With its statutory financials, Accident also files the outside actuary's Statement of Actuarial Opinion on its reserves. (*See, e.g.*, Ex. 41.) The actuary then details its analysis in an annual actuarial report, which NAIC rules require Accident to retain for seven years. (Exs. 39-40, 42-43.)

Since 2013, Accident has retained outside actuaries to estimate, after the end of each calendar year, the ultimate policy liabilities on the Fronting Program. The total potential exposure has three components: (1) prior payments on policies (i.e., cumulative actual claims paid); (2) current case reserves (amounts reserved to pay for existing claims); and (3) "incurred but not reported" or "IBNR" (estimated payments for anticipated, but as-yet unreported, claims going forward). (*See*, *e.g.*, Ex. 43 at SIGMA-USB SUBPOENA-00000070.) Accident provides the actuaries with data on the amount of claims paid and the case reserves, [redacted] (*See* Exs. 39-40, 42-43; Arowood Dep. 56:1-57:22.) [redacted] (Hunter Dep. 25:11-28:5, 226:4-11; Robinson Dep. 112:10-22.) The following table summarizes the outside actuaries' reports on the Fronting Program since 2014:

| ***Date*** | ***Cumulative Actual Claims Paid*** | ***Current Case Reserves*** | ***Estimated IBNR*** | ***Estimated Total Payments through end of Program*** |
|---|---|---|---|---|
| 12/31/14 | $473,590 | $919,228 | $9,707,172 | $11,100,000 |
| 12/31/15 | $2,252,817 | $2,258,455 | $7,238,728 | $11,750,000 |
| 12/31/16 | $4,311,524 | $2,748,207 | $5,615,269 | $12,675,000 |
| 12/31/17 | $5,901,910 | $2,273,586 | $3,444,504 | $11,620,000 |

(Ex. 39 at M&A 845; Ex. 40 at M&A 1136; Ex. 42 at M&A 1412; Ex. 43 at SIGMA-USB SUBPOENA-00000070.)

To estimate IBNR as of December 31 of each year, the outside independent actuary estimates the total amount of payments that ultimately will be made through the end of the program. (*See, e.g.*, Exs. 39-40, 42-43.) IBNR is what remains after subtracting out the actual claims paid to date and the current known case reserves. (*Id.*) The "ultimate loss ratio" (or "ULR") is the ratio of earned premium to the total amount of ultimate payments. (*Id.*) [redacted] (*Id.*; *see also* Hart Report ¶¶ 194-98 & App'x E.) As a result, the actuaries' estimate of the ultimate payments has remained relatively constant; the last estimate of $11,620,000 was within the existing range.

While the estimate of ultimate payments has remained relatively constant, the primary components—historic paid claims and anticipated future claims—have shifted. As claims were reported each year, the cumulative paid claims and related legal expenses steadily increased, rising to $5.9 million as of December 31, 2017. (Ex. 43 at SIGMA-USB SUBPOENA-00000070.) But there were also fewer claims unpaid and unreported going forward. The actuaries' estimate of IBNR thus steadily decreased, falling to $3.44 million as of December 31, 2017. (*Id.*) Meanwhile, Accident's reported case reserves have remained relatively stable since 2015. (*Id.*; *see also* Ex. 40 at M&A 1136; Ex. 42 at M&A 1412.)

[redacted] (Ex. 38, Tab Sheet 1.) However, since December 31, 2017, there has been no updated actuarial estimate of the ultimate payments to be made through the end of the program, and

therefore no updated IBNR. Accident's outside independent actuaries will not provide a Statement of Actuarial Opinion regarding the reserves on the 2018 year-end statutory financials until March 2019, when Accident's regulatory filings as of December 31, 2018 are due, to be followed by a supporting actuarial report months later. (*See, e.g.*, Exs. 39-43.)

**E. Accident Has Not Incurred Any Actual Loss to Date Because the Collateral and Other Amounts Received Exceed the Total Paid Claims.**

With Freestone insolvent and the Fronting Program in run-off, [redacted] (*See* Robinson Dep. 87:14-89:24.) [redacted] (Ex. 28 at AIC ESI 013374; *see also* Hunter Dep. 168:4-22.) [redacted] (*See* Hunter Dep. 40:25-41:4.) In May 2015, Accident's CFO, Michael Hunter, wrote the SCDOI that [redacted] (Ex. 27 at AIC ESI 009163.)

Similarly, in September 2015, Hunter reported to the Florida Office of Insurance Regulation that [redacted] He wrote: [redacted] (Ex. 32 at AIC ESI 115043.)

Since Accident took over the Fronting Program in October 2014, [redacted][3] With respect to an insurance policy, [redacted] (*See*, *e.g.*, Hunter Dep. 35:20-37:14.) [redacted][4] (*Id.*) [redacted] (Hunter Dep. 37:23-39:2.) [redacted] (Robinson Dep. 109:12-22.) With respect to the Fronting Program, Accident recorded earned premium of [redacted] (*See* Exs. 35, 41, 52.) Accident's accounting journal entries for the period of December 1, 2015 to December 31, 2015 [redacted]. (Ex. 34; Robinson Dep. 118:25-119:14.)

[3] The net premium amount of [redacted] is derived from [redacted]. The underlying figures are reflected in: (1) Ex. 42 at M&A 1412, which shows $18,100,467 in Earned Premium on the Fronting Program; and [redacted]) Because AIC ESI 052762 consists of over 4,000 lines of data in an Excel spreadsheet, U.S. Bank has prepared a demonstrative that identifies the source of the [redacted] figure, in addition to submitting the underlying spreadsheet itself.

[4] Hunter explained: [redacted] (Hunter Dep. 37:6-12.)

Meanwhile, U.S. Bank Trust National Association ("U.S. Bank Trust"), as trustee of the Destra UIT, has followed the direction of holders to monetize the Destra UIT and realize value to all holders—including Accident. (*See, e.g.*, Ex. 33.) [redacted] (*Id.* at USB_00084038.) In December 2015, [redacted]. (*Id.* at USB_00084040; Ex. 36; Hunter Dep. 215:16-218:17.) As a remedial measure, [redacted]. (Ex. 33 at USB_00084026, USB_00084038.) [redacted] (*Id.*)

In all, since the Fronting Program was terminated, [redacted]. The breakdown is:

[redacted]

This amount exceeds the actual sum that Accident has paid under the Fronting Program. Through December 31, 2017, [redacted]. (*See* Ex. 43 at SIGMA-USB SUBPOENA-00000070; Hart Rep. ¶¶ 191-92 & App'x J.1.) [redacted]

[redacted]

(Ex. 38, Tab Sheet 1.) As a result, Accident has not incurred any actual losses to date.

**F. Procedural History.**

In early 2015, Accident contacted and met with U.S. Bank to discuss its potential claims. (*See* pp. 21-22, *infra*.) But Accident did not file this suit until July 22, 2016. (ECF No. 1.)[5] As amended, the Complaint brings claims of: (1) breach of contract; (2) breach of fiduciary duty; (3) negligence/gross negligence; (4) negligent misrepresentation; and (5) civil conspiracy. (ECF No. 154.) Accident alleges that U.S. Bank allowed the Trust Account to be depleted of valuable and marketable municipal bonds and replaced by the Destra UIT and Camelot shares—securities that allegedly lack value and were prohibited from entering the Trust Account. Accident's primary allegations are twofold. First, Accident alleges that the Destra UIT were not in "negotiable form" under the Trust Agreement—i.e., such form that it could be sold or transferred by Accident or U.S. Bank as trustee without the consent of Freestone or someone else. Second, Accident alleges that the Destra UIT was valueless and ineligible for the Trust Account, and U.S. Bank as trustee "was aware or should have been aware" of these facts.

On May 2, 2018, Accident served its second amended damages disclosures under Rule 26(a)(1), alleging damages of $13.2 million. (ECF No. 130-6.) U.S. Bank moved to compel Accident to identify and/or produce the documents on which Accident's computations were based. (ECF No. 130.) Accident then served its expert damages report dated June 1, 2018, in which Accident claimed damages of $11,620,495.33. (ECF No. 135-1.) Accident represented that, with its damages report and the accompanying documents identified and produced, it "has provided

[5] Accident sued U.S. Bank and U.S. Bank Trust in the Eastern District of Tennessee on April 19, 2016. *See Accident Ins. Co., Inc. v. U.S. Bank Nat'l Ass'n et al.*, No. 3:16-cv-00186 (E.D. Tenn.). However, Accident dismissed that suit in July 2016 and then commenced this proceeding.

U.S. Bank with the composition of its damages claim" and "U.S. Bank has the records that [Accident] will rely on to prove damages in this case." (ECF No. 135 pp. 2, 5.) Relying on Accident's representations, U.S. Bank withdrew its motion to compel. (ECF No. 136.)

On July 5, 2018, U.S. Bank served the expert report of Tim Hart, which addressed the nature, amount, and computation of damages. (Declaration of Timothy H. Hart dated Oct. 31, 2018 ("Hart Decl.") & Ex. A ("Hart Rep.").) [redacted] (Hart Rep. ¶¶ 77-83, 187-92, 199-202, 210.) This table summarizes Hart's conclusion:

[redacted]

[redacted] (Hart Rep. ¶¶ 193-203, 210-11 & App'x E, F, J.) [redacted][6]

6 [redacted] There is a difference of $1 because this brief uses only the figures rounded to the nearest dollar.

[redacted]

Accident did not serve a rebuttal report. *See* Fed. R. Civ. P. 26(a)(2)(D)(ii) (setting rebuttal report deadline).

## STANDARD OF REVIEW

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine question of material fact exists where, after reviewing the record as a whole, the court finds a reasonable jury could return a verdict for the non-moving party." *Poly-Med, Inc. v. Novus Scientific Pte. Ltd.*, __ F. Supp. 3d __, 2018 WL 4184342, at *4 (D.S.C. Aug. 31, 2018) (Childs, J.). To avoid summary judgment, the non-moving party must "set forth specific facts," Fed. R. Civ. P. 56(c)(1), and may not rely on mere allegations, unsupported speculation, or denials, *Poly-Med, Inc.*, 2018 WL 4184342, at *4.

## ARGUMENT

### I. ACCIDENT'S CLAIMS ARE TIME-BARRED (All Counts).

Accident's claims are time-barred as a matter of law. They are styled as claims for breach of contract and various torts, but each claim is time-barred under the statutory limitations period for breach of trust. This limitations period applies to any claim that a trustee violated a duty owed to the beneficiary, without regard to the name of the claim.

Under South Carolina's version of the Uniform Trust Code, a beneficiary must commence a proceeding for breach of trust within one year of being sent a report from the trustee that provides

inquiry notice of potential claims.[7] S.C. Code Ann. § 62-7-1005. Accident received many such reports through the summer of 2014, triggering the one-year limitations period. Because Accident did not file this suit until July 2016, all of its claims are time-barred as a matter of law.

Specifically, "a beneficiary may not commence a proceeding against a trustee for breach of trust more than one year after the date the beneficiary . . . was sent a report that adequately disclosed the existence of a potential claim for breach of trust." *Id.* § 62-7-1005(a). To start the one-year clock, the report must provide "sufficient information so that the beneficiary . . . knows of the potential claim or should have inquired into its existence." *Id.* § 62-7-1005(b). The clock had run long before Accident filed suit.

**A. Accident's Claims Are Subject to the Limitations Period for Breach of Trust.**

The Trust Code defines breach of trust as "[a] violation by a trustee of a duty the trustee owes to a beneficiary." S.C. Code Ann. § 62-7-1001(a). The one-year bar applies no matter how the claims are labeled. A beneficiary may not avoid the procedural law that governs breach of trust by attaching a different label to its claims. In *Ducharme v. Ducharme*, 850 N.W.2d 607 (Mich. Ct. App. 2014), the beneficiary alleged that the trustee failed to protect trust assets; he sued for, among other things, breach of fiduciary duty, conversion and commingling of assets, and fraud and misrepresentation. Labels aside, the court determined that the beneficiary's allegations "clearly involve claims that defendant breached her duty as trustee in her administration of the trusts," and therefore the claims were subject to the limitations period for breach of trust. *Id.* at

[7] Even where the parties' contract includes a choice of law clause, the statute of limitations is governed by the procedural law of South Carolina as the forum state. *Poly-Med, Inc. v. Novus Scientific Pte. Ltd.*, 2018 WL 1932551, at *5 n.9 (D.S.C. Apr. 24, 2018) (Childs, J.); *In re Ashe*, 2016 WL 1084282, at *2 (Bankr. D.S.C. Mar. 18, 2016).

609-10 (applying provisions of Michigan Trust Code materially identical to those of South Carolina).

The same is true here. Accident alleges that U.S. Bank allowed trust assets to be depleted, as the valuable and permissible municipal bonds were replaced by the Destra UIT and Camelot shares—securities that Accident claims lacked value and were not permitted in the Trust Account. With each claim, Accident alleges that U.S. Bank as trustee violated a duty that it owed to Accident as the beneficiary in administering the Trust Account.

- ***Breach of Contract (Count 1)***. By its terms, the Trust Agreement "sets forth the duties and powers of the Trustee with respect to the trust account established hereby." (TA p. 1.) It provides that "[t]he Trustee shall administer the Trust Account as Trustee for the Beneficiary." (TA § 1(a).) In alleging that U.S. Bank (defined in the agreement as "Trustee") violated contractual duties that it owed to Accident (defined as "Beneficiary") under the Trust Agreement, the Complaint alleges a breach of duties owed to the beneficiary in the administration of the trust.

- ***Breach of Fiduciary (Count 2)***. Accident alleges that U.S. Bank, "due to its special relationship of trust with [Accident], owed [Accident] a fiduciary duty in connection with the collateral and the Trust Accounts [sic] since December 2013." (Compl. ¶ 122.)

- ***Negligence/Gross Negligence (Count 3)***. Accident alleges that "U.S. Bank owed [Accident], as the beneficiary of the Trust Account, a duty to exercise reasonable care in its role as Trustee." (*Id.* ¶ 126.)

- ***Negligent Misrepresentation (Count 4)***. Accident alleges that U.S. Bank misrepresented to Accident the value and nature of the Destra UIT, and "that it was acting as a fiduciary for [Accident]," all in violation of "a duty to use reasonable care when making representations" in U.S. Bank's role as trustee. (*Id.* ¶¶ 130, 132.)

- ***Civil Conspiracy (Count 5)***. Accident alleges that U.S. Bank, which was the trustee of the Trust Account with Accident as the beneficiary, conspired with its subsidiaries and unspecified Southport entities "to withhold assets of the Trust Account from [Accident]." (*Id.* ¶ 137.)

In each instance, as in *Ducharme*, Accident's allegations involve claims that U.S. Bank failed to administer the Trust Account in accordance with its duties to Accident. Accident's claims also echo those in *Regions Bank v. Reed*, 60 So.3d 868 (Ala. 2010). The beneficiaries in *Reed* sued for breach of fiduciary duty, negligence, and fraud, alleging that the trustee knowingly invested assets in conflicted, high-risk transactions. The Alabama Supreme Court held that, labels aside, "all the claims against Regions as trustee involve the maladministration of the assets of the various trusts," and therefore were subject to Alabama's bar on jury trials for breach of trust. *Id.* at 881. The court emphasized: "[T]he fact that the [beneficiaries] have couched some of their claims in terms of torts such as negligence make no difference." *Id.* at 883. *See also United States v. Walters*, 2012 WL 6681825, at *1 (N.D. Okla. Dec. 21, 2012) (construing beneficiary's claim titled "breach of contract and fiduciary duties" as claim for breach of trust under Oklahoma law for purposes of determining right to jury trial) (applying identical definition of "breach of trust"); *Wells Fargo Bank, N.A. v. Cook*, 775 S.E.2d 199, 205-07 (Ga. Ct. App. 2015) (applying breach-of-trust limitations period to claims for breach of fiduciary duty); *In re Thomas Lawrence Reeves Irrevocable Tr.*, 2015 WL 1947360, at *6-8 (Del. Ch. Ct. Apr. 29, 2015) (same).

As in these cases, Accident seeks redress for the trustee's alleged maladministration of trust assets; therefore its claims are subject to the procedural law that governs breach of trust. *See also Evans v. Rite Aid Corp.*, 452 S.E.2d 9, 12 (S.C. Ct. App. 1994) (holding that where the gravamen of the complaint was defamation, the plaintiff "cannot circumvent the statute [of limitations] by

characterizing her claim" as something else), *aff'd as modified on other grounds*, 478 S.E.2d 846 (S.C. 1996).

**B. Accident's Claims Are Barred Under the One-Year Limitations Period for Breach of Trust.**

Reports furnished by the trustee trigger the one-year bar if they "adequately disclosed the existence of a potential claim for breach of trust." S.C. Code Ann. § 62-7-1005(a). The test is whether they provide "sufficient information so that the beneficiary . . . knows of the potential claim ***or should have inquired into its existence***." *Id.* § 62-7-1005(b) (emphasis added). As a matter of law, the information furnished by U.S. Bank satisfied this standard well over a year before Accident filed suit.

Accident was sent multiple reports from U.S. Bank that put it on inquiry notice of potential claims. These reports go to the core of Accident's Complaint. They expressly raised concerns about the Destra UIT and its ability to negotiate the assets without the consent of a third party. For example:

- From January 2014 onward, the account statements notified Accident that the Destra UIT was [redacted] (*See, e.g.*, Ex. 5 at AIC 01-00000136; *see also* Exs. 6-11.)
- The April 2014 account statement included a [redacted] (Ex. 8 at AIC 01-00000157.) The message cautioned: [redacted] (*Id.*)

- In July 2014, after Accident sought to withdraw all assets from the Trust Account, U.S. Bank reported that "additional steps" and "additional paperwork" were required before Accident could withdraw the Destra UIT and Camelot shares. On July 17, 2014, U.S. Bank, through its account manager Judy Staudermann, reported to Accident's CFO Michael Hunter: [redacted] (Ex. 17 at USB_00013252.) On July 23, Ms. Staudermann similarly reported: [redacted] (*Id.* at USB_00013251.) And on July 31, Ms. Staudermann wrote that Accident should speak with the Administrative Agent about the Destra UIT. With respect to Camelot, she reported: [redacted] (Ex. 53.) U.S. Bank followed these reports with account statements reflecting that these assets remained in the Trust Account, even after Accident had requested that they be withdrawn. (*See, e.g.*, Exs. 10, 11.)

Accident's conduct reinforces that it was on inquiry notice from the start—or, at least once Accident reviewed the reports furnished by U.S. Bank. [redacted] (Ex. 17; Hunter Dep. 155:6-157:2.) [redacted] (Hunter Dep. 158:15-159:1.) [redacted] (Ex. 17; Hunter Dep. 155:6-157:2.) According to Mr. Hunter, [redacted] (Hunter Dep. 156:15-19.) Mr. Hunter testified that it was his [redacted]

[redacted] (*Id.* 156:22-157:1.)

Accident's belief intensified in July 2014, after U.S. Bank reported that additional steps and paperwork were necessary for withdrawal of the Destra UIT and Camelot. Mr. Hunter testified: [redacted] (Hunter Dep. 158:11-14.) Bob Arowood—Accident's co-owner, secretary, and treasurer—similarly testified, [redacted] (*See* Arowood Dep. 143:6-144:14.) [redacted] (*Id.* 143:15-19, 144:11-145:2; *see also* Hunter Dep. 151:11-13.) [redacted] (Ex. 21.)

In early 2015—still well over a year before Accident filed this suit—Accident's counsel contacted U.S. Bank to address its potential claims. In part:

- On March 3, 2015, Accident's outside counsel told U.S. Bank that [redacted] (Ex. 23 at USB_00092270.)

- On March 23, 2015, another of Accident's outside counsel advised U.S. Bank: [redacted] … [redacted] (Ex. 22 at USB_00092273.) Accident's counsel referred to the suit Companion had just filed: [redacted]

[redacted] (*Id.*)

- On April 1, 2015, counsel for Accident and U.S. Bank had a conference call. Representing Accident were its general counsel, its Delaware counsel, and its Minnesota counsel. [redacted] (Exs. 25, 26.) [redacted] (Ex. 26.)

- On May 12, 2015, counsel for Accident and U.S. Bank met in Minneapolis. Representing Accident were its general counsel, its Minnesota counsel, and its Nevada counsel. After the meeting, Accident's counsel wrote: [redacted] (Ex. 31 at USB_00092212.) Counsel continued: [redacted] (*Id.*) U.S. Bank provided the requested documents on May 20, 2015. (*Id.* at USB_00092211.)

Accident filed this suit on July 22, 2016—two years after Accident claims it knew, "with certainty," that U.S. Bank allegedly violated its duties as trustee. No later than July 2014, Accident was working with counsel to actively investigate potential claims; by October 2014, Accident was coordinating with other reinsurance trust beneficiaries; and by March 2015, Accident had contacted U.S. Bank to discuss its "claims against U.S. Bank." Each of these events ***took place <u>more than a year</u> before Accident commenced this proceeding.*** Its claims for breach of trust—

under any name—are time-barred. *See, e.g., Wells Fargo Bank, N.A.*, 775 S.E.2d at 204-05 (trustee's reports "adequately disclosed" potential claim where beneficiaries expressed concerns and retained counsel over a year before filing suit); *Ducharme*, 850 N.W.2d at 610 (same). As a result, the Court should grant summary judgment in favor of U.S. Bank on all claims.

## II. ACCIDENT'S CIVIL CONSPIRACY CLAIM ALSO FAILS ON ADDITIONAL GROUNDS (Count 5).

Accident's civil conspiracy claim is time-barred, but it also fails on additional grounds. To prove a civil conspiracy, Accident must establish: "(1) a confederation or combination of two or more parties; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage." *Wavedivision Holdings, LLC v. Highland Capital Mgmt. L.P.*, 2011 WL 5314507, at *17 (Del. Super. Ct. Nov. 2, 2011). A claim for civil conspiracy "is not an independent cause of action; it must be predicated on an underlying wrong." *Id.*

Accident's civil conspiracy claim fails as a matter of law for three reasons. First, Accident has not alleged and cannot prove any underlying wrongs that would support imposing secondary liability on U.S. Bank. Second, U.S. Bank cannot conspire with its wholly-owned subsidiaries. Finally, Accident has not presented any evidence that U.S. Bank had a "meeting of the minds" with its purported co-conspirators to perform unlawful acts in order to withhold trust assets.

### A. Civil Conspiracy Requires Actionable Underlying Wrongs.

Civil conspiracy claims seek to impose secondary liability on "those not a direct party to the underlying wrong." *N.K.S. Distribs., Inc. v. Tigani*, 2010 WL 2178520, at *5 (Del. Ch. May 28, 2010). Thus, Accident must show "some underlying actionable tort" by U.S. Bank's alleged co-conspirators in order "to obtain recovery on a civil conspiracy theory." *Smiley v. Daimler Chrysler*, 538 F. Supp. 2d 711, 718-19 (D. Del. 2008).

Accident cannot make that showing. Accident identifies three alleged co-conspirators: U.S. Bank Trust, U.S. Bancorp Funds Services, LLC[8] ("Funds Services"), and unspecified "Southport entities." (Compl. ¶ 138.) In its Complaint, Accident did not allege the underlying torts committed by U.S. Bank Trust, Fund Services, or the Southport entities. (*Id.* at ¶¶ 137-41.) Discovery has gotten Accident no further. Accident has presented no evidence that any of these entities committed a primary tort that can support a claim of civil conspiracy. Negligence cannot underlie a claim of civil conspiracy. *Anderson v. Airco, Inc.*, 2004 WL 2827887, at *3-4 (Del. Super. Ct. Nov. 30, 2004). Nor can breach of contract. *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009). Similarly, as a matter of Delaware law, fiduciaries cannot conspire among themselves to breach fiduciary duties. *OptimisCorp v. Waite*, 2015 WL 5147038, at *56-57 (Del. Ch. Aug. 26, 2015); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005). Freestanding allegations of unspecified wrongdoing by alleged co-conspirators are sufficient at the pleading stage. They are not on summary judgment.

Additionally, any potentially actionable tort against U.S. Bank Trust, Fund Services, and "Southport entities" would be time-barred. Under Delaware law, the limitations period for causes of action not involving personal injury, like fraud, is three years. 10 Del. C. § 8106. None of the conduct at issue postdates 2014, so any potential underlying tort claim against the alleged co-conspirators is out-of-time and cannot support a claim for civil conspiracy against U.S. Bank. *See Rogers v. Bushey*, 2018 WL 818374, at *7-8 (Del. Super. Ct. Feb. 7, 2018) (dismissing civil conspiracy claim where all underlying torts where time barred).

[8] The Complaint erroneously refers to U.S. Bank Fund Services, LLC, which does not exist. The correct name is "U.S. Bancorp Fund Services, LLC."

### B. Parent Corporations Cannot Conspire with Wholly-Owned Subsidiaries.

Even if Accident tried to plead or prove the required underlying torts, the claim would still fail for lack of a cognizable conspiracy. Civil conspiracy requires "a confederation of combination of *two or more parties*." *Wavedivision Holdings*, 2011 WL 5314507, at *17 (emphasis added). Two of the alleged co-conspirators are U.S. Bank Trust and Fund Services. Each is a wholly-owned subsidiary of U.S. Bank. (Ex. 44.)

As a general rule, a company "cannot be deemed to have conspired with its wholly owned subsidiary, or its officers and agents." *In re Transamerica Airlines, Inc.*, 2006 WL 587846, at *6 (Del Ch. Feb. 28, 2006); *accord Metro Life Ins. Co. v. Tremont Grp. Holdings, Inc.*, 2012 WL 6632681, at *19-20 (Del. Ch. Dec. 20, 2012). This rule ensures there are "two or more persons or entities in a conspiracy" because "[a] corporation cannot conspire with itself any more than a private individual can." *Metro Life Ins. Co.*, 2012 WL 6632681, at *19 (internal quotation marks omitted). The only exception is when "the officer or agent of the corporation steps out of her corporate role and acts pursuant to personal motives." *In re Transamerica*, 2006 WL 587846, at *6.

Accident cannot point to any evidence that the agents of U.S. Bank Trust or Fund Services acted "pursuant to personal motives" outside the normal course of business, and thereby conspired with U.S. Bank. Because U.S. Bank cannot conspire, in effect, with itself, Accident's civil conspiracy claim fails as to U.S. Bank Trust and Fund Services for this reason too.

Even if a parent corporation could conspire with its subsidiaries, Accident's civil conspiracy claim would still be doomed as to U.S. Bank Trust and Fund Services. Accident's original claims against U.S. Bank Trust were for negligence and breach of fiduciary duty—neither of which can support a claim of civil conspiracy. Likewise, with respect to Fund Services,

Accident's sole allegation is that it calculated the net asset value, or "NAV," of the Destra UIT based on the underlying valuations of a Southport entity and relayed the NAV to NASDAQ. (Compl. ¶ 93.) Accident has not alleged, and cannot prove, any duty owed by Fund Services, much less a breach of that duty or other actionable tort that could support a civil conspiracy claim.

### C. There is No Evidence of a Meeting of the Minds Between U.S. Bank and its Alleged Co-Conspirators to Commit an Unlawful Act.

Secondary liability for civil conspiracy is premised on an agreement or "meeting of the minds" between conspirators to perpetrate the unlawful scheme. *See Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 63 (Del. Ch. 2015) ("When secondary liability is premised on an agreement or common design, the theory is typically framed in terms of a 'conspiracy.'"). While the contours of the alleged conspiracy are hazy, the gist is that "U.S. Bank engaged in a scheme . . . to withhold assets of the Trust Account from [Accident]." (Compl. ¶ 137.) Accident's civil conspiracy claim thus requires evidence that U.S. Bank reached "explicit agreement," *Latesco L.P. v. Wayport, Inc.*, 2009 WL 2246793, at *9 n.33 (Del. Ch. July 24, 2009), with its alleged co-conspirators to commit an unlawful fact to further this scheme. (Compl. ¶ 137.)

No such evidence exists. Accident cannot point to any document or testimony that supports, in the slightest, the notion that U.S. Bank reached "explicit agreement" with any Southport entity (much less its wholly-owned subsidiaries, U.S. Bank Trust and Fund Services) to withhold assets from Accident. Delaware courts have cautioned that, at the summary judgment stage, "bare allegations supported by no more than speculation and innuendo" will not sustain a civil conspiracy claim. *See, e.g.*, *Lipson v. Anesthesia Servs., P.A.*, 790 A.2d 1261, 1288-90 (Del. Super. Ct. 2001) ("Plaintiffs' 'belief' or bare allegation that a conspiracy was in the works is not sufficient to survive a motion for summary judgment."). So too here.

## III. ALTERNATIVELY, U.S. BANK IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON THE AMOUNT OF ACCIDENT'S MAXIMUM ACTUAL DAMAGES, IF ANY.

Putting to the side that Accident cannot establish liability on the part of U.S. Bank, alternatively U.S. Bank is now entitled to a ruling on summary judgment that Accident's actual damages, if any, [redacted]. *See, e.g.*, *Clean Harbors, Inc. v. Union Pac. Corp.*, 2017 WL 1175664, at *4-5 (Del. Super. Ct. Mar. 28, 2017) (granting partial summary judgment to exclude damages of markups, lost profits, or lost opportunities); *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 2010 WL 1380252, at *4-5 (Del. Super. Ct. Apr. 8, 2010) (granting partial summary judgment to set out the measure of damages for personal and real property losses).

### A. Accident's Damages Are Limited to Its Out-of-Pocket Losses Resulting From a Lack of Proper Collateral.

Accident alleges that U.S. Bank wrongfully allowed Freestone and its affiliated investment advisor to deplete the Trust Account of valuable and marketable assets in exchange for securities that were valueless and were prohibited from entering the Trust Account. As a result, Accident alleges that it was "denied access to adequate collateral for the Program Agreement. The purpose of the Trust Account of [Accident] with U.S. Bank was to protect [Accident] in the event Freestone failed to meet its obligations under the agreements between [Accident] and Freestone." (Compl. ¶ 113; *see also, e.g.*, Hunter Dep. 104:24-105:3.) Accident's allegations continue: "Because the Destra Funds are worthless, [Accident] now must pay claims from its own funds that otherwise would be paid by the funds in the Trust Account." (Compl. ¶ 114.)

As a matter of law, if liability could be established, Accident's actual damages would be limited to its out-of-pocket losses resulting from a lack of proper collateral. The assets in the Trust Account are collateral that was deposited by Freestone to secure its reinsurance obligations to

Accident.[9] The Trust Agreement provides that Accident may use the collateral only "to pay or reimburse [itself] for [Freestone's] share under the reinsurance secured hereby for any losses and allocated loss expenses paid by [Accident] but not recovered from [Freestone]." (TA § 4(a)(i).)[10] If the collateral exceeds the amount required to fund these obligations of Freestone, Accident must return the excess to Freestone. (TA § 4(a)(ii).)

Accident thus incurs harm only to the extent there is a collateral shortfall and it must make out-of-pocket payments for policy liabilities that should have been secured. In this sense, Accident is akin to a mortgage lender who is entitled to use the proceeds from the sale of a home to pay off the borrower's loan obligations, but has no right to the proceeds to the extent they exceed the loan obligation. (*See* Hart Rep. ¶ 164; *see also id.* ¶¶ 162-66.) The mortgage lender suffers loss only if the home sale proceeds are not enough to cover the balance. The same is true here: Accident suffers loss only if the collateral is not enough to cover program liabilities that Accident must pay out-of-pocket. *See, e.g., Fin. Cas. & Sur., Inc. v. Zouvelos*, 2017 WL 1184106, at *17 (E.D.N.Y. Mar. 29, 2017) (where plaintiff alleged that defendant mishandled and wrongfully depleted collateral, measuring damages by the amount of collateral shortfall compared to plaintiff's outstanding obligations to indemnitors); *Israel Discount Bank of N.Y. v. First State Depository Co., LLC*, 2013 WL 2326875, at *23-24, *27 (Del. Ch. May 29, 2013) (where plaintiff alleged the wrongful release and conversion of loan collateral, measuring damages by amount of collateral shortfall compared to outstanding loan balance).

---

[9] Even Roy Strickland, Accident's proffered damages expert, acknowledges that the assets are "collateral for the Fronting Program." (ECF No. 135-1, Strickland Rep. at 5; *see also id.* at 3, 5-7.)

[10] Accident also may use the collateral to pay for Freestone's share or unearned premiums. (TA § 4(a)(i).) [redacted] (*See* Robinson Dep. 148:8-150:8; Hart Rep. ¶¶ 77-79, 165 n.291.)

**B. Accident's Actual Damages As of Today Are Zero.**

The record establishes that Accident's damages as of today are zero. No reasonable fact-finder could find otherwise. These facts are undisputed:

[redacted] Fronting Program and directly received all premium payments.

[redacted]

Accident's only response has been to deny, without supporting evidence, that it actually collected the earned premiums that it recorded after taking over the Fronting Program. Accident instead asserts that it deposited all premium collections into one designated account at Regions Bank (the "'2255 account"), which it then used solely to pay premium refunds. (Ex. 49, Ans. to Interrog. 6.) Accident alleges that the '2255 account ran a net deficit of $182,244. (*Id.*) But Accident presents no evidence to explain why, or how, it did not collect the $2.72 million of earned premium that it consistently recorded in its authenticated business records. (*See, e.g.*, Ex. 51 at RFA Resp. 25-26, 33-34, 87-88.)

Accident relies exclusively on bank statements and canceled checks from the '2255 account to prove that it refunded over $182,000 more in premiums than it collected. Accident's own evidence is to the contrary. First, it is undisputed that Accident used the account for purposes

other than premium refunds—[redacted]. (Ex. 37 (Dilworth Paxson invoice); Ex. 45 (checks to US Administrator Claims and Dilworth Paxson); *see also* Arowood Dep. 38:20-39:22.)

Second, it is undisputed that Accident's own record of premium collections exceeds the deposits in the '2255 account, so the account deposits cannot establish premium collections. Specifically, Accident's record of premium collections for the Fronting Program for the period January 31 to December 31, 2015, [redacted]. (Ex. 34; *see also* Robinson Dep. 119:3-16.) Based on Accident's own documents, the '2255 account statements do not reflect all premiums collected on the Fronting Program. [redacted] (Ex. 35, p. 5 & Tab 2015.12 Input Dallas 079.)

Finally, Accident's former CFO (Michael Hunter) and its former Director of Financial Reporting and Compliance (Robbie Robinson) testified that [redacted] (Hunter Dep. 45:5-46:22, 220:24-221:5; Robinson Dep. 91:1-92:12, 93:6-99:25.) Robinson further testified that [redacted]. (Robinson Dep. 117:11-118:12.) Despite repeated requests, Accident has produced none of these documents.

Instead, [redacted] Accident has offered no evidence that it did not collect this full amount, and the only premium collection records that

Accident has produced corroborate that Accident actually collected the earned premium it recorded. Accident's mere denials are not sufficient to avoid summary judgment: the undisputed evidence therefore establishes that Accident's actual damages as of today are zero.

### C. Accident Cannot Establish Actual Damages Going Forward Beyond the Amount Set Forth in the Hart Report.

Accident has not presented an estimate of future damages that is based on something other than speculation, and therefore Accident cannot demonstrate that it is entitled to damages other than the amount set forth in the Hart Report. "[W]hen acting as the fact finder, this Court may not set damages based on mere speculation and conjecture where a plaintiff fails adequately to prove damages." *OptimisCorp*, 2015 WL 5147038, at *82 (refusing to award damages based on projections that are speculative and generally unreliable) (internal quotation marks and citation omitted). "Responsible estimates that lack mathematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages. Speculation is an insufficient basis, however." *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *15 (Del. Ch. Oct. 23, 2002) (internal quotation marks and citation omitted); *see also Frontier Oil Corp. v. Holly Corp.,* 2005 WL 1039027, at *39 (Del. Ch. Apr. 29, 2005) ("A prevailing party must prove its damages by preponderance of the evidence; absolute precision is not required but the proof may not be speculative either.")

Accident may incur damages in the future only if the payments it makes on the policies going forward exceed its collateral cushion. The anticipated liabilities going forward consist of two components: (1) the known case reserves that have been set aside to pay existing claims; and (2) IBNR, the anticipated payments to be made on unreported claims. [redacted]

[redacted][11] [redacted]

(Hunter Dep. 25:11-28:6, 226:4-11; *see also* Robinson Dep. 112:10-22, 127:9-128:7.) The only evidence in the record of IBNR is as of December 31, 2017—which does not account for claims paid in 2018 and Accident's updated case reserves. Accident's outside actuaries have not analyzed and opined on IBNR since December 31, 2017, and the independent report and analysis required by Accident's regulators in the ordinary course of business will not be prepared until months into 2019. [redacted] (*Compare* Hart Rep. ¶¶ 27, 193-198 & App'x E.)

[redacted], would be pure speculation and conjecture, and therefore fails as a matter of law. *See, e.g.*, *Medicalgorithmics S.A. v. AMI Monitoring Inc.*, 2016 WL 4401038, at *27-28 (Del. Ch. Aug. 18, 2016) (rejecting plaintiff's lost sales and lost service fees estimates as speculative); *Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179, at *12-13 (Del. Ch. Oct. 10, 2014) (awarding nominal damages of $1.00 where the plaintiffs failed to prove non-speculative damages). Because Accident cannot present an estimate of future losses that is based on something other than speculation, this Court should hold, as a matter of law, that U.S. Bank cannot be liable for an amount in excess of that set forth in the Hart Report.

---

[11] [redacted]

## CONCLUSION

This Court should grant summary judgment in favor of U.S. Bank on all of Accident's claims, or grant partial summary judgment to U.S. Bank setting the maximum amount of Accident's actual damages.

Dated: November 2, 2018

Respectfully submitted,

By: /s/ *Meliah Bowers Jefferson*

**WYCHE, P.A.**

Wallace K. Lightsey (Fed. ID 1037)
Meliah Bowers Jefferson (Fed. ID 10018)
44 East Camperdown Way
Greenville, SC 29601
Phone: (864) 242-8200; Fax: (864) 235-8900
Email: wlightsey@wyche.com
mjefferson@wyche.com

Alice W. Parham Casey (Fed. ID 9431)
801 Gervais Street, Ste. B
Columbia, SC 29201
Phone: (803) 254-6542; Fax: (803) 254-6544
Email: tcasey@wyche.com

**DLA PIPER LLP (US)**
Michael M. Krauss (*pro hac vice*)
Peter J. Farrell (*pro hac vice*)
80 South Eighth Street, Suite 2800
Minneapolis, MN 55402-2103
Phone: (612) 524-3000; Fax: (612) 524-3001
Email: michael.krauss@dlapiper.com
peter.farrell@dlapiper.com

**FAEGRE BAKER DANIELS LLP**

Julie R. Landy (*pro hac vice*)
90 South Seventh Street, Suite 2200
Minneapolis, MN 55402-3901
Phone: (612) 766-7000; Fax: (612) 766-1600
Email: julie.landy@FaegreBD.com

***Attorneys for Defendant U.S. Bank National Association***