IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| ACCIDENT INSURANCE COMPANY, INC., A SOUTH CAROLINA CORPORATION, | ) ) ) | Civil Action No. 3:16-cv-2621-JMC |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| U.S. BANK, NATIONAL ASSOCIATION, | ) ) | **ACCIDENT INSURANCE COMPANY'S RESPONSE MEMORANDUM IN OPPOSITION TO U.S. BANK NATIONAL ASSOCIATION'S MOTION FOR SUMMARY JUDGMENT** |
| Defendant, | ) ) | |
| U.S. BANK, NATIONAL ASSOCIATION, | ) ) | |
| Third-Party Plaintiff, | ) ) | |
| v. | ) ) | |
| SOUTHPORT LANE ADVISORS, SOUTHPORT SPECIALTY FINANCE, ADMINISTRATIVE AGENCY SERVICES, and ALEXANDER CHATFIELD BURNS, | ) ) ) ) | |
| Third-Party Defendants. | ) ) | |
| _____ | ) | |

Plaintiff Accident Insurance Company, Inc. ("Accident" or "Plaintiff") respectfully submits this response memorandum of law in opposition to Defendant U.S. Bank National Association's ("U.S. Bank" or "Defendant") Motion for Summary Judgment (ECF No. 159). In the alternative, Accident requests time to supplement and/or file a sur-reply on December 28, 2018, which is seven (7) days after Defendant's Reply brief is due. This alternative relief is requested because two liability witness depositions were cancelled so that the parties could discuss settlement, and the proposed date for rescheduling is next week. Those depositions would provide additional evidence to support Plaintiff's opposition to the pending motion, including the civil conspiracy sections of Defendant's brief.

## SUMMARY OF OPPOSITION

Defendant asks the Court to grant summary judgment in its favor on all of Plaintiff's claims, or alternatively to grant *partial* summary judgment, setting the maximum amount of Plaintiff's damages. (ECF 159-1, p. 1). For the reasons summarized below, this relief should be denied.

First, Defendant argues Plaintiff's causes of action for breach of contract, breach of fiduciary duty, negligence/gross negligence, negligent misrepresentation, and civil conspiracy are barred by the one-year statute of limitations found in section 62-7-1001(a) of the South Carolina Trust Code (the "Trust Code"). (*Id.* at p. 15-22). As set out in Legal Argument Section I.A. below, this argument overlooks one very important part of the Trust Code: the scope provision found in S.C. Code Ann. § 62-7-102 ("This article . . . does not apply to . . . custodial arrangements, business trusts providing for certificates to be issued to beneficiaries, common trust funds, voting trusts, security arrangements, liquidation trusts, and trusts for the primary purpose of paying debts . . . or any arrangement under which a person is nominee or escrowee for another."). Even if the Trust Code's statute of limitations did apply to a reinsurance collateral trust, the trust account statements Defendant mailed to Plaintiff were not "reports" under S.C. Code § 62-7-1005(a) (the one year limitations period is only applicable where the trustee provides the beneficiary with a "report that adequately disclosed the existence of a potential claim for breach of trust.")

Second, Defendant asserts three reasons Plaintiff's cause of action for civil conspiracy fails, even if timely filed. Initially, Defendant argues there is no allegation and proof of "some underlying actionable tort" by the alleged co-conspirators; however, as set out in the Legal Argument Section II.A below, Defendant overlooks (a) this Court's prior Order finding the civil

conspiracy claim is properly pled;[1] (b) Delaware cases that hold underlying wrongs do not have to be expressly included as a separate cause of action to support imposing secondary liability on the Defendant;[2] and (c) evidence set out in the fact sections below fully supports the "combination of two or more parties" and the "meeting of the mind" elements of the civil conspiracy claim. Delaware law clearly states that Plaintiff does not need to prove the existence of an explicit agreement; a conspiracy can be inferred from the pled behavior of the alleged conspirators.[3] Further, Defendant argues that conspiracies cannot exist between related entities; however, as set out in the Legal Argument Section II.B below, Delaware courts have expressly rejected the argument that entities with common ownership can never conspire illegally with one another.[4]

Finally, Defendant argues it is entitled to partial summary judgment on the amount of Plaintiff's damages;[5] however, as set out in the Legal Argument Section III below, this argument overlooks the fact that stringent requirements of causation and damages area are often loosened when breaches of a fiduciary relationship are involved.[6] Plaintiff's damages are not limited to out-of-pocket losses resulting from lack of proper collateral, and the damages as of today are definitely

---

[1] *Compare* Defendant's Memorandum, ECF 159-1, pp. 23-24 with this Court's Order and Opinion Granting in Part and Denying in Part Motion for Leave to File First Amended Complaint, ECF 142, pp. 10-11 (Court held ¶¶ 137-141 of the proposed Amended Complaint properly alleged civil conspiracy.)

[2] *See Szczerba v. Am. Cigarette Outlet, Inc.*, C.A. No. N13C-09-080, 2016 WL 1424561 at * 4 (Del. Super. Apr. 1, 2016). In fact, allegations that companies worked together to suppress knowledge is, in and of itself, a sufficient underlying wrong to sustain a civil conspiracy cause of action under Delaware law. *Nut v. A.C. & S. Co., Inc.*, 517 A.2d 690, 695 (Del. Super. 1986).

[3] *CMS Inv. Holdings, LLC v. Castle*, C.A. No. 9468-VCP, 2015 WL 3894021 at *22 (Del. Chanc. June 23, 2015).

[4] *See Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1038 n.37, 2044-45 (Del. Chanc. 2006).

[5] *See* ECF 159-1, pp. 27-31.

[6] *Thorpe by Castleman v. CERBCO*, 676 A.2d 436, 445 (Del. 1996) (citing *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994) ("breaches of a fiduciary relationship in any context compromise a special breed of cases that often loosen normally stringent requirements of causation and damages")).

not "zero."  Defendant is also not entitled to partial summary judgment on Plaintiff's *future* damages. (ECF 159-1, pp. 31-32). As described in Roy Strickland's Supplemental Report submitted under seal with this filing, Plaintiff's damages are not speculative.  Thus, the issue of AIC's damages is one for trial and will be the subject of live testimony from fact witnesses, Brian LaPage (SIGMA actuary) and Roy Strickland (damage expert). Plaintiff  offered to schedule the deposition of these witnesses, but Defendant has not attempted to depose them.

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A genuine question of material fact exists where, after reviewing the record as a whole, the court finds a reasonable jury could return a verdict for the non-moving party. *Newport News Holdings Corp. v. Virtual City Vision*, 650 F.3d 423, 434 (4th Cir. 2011).

When ruling on a summary judgment motion, a court must view the evidence in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990). All that is required to survive summary judgment is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249.

## FACTUAL BACKGROUND

### A. Defendant's 2015 Consent Decree with the Office of the Comptroller of the Currency.

On October 23, 2015, the United States of America Department of Treasury, Office of

the Comptroller of the Currency rendered a Consent Order, finding that U.S. Bank:

1. Has deficiencies in its BSA/AML compliance program resulting in a violation of 12 U.S.C. § 1818(s) and 12 C.F.R. §§ 21.11 and 21.21;

2. Possesses an inadequate system of internal controls, ineffective independent testing, inadequate training, and systemic deficiencies in its transaction monitoring systems and customer due diligence processes; and

3. Failed to identify certain suspicious activity by its customers.[7]

The Consent Order further required that U.S. Bank submit a Comprehensive BSA/ALM Action

Plan that specified timelines for the completion of the following remedial measures:

- An enterprise-wide assessment, independent testing, and audit of AML risk;

- Development of a comprehensive, risk-based approach to quantifying BSA/AML risk for new and existing customers;

- Development of appropriate customer due diligence policies, procedures, processes, and training commensurate with the customer's risk profile sufficient for U.S. Bank to develop an understanding of normal and expected behavior of the customer;

- Maintenance of an electronic due diligence database that is readily accessible to the relationship manager or other parties responsible for the customer relationship, complete with suspicious activity monitoring, alert analysts and investigators, quality control and assurance personnel, and regular updates of customer behavior and profile;

- Creation of a specialized or enhanced due diligence process for higher risk clients and/or products and services;

---

[7] **Ex. 1**, OCC Consent Order, dated October 23, 2015, pp. 2, 7-8.

- Periodic reviews of each customer relationship by type, volume, and value;

- Maintenance of surveillance and transaction monitoring that aggregates data across varying platforms, lines of business, and relationships; and

- Implementation of an alert investigation process that ensures the adequacy of staffing to investigate and clear alerts, the availability and adequacy of information to investigate potential suspicious activity, and identification of high volume activity. [8]

This Consent Decree and the testimony of U.S. Bank managers and officers (as described on pages 13-21 below) provides the link between the allegations in the Amended Complaint and the causation of harm to trust beneficiaries, like Plaintiff. But for Defendant's deficiencies and failures described in the OCC Consent Decree, Dallas National Insurance Company could have never been purchased by Alexander Burns, and therefore, Burns would have had no control over the collateral removed from and placed in Plaintiff's reinsurance trust account. Roy Strickland, Plaintiff's damage expert, fully explains how the damages are calculated and supported by admissible facts that are not speculative in the Legal Argument, Section III below. Despite the stringent requirements of the OCC Consent Decree, testimony taken in this case indicates no

**B. Defendant's 2018 Deferred Prosecution Agreement and Statement of Facts Admitted to the United States Department of Justice.**

The culture within Defendant U.S. Bank, was one that "willfully" fail[ed] to maintain an adequate anti-money laundering ("AML") program, in violation of Title 31, United States Code,

---

[8] *Id.* at pp. 9-14.

[9] **Ex. 9**, Deposition of Ronald Richter dated November 14, 2018, pp. 35-39; **Ex. 10**, Deposition of Frank Bradley dated July 25, 2018, pp. 11-33; **Ex. 11**, Deposition of Judy Stauderman dated July 18, 2018, pp. 53, 83-86, 130-131.

Sections 5318(h) and 5322(a) and (c) and Title 31, Code of Federal Regulations, Section 1020.210.[10] "From at least in or about 2009, and continuing until 2014, the Defendant admits it *willfully failed* to establish, implement and maintain an adequate AML program. Among other things, U.S. Bank National Association capped the number of alerts generated by its transaction monitoring systems based on staffing levels and resources . . . . The Bank's then Chief Compliance Officer concealed the Bank's practices from the Office of the Comptroller of the Currency ("OCC"), the Bank's primary regulator."[11]

For all of the relevant period in the present litigation, U.S. Bank "had only 25-30 AML investigators. Apart from investigators added as a result of acquiring other banks, USB did not increase substantially its number of investigators. As late as 2012, when USB had over $340 billion in assets, the Bank had 32 investigators. *** [U.S. Bank also] filled key compliance roles, including policy-making and transaction monitoring positions, with individuals who, by their own admission, lacked experience."[12]

"Regulatory guidance in effect during the relevant time period provided that the cornerstone of a strong AML program is the adoption and implementation of comprehensive customer due diligence ("CDD") policies, procedures, and processes for all customers, particularly those that present a higher risk for money laundering. Effective CDD policies, procedures and processes enable the bank to predict with relative certainty the types of transactions in which a

---

[10] See **Ex. 2**, Deferred Prosecution Agreement between the United States Attorney's Office for the Southern District of New York and U.S. Bancorp, dated February 12, 2018, with accompanying Exs A-C.

[11] *Id.* at Ex. C, ¶¶1,5 (Statement of Facts).

[12] *Id.,* ¶ 13.

customer is likely to engage, comply with regulatory requirements and report suspicious activity."[13]

> The Deferred Prosecution Agreement states in pertinent part:
>
> USB, having truthfully admitted to the facts in the Statement of Facts, agrees that it shall not, through its attorneys, agents, or employees, make any statement, in litigation or otherwise, contradicting the Statement of Facts or its representations in this Agreement. Consistent with this provision, USB may raise defenses and/or assert affirmative claims in any proceedings brought by private and/or public parties **so long as doing so does not contradict** the Statement of Facts or such representations. **Any such contradictory statement by USB, its present or future attorneys, agents, or employees** shall constitute a violation of this Agreement and USB thereafter shall be subject to prosecution . . . ."[14]

These admissions are the cornerstone of Plaintiff's claims because Alexander C. Burns would never have been able to get away with his scheme without Defendant's willful failures as described in the Statement of Facts of the Deferred Prosecution Agreement. Defendant cannot deny the material facts set out in **Exhibit 2** without violating its prosecution agreement with the United States Department of Justice.

This 2018 Deferred Prosecution Agreement along with the testimony of U.S. Bank managers and officers provides another link between the allegations in the Amended Complaint and the causation of harm to trust beneficiaries, like Plaintiff. But for Defendant's *willful failures* described in the Deferred Prosecution Agreement, Dallas National Insurance Company could have never been purchased by Alexander Burns, and therefore, Burns would have had no control over the collateral removed from and placed in Plaintiff's reinsurance trust account.

---

[13] See **Ex. 2**, at Ex. C, ¶10

[14] See **Ex. 2**, Deferred Prosecution Agreement between the United States Attorney's Office for the Southern District of New York and U.S. Bancorp dated February 12, 2018, at page 5, ¶16.

## C. Alexander Burns' 2018 Consent Judgment and Complaint filed by the United States Security and Exchange Commission.

According to a Consent Judgment and Complaint recently filed by the United States Securities and Exchange Commission, Alexander C. Burns and Andrew B. Scherr violated federal securities law by engaging in multiple schemes to defraud their advisory clients, which were insurance companies and reinsurance trusts. *See Securities and Exchange Commission v. Alexander Burns*, 18-cv-9477 (S.D.N.Y October 16, 2018).[15] Just a few days after the enforcement action was filed, the Honorable Lorna G. Schofield, U.S. District Judge for the Southern District of New York, entered Final Judgment against Alexander Burns that enjoined him from future violations of federal securities laws and ordered that he pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty.[16] The Consent of Alexander Burns was attached to the Judgment and precludes Burns from arguing that he did not violate the federal securities laws as alleged in the Complaint.[17]    Therefore, the below SEC allegations (as consented to by Burns) are relevant to this litigation.

As part of their underlying schemes, Burns acquired control over the investment funds of five insurance companies and seven reinsurance trusts.[18] He then fraudulently caused these entities to transfer over $300 million in cash to companies controlled by Burns in exchange for essentially worthless or grossly overvalued securities created by or at the direction of the Burns with the assistance of U.S. Bank. He then fraudulently diverted millions of dollars for his own use,  resulting

---

[15]  **Ex. 3**, *Securities and Exchange Commission v. Alexander Burns*, 18-cv-9477 (S.D.N.Y October 16, 2018), SEC Complaint, Judgment, and Consent to Judgment.

[16]  *Id*. at Burns Judgment, pp. 3-4.

[17]  *Id.* at Consent, pp. 2 and ¶ 12.

[18]  *Id.* at SEC Complaint, at ¶ 1.

in one or more insurance companies having insufficient assets to pay their policy holders' claims and being placed into receivership after the scheme imploded.[19]

Burns used two investment entities to perpetrate the schemes.[20] Burns was the majority owner and control person of Southport Lane Management, LLC ("SLM"), a private equity firm based in Manhattan, New York and Southport Lane Advisors, LLC ("SLA"), a registered investment adviser and wholly owned subsidiary of SLM with offices in Manhattan, N.Y. and Seattle, Washington.[21] For most of the relevant period, Scherr was a minority owner of SLM and SLA. In February 2014, Scherr became the majority owner of SLM and SLA when Burns divested himself of his interests in SLM and SLA.[22]

According to the SEC, the schemes involved three phases.[23] First, SLM acquired majority interests in one or more insurance companies, including Freestone Insurance Company, formerly known as Dallas National Insurance Company, and acquired control of the funds in one or more separate reinsurance trusts with which those insurance companies had reinsurance relationships. SLM acquired the controlling interests in a number of these insurance companies, including Freestone, by either selling them asset-backed securities of questionable, if any, value, or by surreptitiously using the funds controlled by one insurance company to acquire controlling interests in another insurance company.[24]

---

[19] *Id.*

[20] *Id.* at ¶ 2.

[21] *Id.*

[22] *Id.*

[23] *Id.* at ¶ 3.

[24] *Id.* at SEC Complaint, at ¶ 3

Second, Burns and SLM directed the insurance companies, like Freestone, and reinsurance trusts that SLM now controlled to enter into investment management agreements with SLA.[25] The investment management agreements allowed SLA to make investment decisions for, and gain control over, the capital reserve assets of these insurance companies and reinsurance trusts (collectively, the "Advisory Clients").[26]

Third, Burns, with the assistance of Andrew Scherr, raided those insurance companies of their funds through a variety of fraudulent transactions and misrepresentations and omissions of material fact.[27] Scherr assisted Burns, in part, by using entities he was affiliated with to acquire assets that were either worthless or greatly overvalued. Burns, through SLM, then transferred the assets provided by Scherr and others into a series of asset-backed securities and unit investment trusts (collectively the "Southport Securities").[28] Burns, through an SLM affiliate, Administrative Agency Services, Inc. ("AAS"), then created grossly overstated valuations for the Southport Securities and, through SLA, caused these overvalued, illiquid securities to be sold to the Advisory Clients. *Id.* The Defendant was intimately familiar with Burns' purchase of Dallas

███████████████████████████████████

SLA failed to disclose to the Advisory Clients that the Southport Securities were created by, and originally owned by SLM, or its affiliates, and that the assets were valued by an SLM

---

[25] *Id.* at ¶ 4

[26] *Id.*

[27] *Id.* at ¶ 5.

[28] *Id.*

[29] **Ex. 4**, PowerPoint Presentation saved by Defendant as "Beaconsfield Structuring Discussion – 12 Sept 2013.pptx, Last Modified Date:  9/13/13.

affiliate, AAS.[30] These undisclosed, related party transactions, often involving fraudulently overvalued or essentially worthless, illiquid securities, were in direct contravention of the terms of SLA's investment management agreements with the Advisory Clients, were in breach of SLA's fiduciary duties to its Advisory Clients and were otherwise in violation of the securities laws.[31]

For example, in one scheme, Scherr caused a company with which he was affiliated to purchase an interest in a painting of questionable authenticity for approximately $15 million; his affiliated company then sold its interest in the painting to a SLM affiliate for $40 million.[32] Burns, through AAS, then transferred the SLM affiliate's interest in the painting into the unit investment trusts, and valued the interest in the painting at $128 million. *Id.* Burns, through SLA, then sold these overvalued unit investment trusts to SLA's Advisory Clients, thereby fraudulently obtaining approximately $175 million from SLA's Advisory Clients. *Id.*

In another scheme, Scherr helped create a company for the purpose of acquiring what he claimed was $100 million worth of stock in a private fiber optic company in exchange for $80 million in promissory notes.[33] The owner of the fiber optic company considered the company to be worth no more than $10 million. Scherr and Burns, through a SLM affiliate, acquired Scherr's company's interest in the private company for $80 million in promissory notes. *Id.* Burns, retaining the unsupportable value of $100 million for SLM's interest in the private company, contributed that interest into a fourth and fifth series of unit investment trusts. Burns, through SLA, also sold

---

[30] **Ex. 3**, SEC Complaint, at ¶ 6.

[31] *Id.*

[32] *Id.* at ¶ 7.

[33] *Id.* at ¶ 8.

these overvalued unit investment trusts to SLA's Advisory Clients, thereby fraudulently obtaining approximately $112 million from SLA's Advisory Clients.[34]

Through the conduct described above, Burns and Scherr fraudulently diverted more than $300 million of SLA's Advisory Client's funds.[35] Additionally, SLM and SLA collected over $8 million in investment management and advisory fees from the Advisory Clients. *Id.* These fees were based typically on 1.5% of the inflated asset values in the Advisory Clients' accounts.[36] Burns used the proceeds of the fraudulent securities transactions to make payroll, transfer large sums of money to himself and Scherr, and to acquire new investment opportunities to continue to grow SLM's business.[37]

The SEC Complaint, Judgment and Consent to Judgment when reviewed in combination with the Defendant's OCC Consent Decree, Deferred Prosecution Agreement and the testimony of Bank managers and officers (as described below) provides ample material facts, and details concerning actionable underlying wrongs that occurred in this case.

### D. In 2011 and 2012, Defendant Aggressively Courted Alexander Burns and Southport as a Client for the Bank's Various Lines of Business.



---

[34] **Ex. 3**, SEC Complaint, at ¶ 6.

[35] *Id.* at ¶ 10

[36] *Id.*

[37] *Id*

[38] **Ex. 5**, E-mail Correspondence between Burns and Woodcock, dated August 05, 2011.



[redacted]

[39] **Ex. 6**, E-mail Correspondence between Woodcock and Bradley, dated August 09, 2011

[40] *Id.* at E-mail Correspondence between Burns and Woodcock, dated August 09, 2011.

[41] **Ex. 7,** E-mail Correspondence between Burns and Woodcock, dated September 07, 2011.

[42] **Ex. 8**, E-mail Correspondence between Burns and Woodcock, dated September 16, 2011.

[43] **Ex. 9**, Deposition of Ron Richter dated November 14, 2018, at pp. 23-25.

[44] **Ex. 12**, E-mail Correspondence between Burns and Woodcock, dated October 13, 2011.



[redacted]

[45] **Ex. 13**, E-mail Correspondence between Burns and Woodcock, dated December 01, 2011.

[46] **Ex. 14**, E-mail Correspondence between Burns and Bradley, dated December 19, 2011 (emphasis added).

[47] **Ex. 15**, E-mail Correspondence between Burns and Woodcock, dated April 12, 2012.

[48] **Ex. 16**, E-mail Correspondence between Woodcock and Harrison, dated May 14, 2012.

[49] **Ex. 17**, E-mail Correspondence between Burns and Woodcock, dated August 14, 2012.

**E. Defendant Knew Destra UITs Had Negotiability Problems in 2012.**

[redacted]

---

[50] **Ex. 19**, E-mail Correspondence between Tom Hale and Robert McGraw, dated October 2, 2012.

[51] **Ex. 18**, Destra Target Income Unit Investment Trust Standard Terms and Conditions Trust Agreement, Article V, Section 5.01(b).

[52] **Ex. 20**, *Companion* case deposition of Vincent Paglio, pp. 145-46.

[53] **Ex. 20**, *Companion* case deposition of Vincent Paglio, pp. 73, 76-79.



[redacted]

[54] **Ex. 18**, Destra Standard Terms and Conditions Trust Agreement, Article V, Section 5.03, *SEC*.gov's description of Securities Act of 1933.

[55] **Ex. 20**, *Companion* Deposition of Vincent Paglio, pp. 189, 252.

[56] *Id.* at pp. 312-313.

[57] **Ex. 21**, Destra's Form N-8B-2 Filing with the SEC, Section II (a).

[58] *Id.* at 11, 16.



[redacted]

### F. The Conspiracy Unfolds – Agreement Between Two or More Persons

[redacted]

[59] **Ex. 22**, Bradley's IT&C Call Report, dated February 05, 2013.

[60] **Ex. 23**, E-mail correspondence between Bradley and Burns, dated April 19, 2013.

[61] **Ex. 24**, *Companion* Deposition of Franklin Bradley, page 194.



[redacted]

**G. Testimony of Bank Managers and Officers Reveals Willful Failures Described in the OCC, DOJ, and SEC Filings.**

[redacted]

[62] **Ex. 25**, E-mail Correspondence between Ruby and McGraw, dated November 27, 2013.

[63] **Ex. 26**, E-mail Correspondence between Kerr and Dolan, dated April 26, 2014, reflecting only the accounts that Southport Lane and/or its related entities and subsidiaries held.



[redacted]

[64] **Ex. 24**, *Companion* case Deposition of Frank Bradley, pp. 29-30.

[65] *Id.* at page 166, ll. 4-9; *see also* **Ex. 27**, E-mail Correspondence between U.S. Bank Risk Management and Bradley, dated November 27, 2012 (reflecting a downgrade of risk to “medium” for the Southport Lane relationship).

[66] **Ex. 24**, *Companion* case Deposition of Franklin Bradley, page 50.

[67] **Ex. 9**, *Companion* case Deposition of Ronald Richter, page 41, lines 16-19.

[68] *Id.* pp. 45, ll. 10-24.



[redacted]

[69] **Ex. 28**, *Companion* case Deposition of Lawrence Woodcock, page 100.

[70] *Id.* at page 77, ll. 18-23.

[71] **Ex. 20**, *Companion* case Deposition of Vincent Paglio, page 18, 22.

[72] *Id.* at page 42.

[73] *Id.* at page 52

[74] **Ex. 29**, *Companion* case Deposition of Robert Ruby, page 111.

[75] *Id.* at page 277.

## LEGAL ARGUMENTS

### I.     PLAINTIFF'S CLAIMS ARE NOT TIME-BARRED.

#### A. The One-Year Statute of Limitations in the South Carolina Trust Code Does Not Apply to Plaintiff's Causes of Action.

Defendant asserts—without any reference to South Carolina precedent—that Plaintiff's causes of action are really just one claim for "breach of trust," and thus governed by the South Carolina Trust Code's one-year statute of limitations set out at S.C. Code Ann. § 62-7-1005 (Limitation of action against trustee). This assertion ignores the scope provision of the Trust Code. S.C. Code Ann. § 62-7-102 states, "This article . . . does not apply to . . . custodial arrangements, business trusts providing for certificates to be issued to beneficiaries, common trust funds, voting trusts, **security arrangements**, liquidation trusts, and **trusts for the primary purpose of paying debts** . . . ." (emphasis added).

The Trust Agreement clearly states that "the Beneficiary [Plaintiff] desires the Grantor [DNIC/Freestone] to **secure payments** of all amounts at any time and from time to time **owing by the Grantor to the Beneficiary** . . . ."[76] The trust at issue in this case involves a security agreement and/or a trust for the primary purpose of paying debts. For that reason, none of the causes of action against Defendant are  subject to the one-year limitation period of the Trust Code.

The only support U.S. Bank can muster for its argument are a handful of out-of-state cases. However, none of those cases involved a trust that was expressly excluded from those state's Trust Codes.   Thus, the Court should deny Defendant's motion for summary judgment that based on the scope of the Trust Code's statute of limitations.

_____

[76] *See* ECF 159-4, Trust Agreement (emphasis added).

**B. Even if the Trust Were Within the Scope of the Trust Code, Defendant Did Not Provide a Report to Trigger the One-Year Limitation Period.**

According to U.S. Bank, the Trust Account statements it provided were sufficient to trigger the statute of limitations under § 62-7-1005 of the Trust Code. However, this limitations period is only applicable where the trustee provides the beneficiary with a "report that **adequately disclosed** the existence of a potential claim for breach of trust." S.C. Code Ann. § 62-7-1005(a) (emphasis added). Even assuming that the statements constitute "reports" under § 62-7-1005(a), they were not sufficient to provide Plaintiff with adequate disclosure that it had a claim against U.S. Bank.

As this Court previously held in its Order dated September 28, 2017 (ECF 65), the account statements included "boilerplate" disclaimer language. Nothing in the account statements revealed the breach of duties that were hidden from Plaintiff, most of which were first discovered after review of Defendant's document production between February 2018 and July 2018.

In South Carolina, the statute of limitations for all of Plaintiff's causes of action is three years. S.C. Code Ann. § 15-3-530. The lawsuit was filed on July 22, 2016, within three years of the dates asserted by Defendant to be the triggering events for the running of a limitation period.[77] Therefore, for this reason, the court should also deny the Defendant's motion for summary judgment based on the Trust Code's statute of limitations.

## II.    PLAINTIFF'S CIVIL CONSPIRACY CLAIM IS PROPER.

### A. Plaintiff Properly Pled and Proved Civil Conspiracy.

Civil conspiracy is a theory of vicarious liability, whereby "all conspirators will be vicariously liable for the acts of co-conspirators in furtherance of the conspiracy." *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006). To state a claim for civil conspiracy, a plaintiff must allege "a combination between two or more persons, followed by an

---

[77] *See* ECF 159-1, pp. 19-22.

unlawful act carried out in furtherance of such combination, and damages." *Empire Fin. Servs., Inc. v. Bank of N.Y. (Del.)*, 900 A.2d 92, 97 (Del. 2006). The "confederation or combination" of persons need not rise to the level of an express agreement. *Id.* And the requisite unlawful act in furtherance of the conspiracy need not be the goal of the conspiracy. *See Allied Capital Corp.*, 910 A.2d at 1037 (upholding claim for a conspiracy to effectuate a restructuring transaction predicated upon the tort of aiding and abetting); *Microsoft Corp. v. Amphus, Inc.,* C.A. No. 8092-VCP, 2013 WL 5899003, at *15 (Del. Ch. Oct. 31, 2013) (conspiracy to commit breaches of fiduciary duties adequately alleged where fiduciary engaged in self-dealing).

Delaware courts have held that "underlying wrongs" do not have to be expressly included as a separate cause of action to support imposing secondary liability on the Defendant. *See Szczerba v. Am. Cigarette Outlet, Inc.*, C.A. No. N13C-09-080, 2016 WL 1424561 at * 4 (Del. Super. Apr. 1, 2016). In fact, allegations that companies worked together to suppress knowledge is, in and of itself, a sufficient underlying wrong to sustain a civil conspiracy cause of action under Delaware law. *Nut v. A.C. & S. Co., Inc.*, 517 A.2d 690, 695 (Del. Super. 1986).

Nor must the Complaint detail each defendants' precise role in the conspiracy; all that is required are allegations of "the general composition of the conspiracy, some or all of its broad objectives and the defendant[s'] general role in the conspiracy." *Marino v. Cross Country Bank*, C.A. No. 02-65-GMS, 2003 WL 503257, at *5 (D. Del. Feb. 14, 2003).

Defendant argues Plaintiff did not properly allege an "underlying actionable tort" by the alleged co-conspirators, one of the elements of the civil conspiracy claim. Defendant repeats the same arguments it made earlier this year when Plaintiff sought leave to amend its complaint to add the civil conspiracy claim.[78] The Court examined the allegations of the proposed Amended

---

[78] *See* ECF 121 (Defendant's Response in Opposition to Plaintiff's Motion to Amend).

Complaint, and held that the civil conspiracy claim was properly pled since allegations throughout the pleading supported each element of the claim.[79]  Therefore, Defendant's argument as to failure of pleading is without merit. Viewed as a whole, the Amended Complaint alleges U.S. Bank, its lines of business and affiliates, as well as Burns and his Southport entities[80] knowingly pursued tortious conduct in transactions leading to and including the funding/misuse of the trust assets.

U.S. Bank next contends that there was not a meeting of the minds to perform unlawful acts.  This, again, is an unfounded argument.  U.S. Bank seems to suggest that some sort of formal written or explicit agreement is necessary to sustain a civil conspiracy claim.  This is simply not true.

Even at trial, the Plaintiff does not "need to prove the existence of an explicit agreement; a conspiracy can be inferred from the pled behavior of the alleged conspirators." *In re Am. Int'l Grp., Inc.,* 965 A.2d 763, 806 (Del. Ch. 2009).  What is necessary is "evidence of a combination between two or more persons, followed by an unlawful act carried out in furtherance of such combination and damages."  *Empire Fin. Servs., Inc. v. Bank of N.Y. (Del.)*, 900 A.2d 92, 97 (Del. 2006). Plaintiff has alleged many instances of U.S. Bank working with U.S. Bank Trust and the Southport entities to sell the valuable assets held in trust, with Plaintiff having no knowledge of these illegal transfers.

---

[79] *Compare* Defendant's Memorandum, ECF 159-1, pp. 23-24 with this Court's Order and Opinion Granting in Part and Denying in Part Motion for Leave to File First Amended Complaint, ECF 142, pp. 10-11 (Court held ¶¶ 137-141 of the proposed Amended Complaint properly alleged civil conspiracy.)

[80] U.S. Bank claims the summary term "Southport entities" does not reference any particular companies. However, as alleged in the Amended Complaint, these entities include (1) Southport Lane, L.P. (¶ 9); (2) Southport Lane Advisors (¶ 36); and (3) Southport Specialty Finance (¶ 102). (ECF 154, Amended Complaint).

As set out fully in the Factual Background section above, Plaintiff has supported its allegations of civil conspiracy by providing evidence of a combination between two or more persons, followed by an unlawful act carried out in furtherance of such combination, and damages. Therefore, Plaintiff has properly pled and provided evidence of its civil conspiracy claim, and this Court should deny Defendant's motion for summary judgment on the civil conspiracy claim.

### 1.  The Burden of Proof.

There is no elevated burden of proof for civil conspiracy. *See Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987) ("The complaint clearly charges [defendant] with membership in the conspiracy, and if supported by a preponderance of the evidence at trial, Delaware law imposing liability for civil conspiracy is well-settled"). Evidence submitted herein meets this burden.

### 2.  Conspiracy May Be Proved by Circumstantial Evidence

Proof of a conspiracy does not require an explicit agreement; it can be inferred from the behavior of the alleged conspirators. *See In re Am. Int'l Grp., Inc.,* 965 A.2d 763, 806 (Del. Ch. 2009). As set out in the Factual Background above, Defendant clearly put the interests of itself and Alexander Burns ahead of the interests of all "Reg. 114" (reinsurance) trusts that were to be created as part of the Burns and Southport relationship.

Furthermore, it is not necessary for a plaintiff to prove that the alleged conspirators entered into an express or formal agreement regarding the object of the conspiracy or the means to that end. *Am. Gen. Life Ins. v. Goldstein*, 741 F. Supp. 2d 604, 615 (D. Del. 2010). Co-conspirators do not need to know all details of a plan or possess similar motives, but must share a "general conspiratorial objective." *Kuhn Const. Co. v. Ocean & Coastal Consultants, Inc.*, 723 F. Supp. 2d 676, 689 (D. Del. 2010) (citations omitted). Plaintiff must ultimately prove that there was "a single

plan, the essential nature and general scope of which [was] known to [the Defendant] who is to be held responsible for its consequences." *Id.* (citations omitted).

### 3. Hand of One is the Hand of All.

Moreover, Delaware law provides that a named defendant is liable for the actions of each of their co-conspirators taken in furtherance of the conspiracy. "Under Delaware law, a conspirator is jointly and severally liable for the acts of co-conspirators committed in furtherance of the conspiracy." *Nicolet*, 525 A.2d at 150; *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006). Therefore, Defendant can be held liable for the actions of Burns and Southport.

### B. Plaintiff May Allege a Civil Conspiracy Among Related Entities.

U.S. Bank makes a blanket statement that wholly-owned subsidiaries cannot conspire together. This is not consistent with Delaware case law. Delaware courts have noted that decisions in line with Defendant's theory generally are limited to claims under the Sherman Antitrust Act. *Outdoor Techs., Inc. v. Allfirst Fin., Inc.*, C.A. No. 99C-09-151, 2000 WL 141275 at *6 (Del. Super. Jan. 24, 2000). After analyzing Maryland and Delaware case law on the issue, the Court in *Outdoor Technologies* specifically found no case law "prohibiting civil conspiracy claims that arise from conduct that occurs between sister and parent corporations." *Id.*

In *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, the Delaware Chancery Court expressly rejected the argument that entities with common ownership can never conspire illegally with one another. *Allied Capital Corp.*, 910 A.2d at 1038 n.37, 2044-45. The Court reasoned:

> The fact that a corporation owns all of the equity of another corporation and that both corporations have the same directors and officers does not mean the separate corporations cannot collaborate on a common illegal scheme. *It is precisely because*

*the corporations have, as a presumptive matter, a separate legal existence irrespective of their common control, that doctrines like conspiracy* and aiding and abetting *may have a policy purpose*. Moreover . . . the idea that the economic interests of a parent and subsidiary are always aligned when the parent owns all the equity of the subsidiary is, if accepted as an unvarying natural law, wrong. As important, even in criminal conspiracies involving more than one human, it is not uncommon for one of the participants to have a dominating relationship towards the others. That does not render the others less legally culpable for their own decisions to participate in the common plan. *The fact that affiliated entities are directed by common persons does not self-evidently render those entities—as societally chartered persons with separate legal status—obviously immune for their own actions in aid of an illegal plan that causes harm.* There are principled reasons for cabining the situations when conspiracy claims can lie against commonly-owned entities. That they are conceived of as having one hypothetical "brain" is not one of them. And under the confused jurisprudence of "alter ego" liability, a defense argument of that kind amounts to an argument in favor of disrespecting their separate corporate forms and holding the parent liable. In sum, Allied's complaint pleads facts that satisfy the elements of a cause of action for civil conspiracy as articulated by our Supreme Court. *The defendants' argument -- that entities with common equity ownership can never conspire illegally with one another -- is not one that convinces me.*

*Id.* at 1044-45 (emphasis added). Thus, as explained in *Allied Capital*, Delaware law does not prohibit claims of conspiracy among entities that are commonly owned.

Even if it did, Defendant's evidence of the "relatedness" of Defendant and its lines of businesses, like U.S. Bank Trust and U.S. Bancorp Fund Services, LLC, does not prove the subsidiary relationship claimed.[81] At most the Bank's evidence mentions a hierarchy, not a parent-subsidiary relationship between the Defendant and U.S. Bank Trust or Fund Services.

---

[81] *Compare* ECF 159-1, at Exhibit 44 (Corporate Documents of U.S. Bank Trust National Association and U.S. Bankcorp Fund Services, LLC) to ECF 13-2 (Declaration of Matthew Scott, Vice President at U.S. Bank Trust, which states "U.S. Bank Trust and U.S. Bank *are distinct and independent entities* . . . ." The corporate documents submitted by Defendant do not even mention the word subsidiary, instead using the word "hierarchy" but not "subsidiary."

### III.    PLAINTIFF'S DAMAGES ARE NOT SPECULATIVE.

Delaware law grants courts the power to fashion a remedy. *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del. Ch. 1999) (in shareholder suit for corporate fiduciary duty breach, "the Court's powers are complete to fashion any form of equitable and monetary relief as may be appropriate . . ."); *Cantor v. Perelman,* C.A. No. 97-586-KAJ, 2006 WL 318666, at * 8 (D. Del. Feb. 10, 2006) (under Delaware law, "significant discretion is given to the Court in fashioning an appropriate remedy" for breach of fiduciary duty).

There is case law specifically holding that, when the fiduciary breaches its duty of loyalty, the remedy awarded should be less about what the beneficiary lost and more about deterring (to the point of harshness) the misconduct.  *See Thorpe by Castleman v. CERBCO*, 676 A.2d 436, 445 (Del. 1996) (citing *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994) ("breaches of a fiduciary relationship in any context compromise a special breed of cases that often loosen normally stringent requirements of causation and damages").

On November 28, 2018, Plaintiff produced a timely[82] Supplemental Report of Roy Strickland.  Based on his analysis and discussions with AIC's representatives through the date of this Supplemental Report, Mr. Strickland calculated the damages incurred by AIC to a reasonable degree of accounting certainty to be $8,451,595.[83] These damages are a sum of the following components of loss:

---

[82] Under Federal Rule 26(e)(2), expert supplements must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.  Per page 3, paragraph 11 of the current Scheduling Order, the pretrial disclosure deadline for all parties was November 27, 2018, the date Plaintiff served the Supplemental Report on Defendant's counsel.

[83] **Ex. 30**, Roy Strickland's Supplemental Report dated and served on November 27, 2018.

| | | |
|---|---:|---:|
| Lost Front Fee | $ | 413,655 |
| Fronting Program Losses incurred by AIC | | 7,559,900 |
| Fronting Program Extra Expenses incurred by AIC | | 478,040 |
| **Total Damages to AIC** | **$** | **8,451,595** |

The supplement was needed because Plaintiff recently received additional information necessary to include damages based on the actuarial estimates of the Fronting Program's loss as a component of total damages. The Supplement Report is being provided to the Court. It cites documentation to support the damage figure, all of which were provided to Defendant in supplemental document productions last month. Because the Plaintiff has come forward with testimony and documentation to support its theory of damages, the Defendant's arguments concerning lack of damages and the assertion that damages should be capped, are without merit. Included with this brief is a Declaration of James Ray Robinson, former Director of Compliance for Accident Insurance Company.[84] Mr. Robinson provided some of the underlying data considered by Plaintiff's damage expert and is properly considered in opposition to Defendant's pending motion. Therefore, the Court should deny Defendant's motion for summary judgment on damages, and Plaintiff's damages should not be capped.

## CONCLUSION

For all of these reasons, U.S. Bank's Motion for Summary Judgment should be denied in full. In the alternative, Plaintiff requests additional time to supplement and/or prepare a sur-reply in further support of this opposition, at the conclusion of planned depositions later this month.

---

[84] **Ex. 31**, Declaration of James Ray "Robbie" Robinson.

December 13, 2018                    Respectfully submitted,

/s Susan F. Campbell
MCGOWAN, HOOD & FELDER, LLC
Susan F. Campbell (Fed Id. 9002)
232 King Street
Georgetown, South Carolina 29440
(843) 833-8082-Tel.
(843) 833-8092-Fax
scampbell@mcgowanhood.com

Chad A. McGowan (Fed Id. 6620)
1539 Health Care Drive
Rock Hill, SC 29732
(803) 327-7800 Tel.
(803) 328-5656 Fax
cmcgowan@mcgowanhood.com

ATTORNEYS FOR PLAINTIFF