IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| ACCIDENT INSURANCE COMPANY, INC., A SOUTH CAROLINA CORPORATION,<br><br>Plaintiff,<br>v.<br><br>U.S. BANK, NATIONAL ASSOCIATION,<br><br>Defendants,<br><br>U.S. BANK, NATIONAL ASSOCIATION,<br><br>Third-Party Plaintiff,<br>v.<br><br>SOUTHPORT LANE ADVISORS, SOUTHPORT SPECIALTY FINANCE, ADMINISTRATIVE AGENCY SERVICES, and ALEXANDER CHATFIELD BURNS,<br><br>Third-Party Defendants | ) | Civil Action No. 3:16-cv-2621-JMC<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT U.S. BANK NATIONAL ASSOCIATION'S MOTIONS IN LIMINE TO EXCLUDE TESTIMONY OF PLAINTIFF'S LIABILITY EXPERT AND EVIDENCE RELATED TO GOVERNMENT INVESTIGATIONS** |

Plaintiff Accident Insurance Company respectfully submits its memorandum of law in opposition to Defendant U.S. Bank National Association's ("USB") Motions in Limine to Exclude Testimony of Plaintiff's Liability Expert and Evidence Related to Government Investigations. [ECF 177].

## INTRODUCTION

From the time it signed on as AIC Trust trustee through the time the trust was drained of legitimate assets, USB did not take bank security seriously. Unbeknownst to AIC and many other customers, USB willfully failed to maintain an adequate Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") program. Deferred Prosecution Agreement between U.S. Attorney

for the S.D.N.Y. and U.S. Bancorp ("DPA"), "Statement of Facts" at ¶ 5. Rather than make an honest effort to root out suspicious activity flowing through its institution, USB curbed this government-mandated fraud monitoring program by starving it of resources. Id. at ¶ 6. BSA/AML programs are crucial for customer due diligence and customer identification—i.e. verifying the true identity of a bank's customers and the nature of their financial activities. Id. at ¶ 10. USB's program had little hope of achieving these objectives because USB did not pursue them diligently.

For instance, USB (America's fifth largest bank) placed its fraud monitoring program under the oversight of an employee with zero BSA/AML experience. Id. at ¶¶ 3, 12. The program's "dangerously thin" staff was inexperienced and underpaid. Id. at ¶¶ 13, 18. When internal testing proved USB's fraud monitoring efforts were missing large swaths of suspicious activity, USB chose not to shore up its BSA/AML program but rather to discontinue the testing that highlighted its deficiencies. Id. at ¶¶ 23, 24. USB then omitted proof of these deficiencies from its official records in an effort to ward off scrutiny from regulators. Id. at ¶¶ 26, 27.

None of these statements are accusations—USB has admitted them all. DPA at 1, ¶ 3. Plus, AIC does not offer evidence of this misconduct merely for shock value. What USB knew or what it did not bother to learn are cornerstones of AIC's current claims. (Am. Compl. ¶¶ 15-20, 28, 42, 73, 86, 94). As AIC's banking expert explains, there is a direct connection between USB's pervasive monitoring and oversight errors in 2013-14 and USB's failure to identify the malfeasance it should have seen in AIC Trust. D. Coker Report at 14-15; 18. The government investigations that unearthed USB's misconduct (and that of Alexander Burns) were statutorily-authorized and produced factual findings that are highly probative and otherwise admissible pursuant to the Federal Rules of Evidence. In short, USB is understandably concerned about the

effect of its admitted misconduct on the viability of its defense to AIC's claims. However, the evidence in question is admissible, and USB's motions should be denied.

## ARGUMENT

### 1. Plaintiff's Expert Don Coker Offers Admissible Opinion Testimony on USB's Conduct as Trustee for AIC Trust.

This litigation seeks primarily to determine whether USB properly performed its functions as AIC Trust trustee both in choosing to undertake the role and in administering the trust while it was being drained of valuable assets and filled with fraudulent ones. USB's conduct allegedly violated its contract (i.e. AIC Trust Agreement), its fiduciary obligations, and, for the negligence claim, the standard of care maintained by a reasonably competent trustee facing similar circumstances. See McNeil v. McNeil, 798 A.2d 503, 509 (Del. 2002) ("a trustee must act as the reasonable and prudent person in managing the trust"). Since the parties dispute whether USB met this standard, it is crucial for AIC to offer evidence to show what a competent bank in USB's position would have done to administer AIC Trust. AIC retained Don Coker, a financial industry expert with over twenty years' experience managing banks and other financial service institutions. USB now argues Mr. Coker's testimony invades the factfinder's province and offers no helpful information. However, excluding Mr. Coker's report or barring him from trial would be inconsistent with evidence rules and standard practice within the Fourth Circuit.

AIC may offer opinion testimony on issues implicating "scientific, technical, or other specialized knowledge" that will assist in understanding the evidence or in determining a disputed fact. Fed. R. Evid. 702. While expert testimony must stay clear of legal conclusions reserved for the factfinder, an expert's opinion "is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a); see also Smith v. First Union Nat'l Bank, No. 00-4485-CIV, 2002 WL 3455951, at * 2 (S.D. Fla. Aug. 27, 2002) (applying Rule 704(a) to deny motion

to exclude banking expert's testimony on industry standards). At times, the line between acceptable expert opinion and inadmissible legal conclusion can be hazy. Hermitage Indus. v. Schwerman Trucking Co., 814 F. Supp. 484, 486 (D.S.C. 1993). However, Mr. Coker's report steers clear of the line by informing the Court of banking industry practice rather than attempting to supplant the Court's role in determining USB's culpability.

Based on his experience as a banking executive, Ms. Coker testified that a trustee in USB's position must know its client, understand the client's business, and conduct adequate due diligence on substantial transactions affecting trust assets. D. Coker Rep. at 17. Mr. Coker then listed six actions USB should have taken when administering AIC Trust, all of which were "a matter of industry practice." Id. at 7-8. Mr. Coker also provided crucial insight on how parties to an arrangement like AIC Trust would define the trustee's scope of duties. Even when state substantive law permits a bank like USB to alter certain default trustee roles, "as a matter of industry practice" those variations are usually delineated in the trust agreement. Id. at 8. Likewise, if a trustee intends to disclaim any duties, then "generally accepted industry practice and principles" call for the disclaimer to be specified in the trust agreement. Id. at 9.

Even when addressing USB's specific conduct, Mr. Coker did not tell the Court how to rule; he only compares USB's actions to the specialized industry standards the Court will be asked to apply. Mr. Coker's "Summary of Opinion" section USB seizes on as proof his alleged impropriety is an application of this principle. After reviewing the key documents and applying his experience as a bank executive, Mr. Coker concluded USB's due diligence programs lacked "compliance with industry standards." Id. at 16. Excluding testimony on how a prudent bank would function as a trustee would represent a substantial shift away from how district courts have viewed similar evidence throughout this Circuit. For example, in Greenbrier Hotel Corp. v.

UNITE HERE Health, a West Virginia district court conducted a bench trial in a complex dispute regarding fiduciary duties owed by a trustee to a labor union. Civil Action No. 5:13-cv-11644, 2016 WL 9779134 (S.D. W. Va. Aug. 26, 2016). Before entering its ruling, the Greenbrier court summarized the evidence produced at trial and noted "[b]oth parties presented experts to testify on the appropriate response from a fiduciary under the circumstances presented by this case." Id. at * 8. One year earlier, a Virginia district court denied a motion like USB's to exclude an expert whose report stated in part that a party "had no fiduciary duty to resign," finding the report "does not render a conclusion on the ultimate issue." Stradtman v. Republic Servs., Inc., No. 1:14CV1289, 2015 WL 1930498, at * 1, 3 (E.D. Va. Apr. 28, 2015). The Fourth Circuit itself has found no error when a district court admitted at trial evidence that "consisted largely of expert opinions as to . . . what steps a prudent trustee should have taken." Bidwell v. Garvey, 943 F.2d 498, 503 (4th Cir. 1991).

This is the sensible approach for distinguishing "ultimate issue" testimony from a "legal conclusion," especially when considering complex banking issues, commercial trusts, and reinsurance arrangements that may go beyond a Court's inherent expertise. It is "hard to imagine" how a case like this could be fairly resolved without evidence of "reinsurance industry custom and practice." Travelers Indem. Co. v. Scor Reinsurance Co., 62 F.3d 74, 78 (2d Cir. 1995); see also U.S. v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991) ("Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts"). The case law on which USB relies does not apply to Mr. Coker's testimony. For example, USB cites Travelers Indem. Co. v. Scor Reinsurance Co., 62 F.3d 74, 78 (2d Cir. 1995), where an expert's testimony was excluded but only because the proffered expert

failed to tie his testimony to established industry practice and offered opinions on policies he had not read. In another instance, USB relies on a district court order that is no longer good law.[1]

Moreover, many of the ills USB's motion attributes to Mr. Coker are mirrored in USB's own expert testimony. USB faults Mr. Coker for commenting on the existence of various legal duties. Def.'s Mot. at 2-3. However, USB's expert Christopher Hillcoat goes just as far if not further in seeking to exculpate USB. Mr. Hillcoat concludes USB "would understand it had no responsibility to determine whether Assets were Eligible Securities," "would not understand itself to have" any extra-contractual duties, and would not understand itself to have any due diligence responsibilities. C. Hillcoat Rep. at 30, ¶ 67; at 35, ¶ 74; at 40; at 42, ¶ 87. Mr. Hillcoat then goes beyond his perception of USB's "understandings" to state affirmatively USB "had no responsibilities whatsoever with respect to the eligibility of securities." Id. at 37, ¶ 78. In sum, it seems USB wants to offer its own comments on the scope of the duties USB undertook for AIC Trust while asking the Court to bar AIC from offering a contrasting viewpoint. Along with its legal errors, the inherent inequity of USB's argument shows why it should be rejected.

Finally, USB's motion fails to account for the practical realities of the bench trial in this case. While the same rules apply to bench and jury trials, a big reason for addressing the risk of experts straying into legal conclusions before a jury trial begins is to prevent the unique danger of lay jurors hearing (and being unable to disregard) a witness designated as an "expert" comment on an ultimate issue. That danger is less acute when the Court functions as factfinder. As discussed above, Mr. Coker's testimony is not a legal conclusion but, to the extent the Court believes Mr. Coker or Mr. Hillcoat's conclusions could approach that line, contemporaneous

[1] See Def.'s Mot. at 3-4 (citing Muller-Paisner v. TIAA, 881 F. Supp. 2d 579, 590-91 (S.D.N.Y. 2012) (*order vacated by* 528 Fed. Appx. 37 (2d Cir. June 20, 2013)).

objections and rulings during the experts' testimony are an appropriate way to enforce Rule 704 without unduly restricting the parties from presenting their cases.

**2. Government Agency Findings on USB's Systemic and Admitted Misconduct is Relevant and Admissible.**

USB consistently failed to meet industry standards to monitor and root out suspicious financial activity running through its institution, knew its monitoring program was deficient, failed to take reasonable steps to address the deficiencies, and actively sought to conceal its misdeeds from regulators. These are not mere allegations—USB has admitted willful misconduct. USB's errors included rank-and-file employees as well as corporate executives and were ongoing when USB became AIC Trust trustee and when it administered that trust as it became rife with suspicious or even outright fraudulent activity. As authorized by federal law, financial regulators (OCC, SEC) investigated USB and other bad actors' conduct and made factual findings documenting where USB went wrong. USB's urge to gloss over its acknowledged misconduct is understandable, but this evidence clears the low bar of being relevant to AIC's claims and is otherwise admissible under the Federal Rules of Evidence.

**a. Regulators' Statutorily-Authorized Findings on USB's Misconduct are not Inadmissible Settlement Documents.**

USB argues every document offered as evidence for its misconduct is so connected to settlements with regulators that the documents must be excluded pursuant to Fed. R. Evid. 408. Rule 408(a) does bar settlement offers as well as "conduct or a statement made during compromise negotiations." However, the prohibition is far from absolute as Rule 408(b) provides examples of permissible uses for settlement-related evidence. Plus, there is a well-recognized exception to Rule 408 exclusions for USB's factual admissions made during government investigations. Moreover, Rule 408 is not meant to sweep up findings of government agency

investigations initiated and operated pursuant to statutory authority, and USB has no standing to object to government agency findings against Burns.

Rule 408's bar on settlement-related documents does not affect USB's[2] February 2018 Deferred Prosecution Agreement with the U.S. Attorney for the Southern District of New York ("DPA"). The DPA consists not only of the government's allegations and USB's desire to avoid litigation but also USB's admission to an attached twenty-nine (29) page "Statement of Facts" thoroughly describing USB's willful failure to monitor for suspicious transactions, fraudulent activity, and suspected money laundering. USB both admitted the Statement of Facts is accurate and pledged not to dispute or contradict its contents "in litigation or otherwise." DPA at 5, ¶ 16. Even in instances where Rule 408 would bar a settlement agreement, the exclusion would not extend to the "Statement of Facts." Admissions of fact are a "well-recognized exception" to the ban on settlement documents. Cabeza v. Richey Law & Assocs., Civil No. WDQ-13-3511, 2014 WL 4635381, at * 2 n. 14 (D. Md. Sept. 16, 2014); Petty v. Freightliner Corp., 122 F. Supp. 2d 666, 670 n. 2 (W.D.N.C. 2000) (citing Fed. R. Evid. 408, Advisory Committee Notes (1974) ("Statements of fact made during settlement negotiations . . . are excepted from this ban and are admissible"). This exception has been applied broadly in federal courts across the country.[3]

Findings from the SEC's investigation of Alexander Burns fall within another limitation on Rule 408's scope. The bar on settlement-related evidence does not immunize findings made

[2] The DPA's parties were the U.S. Attorney's office and corporate parent U.S. Bancorp. but its focus was on U.S. Bancorp.'s conduct "through USB." DPA, "Statement of Facts" at 1, ¶ 4.

[3] See e.g., Hiram Ricker & Sons v. Students Int'l Meditation Society, 501 F.2d 550, 553 (1st Cir. 1974) (finding that, while generally settlement negotiations are inadmissible, there is a "well-recognized exception regarding admissions of fact"); Megarry Bros., Inc. v. U.S. for Use of Midwestern Elec. Constr., Inc., 404 F.2d 479, 485 (8th Cir. 1968) ("admissions with respect to independent facts which are made during the course of compromise negotiations may be received in evidence"); U.S. v. Shotwell Mfg. Co., 287 F.2d 667, 673 (7th Cir. 1961) (noting difference between settlement negotiations and admissions of fact "which may be admitted"); see also U.S. v. Robertson, 582 F.2d 1356, 1358 (5th Cir. 1978) (citing Shotwell Mfg. Co.).

by government regulators just because a target of the investigation later chooses to settle. Notes of Comm. on the Judiciary for Fed. R. Evid. 408 (Senate Report No. 93-1277) ("A party should not be able to immunize from admissibility documents otherwise discoverable merely by offering them in a compromise negotiation). Accordingly, the SEC's findings, opinions, and conclusions regarding Burns that may appear in settlement-related documents are not subject to Rule 408 when "rendered pursuant to the SEC's independent obligations to enforce the securities laws." Option Resource Group v. Chambers Dev. Co., Inc., 967 F. Supp. 846, 850 (W.D. Pa. 1996). According to a December 26, 2018 order, the investigation of Burns was instituted pursuant to the SEC's authority under Section 203(f) of the Investment Advisers Act of 1940[4]. See Order Instituting Administrative Proceedings ("SEC OIP"), attached as **EXHIBIT 1**.

Section III of the SEC OIP then sets out the SEC's findings made during the statutorily-authorized investigation and incorporates the SEC's October 16, 2018 Complaint against Burns ("SEC Complaint") into those findings. SEC OIP, § III(C). Thus, even though the SEC OIP and SEC Complaint are related to Burns choice to enter a Consent Judgment with SEC, Rule 408 does not support their exclusion because they represent findings reached as part of SEC's independent obligation to enforce securities laws. See also Meyer v. Ward, No. 13 C 3303, 2017 WL 1862626, at * 3 (N.D. Ill. May 9, 2017) (citing with approval Option Resource Group which admitted SEC's "findings, opinions, and conclusions rendered pursuant to its independent obligations to enforce the securities laws" and finding Rule 408 did not apply to an SEC OIP). The same principles apply to the OCC Consent Order which was issued pursuant to the OCC's authority provided by the Federal Deposit Insurance Act ("FDIC Act"). See OCC Consent Order at 3 (citing 12 U.S.C. § 1818(b)).

---

[4] Codified as 15 U.S.C. § 80b-3(f).

USB's attempt to invoke Rule 408 to exclude the SEC's findings against Burns should be rejected for another reason. For purposes of the SEC investigation, USB is not the party Rule 408 intends to protect. Rule 408's goal of protecting Burns' right to negotiate candidly and settle charges freely is in no way imperiled by admitting the SEC's findings *against USB*. USB also argues by footnote that Burns' refusal to admit to the facts in the SEC's findings supports exclusion. However, Burns' refusal to admit to particular does not take away probative value of SEC's findings made pursuant to statutory obligation to enforce securities laws—i.e. whatever Burns thinks of allegations in the SEC Complaint, those allegations are now the SEC's official "findings." SEC v. Pentagon Capital Mgmt. PLC, No. 08 Civ. 3324, 2010 WL 985205, at * 3 (S.D.N.Y. Mar. 17, 2010) ("the fact that the parties settled the actions without admitting or denying the allegations also did not preclude admissibility . . ."); Option Resource Group, 967 F. Supp. at 851 ("the fact that an agency or the parties before it provide by rule or stipulation that the factual findings are not binding and disclaim their viability in other proceedings does not control their admissibility").

In sum, neither the language or purpose of Rule 408 support exclusion of SEC/OCC's findings regarding USB or Burns and the DPA's "Statement of Facts" are admissible pursuant to the rule's well-recognized exception for factual admissions.

**b. Government Investigation Materials are Either Not Hearsay or Admissible Through a Hearsay Exception.**

Generally, hearsay is inadmissible (Fed. R. Evid. 802) but there are a number of exceptions (Fed. R. Evid. 803, 804(b)) and, just as importantly, a number of limitations on what qualifies as hearsay (Fed. R. Evid. 801(d)). USB's attempt to label government investigation materials inadmissible hearsay overlooks these exceptions and limitations. The DPA's

"Statement of Facts" is excluded from the definition of hearsay while the SEC findings against Burns and the OCC Consent Order are admissible through the public records hearsay exception.

By definition, "hearsay" does not include statements made by a proponent's opposing party. Fed. R. Evid. 801(d)(2). Statements of a party-opponent include those made by the party personally in an individual or representative capacity, statements asserted by the party's agent/employee/authorized representative, and statements the party adopts as true. Fed. R. Evid. 801(d)(2)(A)-(D). USB has affirmatively claimed the DPA's "Statement of Facts" are a fully accurate statement of its misconduct. Even if USB argues U.S. Bancorp. (as party to the DPA) is actually making the statement, it applies to and binds USB. Moreover, even if USB argues the government is actually the declarant for the "Statement of Facts," USB has "adopted" its assertions in full because it agreed not to say or do anything to contradict them. DPA at 5, ¶ 16.

The records documenting SEC's findings against Burns are not statements of a party-opponent, but they are admissible pursuant to the public records hearsay exception. Fed. R. Evid. 803(8). A public record is admissible in a civil case if it sets out "factual findings from a legally authorized investigation" except in instances where an opponent proves there is some reason to believe the findings are unreliable. Fed. R. Evid 803(A)(iii). In other words, "[g]overnment reports which include findings and opinions from an official investigation are admissible under Rule 803(8) if the contents are trustworthy." Distaff, Inc. v. Springfield Contracting Corp., 651 F.2d 108, 111 (4th Cir. 1993). The public records exception is grounded in the reasonable assumption that a "public official will perform his duty properly." Ellis v. Int'l Playtex, Inc., 745 F.2d 292, 300 (4th Cir. 1984).

The SEC OIP shows the SEC's findings against Burns qualify for the public records exception. The SEC OIP was the product of a "legally authorized investigation" because SEC

issued it in accordance with the authority granted by Section 203(f) of the Investment Advisers Act of 1940. SEC OIP at 1, § I. The SEC OIP then goes on to make "factual findings" which incorporate the statements in the SEC Complaint. SEC OIP at 2, § III(C). As other courts have noted, SEC findings, opinions, and conclusions are "plainly admissible" under the public records exception. Option Resource Group, 967 F. Supp. at 849; Meyer, 2017 WL 1862626, at * 2 (applying public records exception to SEC OIP because it was "issued after an investigation conducted pursuant to the SEC's authority" granted by federal statute). Similarly, the OCC Consent Order was the product of the OCC's statutory authority—the FDIC Act—and stated the agency's "findings" regarding USB's conduct. OCC Consent Order at 2-3.

While the public records exception grants leave for USB to argue the SEC/OCC findings are untrustworthy, USB has made no such showing in its motion. Nor could it. Public records are presumed admissible and there are no negative factors suggesting SEC/OCC were biased or incompetent in reaching their findings on USB/Burns' misconduct. Zeus Enters., Inc. v. Alphin Aircraft, Inc., 190 F.3d 238, 241 (4th Cir. 1999) (public records are admitted "as a matter of course" absent proof of untrustworthiness); Complaint of Nautilus Motor Tanker Co., Ltd., 85 F.3d 105, 112-13 (3d Cir. 1996). USB also errs in its reliance on In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on Apr. 20, 2010, to argue the government investigations are inadmissible hearsay. Deepwater Horizon excluded a DPA because "the conduct at issue in the DPA is too dissimilar and not relevant to the primary issue in the upcoming trial." There, the DPA related to BP's conspiracy to manipulate market for propane in 2004 and was being offered in suit arising out of oil spill in 2010. In contrast, the misconduct USB admitted in the DPA here is the same in type (deficient efforts to identify suspicious financial activity) and time (2013-14) as AIC alleges in its Amended Complaint.

Thus, the Court should reject USB's hearsay objections to the government investigation evidence. AIC may offer the DPA's "Statement of Facts" are a statement of its party-opponent and the remaining documents are excepted from the hearsay rule because they are public records.

**c. USB's Fraud and Suspicious Activity Monitoring Failures are Direct Evidence to Support AIC's Claims and Not Improper Character Evidence.**

Fed. R. Evid. 404 prevents litigants from attempting to establish an opponent's claim-related conduct based on past, unrelated character evidence. USB invokes the rule seeking to exclude government findings of its misconduct and its admissions to that misconduct. But, these records are not character evidence, they are direct evidence of the conspiracy, misrepresentation, and fiduciary duty breaches AIC alleges in the Amended Complaint. USB's error—as evidenced by the inapplicable case cited in support—is in suggesting a great chasm between the conduct outlined in the government investigations and the conduct AIC seeks to prove in this case. Rule 404 would prevent AIC from delving into unrelated crimes and regulatory violations in USB's distant past but what the OCC, SEC, and U.S. Attorney found here is directly related to the misconduct that allegedly caused AIC's damages.

USB errs in arguing government investigation documents are offered for "general character" purposes. Def.'s Mem. at 11. USB claims AIC's claims have little to do with the conduct the OCC, SEC, and U.S. Attorney investigated. Id. (citing In re DePuy Ortho., Inc. Pinnacle Hip Implant Prod. Liab. Litig., 888 F. 3d 753, 785-86 (5th Cir. 2018)). However, DePuy is very different because in that case there was no temporal or subject-matter connection between the evidence offered and the claims asserted. The DePuy plaintiffs alleged products liability claims against a Johnson & Johnson subsidiary related to an allegedly defective medical product yet sought to admit evidence a different Johnson & Johnson subsidiary had bribed the Iraqi government during the Saddam Hussein regime. Id. at 784. That evidence was clearly

within Rule 404(a)'s prohibition because it was wholly unrelated to the allegedly defective product and its only conceivable purpose would be to impugn the defendant's general character.

Here, Rule 404(a) does not apply because the government investigation documents are not "other bad acts" evidence, they are direct evidence of misconduct AIC alleges. The Fourth Circuit recognizes the difference between "other acts" evidence and "direct evidence of the conspiracy" alleged. U.S. v. Weston, 962 F.2d 8 (4th Cir. 1992); U.S. v. Ramirez, Case No. 5:14-cv-00559-JMC-3, 2015 WL 4606089, at * 2 (D.S.C. July 30, 2015) (citing U.S. v. Melvin, 2007 WL 2046735, at * 13 (4th Cir. July 13, 2007) ("Acts committed in furtherance of the charged conspiracy are themselves part of the act charged" and constitute "intrinsic" or "direct evidence" not evidence of "other acts" governed by Rule 404)). Conduct related to the charged offense is not subject to Rule 404 if evidence of that conduct "is necessary to complete the story of the crime on trial." U.S. v. Siegel, 536 F.3d 306, 317 (4th Cir. 2008); see also U.S. v. Angelilli, 660 F.2d 23, 39 (2d Cir. 1981) ("where the incident offered is part of the conspiracy alleged," evidence is admissible because it is not an "other" crime" but rather "is offered as direct evidence of the fact in issue, not as circumstantial evidence requiring an inference as to the character of the accused").

Direct evidence (as opposed to other bad acts) is especially applicable on causes of action like those AIC alleges (i.e. misrepresentation and conspiracy). For example, evidence of false statements related to a home equity loan may be admitted as "direct evidence" for proving a scheme to defraud a credit union. U.S. v. Logan, 593 Fed. Appx. 176, 183 (4th Cir. Nov. 26, 2014). Similarly, forensic evidence of insider trading in 2013 has been found to be admissible as direct evidence in claims related to insider trading in preceding years. SEC v. McGinnis, Case No. 5:14-cv-6, 2015 WL 5643186, at * 8-9 (D. Vt. Sept. 23, 2015); see also McCormick on

Evidence § 197 (7th ed. 2016) ("In cases alleging fraud or misrepresentation, proof that the defendant perpetrated similar deceptions frequently is received in evidence"). This principle applies in equal force to civil and criminal cases.[5]

There is a distinct nexus between the misconduct AIC alleges and the misconduct the government agencies (OCC, SEC, and U.S. Attorney) investigated. AIC alleges USB exercised a lack of due diligence before undertaking the trustee role and accepting various assets into AIC Trust by citing various things USB "knew or should have known" about Burns, Southport, AAS, etc. (Am. Compl. ¶¶ 15-20, 28, 42, 73, 86, 94). Along those same lines, the government investigated, found, and USB admitted (DPA "Statement of Facts") that it lacked personnel to conduct oversight of potentially suspicious transactions, that it knew of these deficiencies, and that it tried to hide the deficiencies from OCC. The government investigations covered the 2013-14 where AIC's claims focus. Accordingly, the government investigation documents are "direct evidence" on AIC's fiduciary duty and negligence/gross negligence claims. Since they are probative on USB's intent in failing to monitor suspicious activity, these documents relevant also to AIC's punitive damages claim.

In short, AIC's use of the OCC/SEC Orders and DPA "Statement of Facts" are very different than the "ploy" rejected in DePuy. Def.'s Mem. at 11. AIC is not asking the Court to infer wrongdoing from unrelated bad conduct by a non-party. USB has been found and has admitted misconduct that is directly related to the claims AIC alleges. Rule 404(a)'s bar on general character evidence does not apply. Even if the misconduct found by OCC and admitted by USB in the DPA "Statement of Facts" does not specifically include the transactions that wrecked AIC Trust, this evidence is admissible under Fed. R. Evid. 404(b) which permits other

[5] See e.g., Lavoie v. Haynes, 510 Fed. Appx. 510, 511 (9th Cir. Feb. 20, 2013); Edwards v. Cornell, No. 3:13-cv-878, 2017 WL 5719144 at * 12 (D. Conn. Nov. 28, 2017).

bad act evidence for non-propensity purposes when it is similar in time and type to the conduct at issue. U.S. v. Johnson, 617 F.3d 286, 297 (4th Cir. 2010) ("the more closely the prior act is related to the charged conduct—either in time, pattern, or state of mind—the more probative it is of the defendant's intent or knowledge in relation to the charged conduct").

**d. The Government's Findings are Relevant to AIC's Claims that USB Failed to Monitor for Suspicious Activity.**

USB's relevancy argument is actually a misguided quibble with the Amended Complaint's language. USB admits the OCC Consent Order/DPA found substantial faults in USB's fraud monitoring programs and USB willfully committed violations enumerated in the DPA's "Statement of Facts." Def.'s Mem. at 11-12. USB admits the SEC's findings on Burns are directly related to malfeasance involving AIC Trust. Id. at 12. USB even acknowledges AIC's liability expert draws a direct line from USB's willfully deficient fraud monitoring programs and lack of due diligence to AIC's damages. Id. Yet, USB argues none of this evidence is relevant because AIC's Amended Complaint alleges a different type of wrongdoing. USB's argument should be rejected because the Amended Complaint provides fair notice to USB that deficient fraud monitoring and lack of due diligence were key components of AIC's contract and tort claims.

Banking industry standards require a bank like USB acting as fiduciary for a legal arrangement like AIC Trust to make diligent efforts to understand the source of trust funds and to determine whether assets offered for entry meet the trust's explicit requirements. D. Coker Report at 16-18. If a bank in these circumstances fails to make those efforts or the required determinations, then it is reasonably foreseeable that the trust and its beneficiary will be harmed as AIC was in this case. Id. The willful failures in fraud/suspicious activity monitoring identified by OCC and acknowledged by USB in the DPA "Statement of Facts" are important evidence to

show USB failed to provide AIC the services demanded of a trustee by the governing law and the AIC Trust Agreement. Id. at 14-15; 18. The documents themselves as well as AIC's expert testimony sufficiently tie the regulatory findings to AIC's claims to clear the minimal relevancy bar. Fed. R. Evid. 401 (defining "relevant evidence" as an item having "any tendency to make a fact more or less probable than it would be without the evidence"); U.S. v. Recio, 884 F.3d 230, 235 (4th Cir. 2018) (finding "the threshold for determining whether evidence is relevant is comparatively low") (citations omitted).

AIC's expert testimony aligns with the misconduct alleged in the Amended Complaint. What USB knew or what it failed to investigate are crucial underpinnings for all five of AIC's causes of action. For all of the alleged wrongdoing, AIC alleges USB had crucial knowledge that it ignored or failed to share with AIC while administering AIC Trust. (Am. Compl. ¶¶ 15-20, 28, 42, 73, 86, 94). These allegations are borne out in OCC's finding and USB's admission to willful misconduct in its fraud/suspicious activity monitoring programs. As an alternative, AIC alleges that if USB did not in fact have this crucial knowledge, then it should have acquired it before accepting and administering the trust. Id. (alleging various facts AIC "knew or should have known"). If USB did not actually know of Burns' illicit dealings in acquiring Dallas National Insurance Company, then it should have. (Am. Compl. ¶¶ 17-20). If USB was not actually aware of the conflicts and self-interested transactions among Burns, the Southport entities, and the company that placed a value on Destra UITs, USB had all the relevant data as its disposal to acquire this knowledge. (Am. Compl. ¶¶ 15, 73).

The fact that the key January 2014 account statement contained false information was also something USB either knew or should have known. (Am. Compl. ¶ 45). Crucially, the Amended Complaint alleges USB was either aware the Destra UITs were valueless when added

to AIC Trust or that USB would have known this fact had it acquired and applied the information reasonably available to it. (Am. Compl. ¶ 94). Thus, while it is true the Amended Complaint does not use the phrase "due diligence," USB's lack of diligence is a consistent theme in the factual allegations AIC has pled. USB's read of the Amended Complaint to omit "due diligence" related claims violates pleading construction standards. Courts examining a complaint's sufficiency and scope must draw all reasonable inferences in the plaintiff's favor and a complaint "need only give the defendant fair notice of what the claim is and the grounds on which it rests." Coleman v. Md. Ct. of Apps., 626 F.3d 187, 190 (4th Cir. 2010); Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009).

USB also argues the government investigation documents and AIC's expert testimony on BSA/AML violations should be excluded under Fed. R. Evid. 403 because they are only "marginally relevant" and would waste judicial resources. Def.'s Mem. at 13. But, for the reasons discussed above, these violations are more than marginally relevant. Failures in USB's BSA/AML program are consistent with the monitoring and oversight failures that led to AIC's losses. See Coquina Investments v. Rothstein, No. 10-60786, 2011 WL 4949191, at * 4 (S.D. Fla. Oct. 18, 2011) (finding expert's testimony on BSA/AML compliance relevant evidence that bank "ignored red flags" and acted willfully or recklessly). Since USB's BSA/AML program errors were directly related to monitoring and oversight failures, it is a legitimate use of trial time for AIC to present evidence of the failures. In turn, it is fair game for USB to explain how it believes the programs were operating effectively or how it believes the programs operations did not affect AIC Trust. USB cites cases where Rule 403 was applied to exclude evidence that would take the trial far afield of the claims alleged. For example, in Dodson v. CBS Broadcasting Inc., 423 F. Supp. 2d 331, 333-34 (S.D.N.Y. 2006), a defendant's settlement with

the EEOC was excluded but only because it did not cover the same time period as the defendant's misconduct. Here, USB's BSA/AML cover the same 2013-14 time period when all of the AIC Trust issues arose.

Accordingly, USB's motion to exclude the government investigation documents on relevance grounds should be denied. Far from a "distracting sideshow" (Def.'s Mem. at 13), the misconduct OCC, SEC, and the DPA identify tracks directly with AIC's Amended Complaint allegations and the connection is further supported by AIC's expert testimony.

**3. USB's BSA/AML Training is Relevant Evidence.**

USB moves to exclude evidence of its BSA/AML program training for the same reasons it asks the Court to ignore government investigations documenting the program's failures. Therefore, USB's motion should be denied for the reasons stated above. Specifically, this evidence is relevant because BSA/AML programs are intended to identify and prevent suspicious transactions flowing through national banks like the illicit business Burns, the Southport entities, and others operated through AIC Trust administered by USB. The OCC specifically cited "inadequate training" as a deficiency in USB's BSA/AML program. Plus, AIC's expert found a crucial connection between the training failures identified by OCC and USB's misconduct leading to AIC's losses. D. Coker Report at 18 (noting USB's conduct here "mirrors the pattern of deficiencies and failures" in the BSA/AML program identified by OCC).

## CONCLUSION

Based on the arguments stated above, AIC respectfully requests the Court deny USB's motions in limine. Mr. Coker's expert testimony provides helpful insight on banking industry standards that does not invade the factfinder's role in determining USB's culpability. Additionally, the OCC Consent Order, DPA (with its incorporated "Statement of Facts"), and

SEC findings against Burns are highly probative evidence that is not barred by the hearsay rule and is otherwise admissible. In a case that centers on absent due diligence and sloppy fraud monitoring, AIC should be allowed to offer this objective evidence from federal regulators showing USB's systematic, willful failures on these points at the precise moments AIC Trust was crumbling before its eyes.

Respectfully submitted,

s/ Susan F. Campbell

**MCGOWAN, HOOD & FELDER, LLC**
Susan F. Campbell (Fed Id. 9002)
232 King Street
Georgetown, South Carolina 29440
(843) 833-8082-Tel.
(843) 833-8092-Fax
scampbell@mcgowanhood.com

Chad A. McGowan (Fed Id. 6620)
1539 Health Care Drive
Rock Hill, SC 29732
(803) 327-7800 Tel.
(803) 328-5656 Fax
cmcgowan@mcgowanhood.com

**ATTORNEYS FOR PLAINTIFF**

January 9, 2019
Georgetown, SC