**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | | |
|---|---|---|
| Accident Insurance Company, Inc., a South Carolina Corporation, | ) ) ) | Civil Action No.: 3:16-cv-02621-JMC |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| U.S. Bank National Association, | ) ) | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |
| Defendant. | ) ) | |
| U.S. Bank National Association, | ) ) | |
| Third-Party Plaintiff, | ) ) | |
| v. | ) ) | |
| Southport Lane Advisors, Southport Specialty Finance, Administrative Agency Services, and Alexander Chatfield Burns, | ) ) ) ) | |
| Third-Party Defendants. | ) ) | |

## I.     INTRODUCTION

Plaintiff Accident Insurance Company, Inc. ("Accident") filed this action against Defendant U.S. Bank National Association ("U.S. Bank") seeking monetary damages related to its allegedly deficient administration of a reinsurance trust account created pursuant to a written trust agreement. (ECF No. 154 at 21 ¶ 116–25 ¶ 141.[1])

---

[1] The court observes that, as to its citations in this Order, "ECF No." refers to a filing on the court's electronic docket; "Tr. ECF No." refers to the filed trial transcript; "Pl. Ex. No." refers to the specified trial exhibit of Accident; and "Def. Ex. No." refers to the specified trial exhibit of U.S. Bank.

## II.   PROCEDURAL HISTORY

1.      Accident filed a Complaint against U.S. Bank on July 22, 2016, alleging claims for breach of contract, breach of fiduciary duty, negligence/gross negligence, negligent misrepresentation, and violation of Section 10(b) and Rule 10(b)-5 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78jj.  (ECF No. 1 at 21 ¶ 115–30 ¶ 181.)

2.      After the court denied its Motion to Dismiss (ECF No. 65), U.S. Bank answered the Complaint and filed a counterclaim against Accident for contractual indemnification on November 2, 2017.  (ECF No. 74.)

3.      On November 16, 2017, U.S. Bank filed a Third-Party Complaint against Southport Lane Advisors, LLC, Southport Specialty Finance, LLC, Administrative Agency Services, LLC ("AAS"), and Alexander Chatfield Burns ("Burns"), asserting claims for contribution and apportionment.  (ECF No. 80 at 28 ¶ 94–29 ¶ 100.)

4.      Accident answered U.S. Bank's counterclaim on November 22, 2017.  (ECF No. 89.)

5.      While the parties were engaged in discovery, the court granted Accident leave on July 23, 2018, to file a First Amended Complaint, which alleged claims against U.S. Bank for breach of contract, breach of fiduciary duty, negligence/gross negligence, negligent misrepresentation, and civil conspiracy.  (ECF No. 154 at 21 ¶ 116–25 ¶ 141.)  In the First Amended Complaint, Accident did not assert a claim for violation of the Securities Exchange Act.

6.      After answering the Amended Complaint and filing a counterclaim against Accident for contractual indemnification (ECF No. 155), U.S. Bank moved for summary judgment on November 2, 2018.  (ECF No. 159.)  Accident filed a Response Memorandum in Opposition to Defendant's Motion for Summary Judgment on December 13, 2018, to which U.S. Bank filed a

Reply Memorandum in Support of Its Motion for Summary Judgment on January 2, 2019. (ECF Nos. 174, 184.)

7.    On February 19, 2019, the court heard oral argument from the parties on U.S. Bank's Motion for Summary Judgment. (ECF No. 216.)

8.    In Orders entered on March 22, 2019, and April 11, 2019 (ECF Nos. 223, 232), the court denied U.S. Bank's Motion for Summary Judgment.

9.    Thereafter, the court conducted a bench trial starting on July 8 through July 12, 2019, and concluding on July 15, 2019. (ECF Nos. 275, 277–281, 286–291.) The court heard live testimony from thirteen witnesses and was read the deposition testimony of one witness. The parties also stipulated to the admission of the reports of three expert witnesses in lieu of live testimony (*see* ECF No. 265), and the court took witnesses out of order pursuant to Rule 611 of the Federal Rules of Evidence to facilitate efficiency through the examination of the witnesses for both parties' cases-in-chief.

10.    Following the bench trial, the parties submitted proposed Findings of Fact and Conclusions of Law.[2]

11.    After receiving the testimony, carefully considering all the evidence, weighing the credibility of the witnesses, reviewing the exhibits, and studying the applicable law, the court makes the following Findings of Fact and Conclusions of Law and Order, in accordance with Rule 52(a)(1) of the Federal Rules of Civil Procedure.[3]

---

[2] The court observes that the parties did not jointly identify stipulated facts or separately specify uncontested, undisputed facts in their submissions. In considering their proposals, the court adopted in this Order some of the language suggested by the parties without attribution. In all such instances, the language has become part of the court's review of the evidence and the law.

[3] Rule 52 requires that "[i]n an action tried on the facts without a jury . . ., the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). To the extent

### III.     FINDINGS OF FACT

A.     The Parties to the Instant Action

1.     At the time it filed the instant action, Accident was a South Carolina corporation with its principal place of business in Lexington County, South Carolina.[4]  (ECF No. 1 at 1 ¶ 1.) At all times relevant to this action, Accident was a commercial insurance carrier regulated by the South Carolina Department of Insurance.  (Def. Ex. No. 246.)

2.     U.S. Bank is a wholly-owned subsidiary of U.S. Bancorp, and is a national banking association organized under the laws of the United States with its main office in Cincinnati, Ohio, and its principal place of business in Minneapolis, Minnesota.  (ECF No. 155 at 2 ¶ 2.)  U.S. Bank provides services to include institution trust and custody ("IT&C") for companies in the insurance industry.  (*See* Def. Ex. No. 360 at 16 ¶ 34 (citation omitted).)

B.     Creation of the Fronting Reinsurance Program

3.     On March 1, 2013, Accident began participating in a fronted reinsurance program (the "Program") with Dallas National Insurance Company ("Dallas National").[5]  (Def. Ex. No. 54; Tr. ECF No. 289 at 37:2–4.)

4.     A fronting reinsurance arrangement is summarized as follows:

The fronting company allows another insurer to sell insurance under the fronting company's name.  The fronting company typically receives a fee, usually a set percentage of the premiums, in exchange for allowing the other insurer to use its license and issue policies in its name.  The other insurer, which is the reinsurer, is responsible for underwriting, administering policies and paying claims.  In other

---

any Findings of Fact constitute Conclusions of Law, they are adopted as such; to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

[4] Accident is now a New Mexico corporation with its principal place of business in Albuquerque, New Mexico.  *AIC*, http://www.accinsco.com/about-aic/ (last visited Apr. 1, 2020); *Accident Insurance Company, Inc.*, https://businessfilings.sc.gov/BusinessFiling/Entity/Profile/6dc9a27f-8eb9-4cff-95c2-3df0a757091d (last visited Apr. 1, 2020).

[5] Dallas National and Accident were already familiar with one another because they had previously engaged in a quota share reinsurance arrangement.  (*E.g.*, Def. Ex. No. 360 at 16 ¶ 33 (citation omitted).

words, the reinsurer assumes most, if not all, of the financial risk. As the party responsible for paying claims, the reinsurer bears all risk of loss in the first instance. But if the reinsurer becomes insolvent and is unable to pay claims, that responsibility falls to the fronting company, in whose name the policies were issued.

(Def. Ex. No. 363 at 10 ¶ 14.)

5.    "The fronting carrier buys reinsurance for this fronted business, either from the production source entity or from unrelated reinsurer(s)." (Def. Ex. No. 362, ECF No. 265-3 at 10 ¶ 17.)

6.    "Reinsurance is insurance purchased by an insurance company and results in some or all of the insurer's risk being transferred to the reinsurer." (Pl. Ex. No. 102 at 8 ¶ 10.)

7.    "The reinsurance contract typically provides a ceding commission back to the fronting carrier, which it then passes along to the production source to cover its costs for sourcing and servicing this business." (Def. Ex. No. 362, ECF No. 265-3 at 10 ¶ 17.)

8.    "Accident acted as the fronting carrier, writing general liability insurance policies that were generated by Dallas National and ceding all of the insurance obligations back to Dallas National." (Def. Ex. No. 362, ECF No. 265-3 at 7–8; *see also* Pl. Ex. No. 102 at 12 ¶ 18.) Dallas National, including its various affiliates, was both the production source and the reinsurer of the fronted business." (Def. Ex. No. 362, ECF No. 265-3 at 24 ¶ 44.)

9.    At the inception of the Program, Dallas National was a Texas company and wholly-owned subsidiary of Lonestar Holdco, LLC, which in turn was a wholly-owned subsidiary of Southport Lane, LP.[6] (Def. Ex. No. 158 at 115528); *see also Report on Examination of the Dallas*

---

[6] The Program Agreement specifically affirmed Southport's interest in Dallas National, stating that "Lonestar Holdings, LLC, a subsidiary of Southport owns all of the issued and outstanding equity and voting interests in D[allas] N[ational]." (Def. Ex. No. 54 at 070251 § 21.) Accident knew and understood that Dallas National was a wholly-owned subsidiary of a Southport entity. (Tr. ECF No. 289 at 20:15–21:4; Tr. ECF No. 288 at 159:6–10.) At the time, Southport and its

*National Insurance Company as of December 31, 2011*, https://webcache.google usercontent.com/search?q=cache:hsnLV42l00AJ:https://insurance.delaware.gov/wp-content/uplo ads/sites/15/2016/12/DallasNationalInsuranceCompany2011web.pdf+&cd=3&hl=en&ct=clnk&g l=us&client=firefox-b-1-d (last visited Apr. 3, 2020).

10.    The Program allowed Dallas National or its affiliates to "produce[] commercial general liability insurance business written on policies issued by A[ccident] in certain states approved by A[ccident]."  (Def. Ex. No. 54 at 70244.)

11.    The Program was governed by a Program Agreement between Accident and Dallas National.  (*See id.*)

12.    Under the Program Agreement, Dallas National wrote general liability insurance on Accident's paper; Accident received a fee calculated as a percentage of premium; and, Dallas National reinsured 100% of the business written on Accident's paper.  (Def. Ex. No. 362, ECF No. 265-3 at 25 ¶ 47.)

13.    "Dallas National was responsible in the first instance for all liabilities and loss exposure, but Accident was responsible if Dallas National could not fulfill its policy obligations."  (*Id.* (citing Def. Ex. No. 54 at 702448 § 12).)

14.    The Program Agreement required Dallas National to establish and maintain a "Claims Reserve Fund" in a segregated bank or trust account established for the benefit of

---

affiliates were controlled by Southport's co-founder, then majority owner, and then-chief strategist, Burns.  On March 12, 2013, Dallas National re-domiciled and changed its name to Freestone Insurance Company.  (*See, e.g.*, Def. Ex. No. 360 at 360-19 ¶ 39.)  Freestone is a Delaware corporation.  *Delaware Department of State: Division of Corporations*, https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx (last visited Apr. 1, 2010). For purposes of consistency, the court will continue to refer to Dallas National by that name.

Accident to secure Dallas National's obligations as the 100% insurer.[7]  (*See* Def. Ex. No. 54 at 070248 ¶ 12(a) ("So long as A[ccident] shall have any loss exposure in respect of the Policies, there shall be established and maintained in a segregated bank or trust account . . . established for the benefit of A[ccident]. . . one or more reserve funds for Policy liabilities . . . to be funded by D[allas National]."".)

15.    "As long as Accident had any loss exposure in respect of the policies under the program, Dallas National had to establish and maintain collateral in the account of at least 100 percent of its policy obligations, assuming a loss ratio of at least 75 percent."  (Def. Ex. No. 362, ECF No. 265-3 at 25 ¶ 47 (citing Def. Ex. No. 54 at 702448 § 12).)

16.    On September 25, 2013, after Accident and Dallas National had been running their fronted reinsurance program for approximately five months, they reached an agreement (the "Trust Agreement") with U.S. Bank for it to serve as the trustee for the account (the "Trust Account") that was created to support their reinsurance relationship.  (Def. Ex. No. 89.)  The Trust Agreement's stated purpose was to secure Dallas National's reinsurance obligations to Accident. (*Id.* at 008969.)  The parties were Dallas National as Grantor, Accident as Beneficiary, and U.S. Bank as Trustee.  (*Id.*)

17.    The Trust Agreement (Def. Ex. No. 89) provided in relevant part:

Paragraph 1(a): The Grantor hereby creates a trust account for the sole use and benefit of the Beneficiary pursuant to the terms of this Agreement [].

Paragraph 2(a):  The Trustee shall receive Assets from the Grantor, deposit the Assets into the Trust Account and hold the Assets in the Trust Account for safekeeping, subject to the terms of this Agreement.  All Assets of the Trust Account shall be held by the Trustee in physical or customary book entry form at the Trustee's offices in the United States.  The Trustee shall notify the Beneficiary and Grantor within ten (10) days of any deposits into the Trust Account.

---

[7] U.S. Bank "was not a party to the Program Agreement, had no role in drafting it, had no responsibilities under it, and did not even have a copy of it."  (Def. Ex. No. 363 at 11–12 ¶ 22.)

<u>Paragraph 2(b)</u>: The Assets shall consist only of cash (United States legal tender) and Eligible Securities (as hereinafter defined). The Trustee shall have no duty or responsibility with respect to the qualification, character or valuation of the Assets deposited in the Trust Account, except to determine whether the Assets are in such form that the Beneficiary, or the Trustee upon direction by the Beneficiary, may whenever necessary negotiate any such Assets without consent or signature from the Grantor or any other person or entity.

<u>Paragraph 3(a)</u>: Without notice to or the consent of the Grantor, the Beneficiary shall have the right, at any time, to withdraw from the Trust Account, upon written notice to the Trustee (a "Withdrawal Notice"), such Assets as are specified in the Withdrawal Notice . . . . The Beneficiary need present no statement or document in addition to a Withdrawal Notice in order to withdraw any Assets.

<u>Paragraph 3(b)</u>: Upon receipt of a Withdrawal Notice, the Trustee shall immediately take any and all steps necessary to transfer absolutely and unequivocally to the Beneficiary or to its order all right, title and interest in the Assets being withdrawn, and shall deliver the physical custody of such Assets to or for the account of the Beneficiary as specified in the Withdrawal Notice.

<u>Paragraph 5(a)</u>: Following notice to the Beneficiary, the Trustee shall surrender for payment all maturing Assets and all Assets called for redemption and deposit the proceeds of any such payments into the Trust Account. All such proceeds shall be Invested, as instructed by the Grantor or its designated investment advisor in Eligible Securities satisfying the requirements of Applicable Law regarding the investment of Assets in the Trust Account. Any instruction or order concerning such investment of Assets shall be referred to as an "Investment Order". The Trustee shall execute each Investment Order and settle securities transactions by itself or by means of an agent or broker. The Trustee shall not be responsible for any act or omission, or for the solvency, of any such agent or broker.

<u>Paragraph 5(b)</u>: The Grantor may direct the Trustee to accept substitute Assets for other Assets held in the Trust Account.

<u>Paragraph 5(c)</u>: The Grantor represents and warrants that each Investment Order or Asset substitution will involve an investment in Eligible Securities satisfying the requirements of Applicable Law regarding investments in the Trust Account. The Trustee has no responsibility for determining whether any Assets invested pursuant to an Investment Order or Asset substitution are made in Eligible Securities that comply with the requirements of Applicable Law regarding investments in the Trust Account.

<u>Paragraph 8(a)</u>: The Trustee shall furnish to Grantor and Beneficiary an accounting of all Assets in the Trust Account upon its inception and thereafter at intervals no less frequent than as of the end of each calendar month. Such accounting shall include a statement of all Assets in the Trust Account and shall be given as soon as [] practicable, but in no event later than fifteen (15) days after such date.

<u>Paragraph 8(b)</u>: Before accepting any Asset for deposit to the Trust Account, the Trustee shall determine that such Asset is in such form that the Beneficiary whenever necessary may, or the Trustee upon direction by the Beneficiary will, negotiate such Asset without consent or signature from the Grantor or any person or entity other than the Trustee in accordance with the terms of this Agreement.

<u>Paragraph 12(b)</u>: The term "<u>Applicable Insurance Law</u>" shall mean the law of the State of New York."

<u>Paragraph 12(f)</u>: The term "<u>Eligible Securities</u>" shall mean and include certificates of deposit issued by a United States bank and payable in United States legal tender and securities representing investments of the types specified in subsections (1), (2), (3), (4), (6), (8) and (10) of Section 1404(a) of [] New York Insurance Law; provided, however, that no such securities shall have been issued by a Parent or a Subsidiary of either the Grantor or the Beneficiary. Any deposit or investment direction by Grantor shall constitute a certification by Grantor to the Trustee that the Assets so deposited, or to be purchased pursuant to such investment directions, are Eligible Securities under Applicable insurance Law, and the Trustee shall be entitled to rely on Grantor's representation.

<u>Paragraph 13</u>: This Agreement shall be subject to and governed by the laws of the State of Delaware.

18.    As of September 25, 2013, the following individuals were authorized on behalf of the Trust Account to direct U.S. Bank to take action with regard to the account: Dennis Savage, Controller of Dallas National; Eric Vogelsberg, VP/Sec/Treas/CFO of Dallas National; Harriet Berenstein, VP, Controller of Dallas National; Jim Foy, Finance Director of Dallas National; Christopher Nehls, President, CEO of Dallas National; and Michael D. Hunter, Chief Financial Officer of Accident.[8]  (Def. Ex. No. 84.)

19.    In its role as trustee, U.S. Bank earned the following fees: $5,000.00 annual minimum; 3 basis points (.03%) on the first $50 million of assets; 2 basis points (.02%) on the next

---

[8] Prior to the signing of the Trust Agreement, U.S. Bank was informed by Vogelsberg that Michael Morrow was an authorized signer on all Dallas National accounts. (Def. Ex. No. 84 at 00003010.) "Morrow was the President and Chief Investment Officer of S[outhport Lane Advisors, LLC], a designated SEC registered investment advisor to [Dallas National] and other Southport insurance and reinsurance companies."  (Def. Ex. No. 363 at 21.)

$100 million; 1.5 basis points (.015%) on the balance; and a $3,500.00 annual base fee.  (Def. Ex. No. 95.)

C.    Operation of the Fronting Program

20.    "[F]rom March 2013 to December 2013, Accident allowed Dallas National to write insurance on Accident's paper while the reinsurance Collateral Account was unfunded."  (Def. Ex. No. 363, ECF No. 265-3 at 27 ¶ 52.)

21.    Dallas National first funded the Trust Account on December 5, 2013, when it contributed Port of Seattle Intermediate Lien Revenue Refunding municipal bonds (CUSIP[9] 735389RF7), which possessed a market value of $7,362,904.05.  (Def. Ex. No. 126 at 01-00000130, -133.)

22.    Dallas National next funded the Trust Account on December 30, 2013, when it contributed New Mexico Hospital Equipment Loan Council, Hospital Revenue municipal bonds (CUSIP 647370FN0), which possessed a market value of $2,001,463.20.  (*Id.* at 01-00000129, -133.)

23.    At the end of December 2013 and after each month thereafter, U.S. Bank provided Accident with an account statement that listed all assets and transactions in the Trust Account. (*See* ECF No. 209-4 at 11:35:24–36:9[10]; Def. Ex. No. 126.)

24.    On January 13, 2014, the New Mexico municipal bonds were sold for $2,004,475.00.  (Def. Ex. No. 126 at 00000139.)

---

[9] "The CUSIP number, also known as the Committee on Uniform Securities Identification Procedures number, is a unique nine-character identification number assigned to all stocks (and registered bonds) in the U.S. and Canada."  Investopedia, https://www.investopedia.com /ask/answers/06/cusipforspecificstock.asp (last visited Mar. 15, 2020).

[10] This statement originates from the deposition testimony of Maria Todd, which was read into the trial record.  (*See* Tr. ECF No. 291 at 32:17–34:19.)

25.     On January 14, 2014, the Port of Seattle municipal bonds were sold for $7,381,762.05.  (*Id.*)

26.     On January 17, 2014, Dallas National placed into the Trust Account $193,000.00 in face value of membership interests in Camelot Assets Holding LLC ("Camelot") and $9,391,423.29 worth of Destra Targeted Income Unit Investment Trust securities ("Destra UITs"). (Def. Ex. No. 126 at 00000135, -140.)

27.     The Destra UIT is a Delaware statutory trust under the Delaware Statutory Trust Act, 12 *Del. C.* §§ 3801 et seq.  (Pl. Ex. No. 89 at 00061311–00061312.)  Destra UITs are governed by the Standard Terms and Conditions of Trust (the "Destra Master Trust Agreement") and are subject to Delaware law.  (Def. Ex. No. 39.)  The Destra Master Trust Agreement is dated as of October 1, 2012. (Def. Ex. No. 39.) The parties to Destra UITs are AAS as Administrative Agent,[11] Destra Capital Investments LLC as Depositor and Sponsor, Destra Capital Advisors LLC as Evaluator, and U.S. Bank Trust, a Delaware-based wholly-owned subsidiary of U.S. Bank, as Trustee.[12]  (*Id.* at 00006199.)  Destra UITs were primarily meant to hold membership interests in

---

[11]AAS was responsible for managing Destra UITs, functioning as the collateral manager.  (Tr. ECF No. 286 at 129:23–130:4.)  It was AAS's exclusive responsibility to value the Destra UITs' underlying assets.  (Def. Ex. No. 39 at 00006211–00006212 §§ 4.01, 4.02, 4.04.)  AAS also had sole discretion to approve all unit transfers and unitholders.  (*Id.* at 00006204 §§ 1.04, 1.05, 00006216–00006217 § 5.03.)  There was no form of documentation to evidence unit ownership; instead, AAS maintained the official book of registered holders.  (*Id.* at 00006203 § 1.01(45), 00006204 § 1.05, 00006205 § 2.02.)

[12] As to the Destra UITs, U.S. Bank's role was custodial, administrative, and non-discretionary. (Tr. ECF No. 286 at 130:5-23.)  U.S. Bank's duties were expressly limited to those specified in the Destra Master Trust Agreement.  Section 7.01(m) provided: "The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Trust Agreement, and no implied covenants or obligations shall be read into this Trust Agreement against the Trustee." (Def. Ex. No. 39 at 00006221 § 7.01(m).)  The Destra Master Trust Agreement also provided that "[t]he Trustee shall not be responsible for the acts or omissions of . . . the Administrative Agent or any other person." (*Id.* § 7.01(p).)  The Destra Master Trust Agreement further provided that "[t]he Trustee shall not be responsible . . . for the form, character, genuineness, sufficiency, value or validity of any Portfolio Securities . . . ." (*Id.* at 00006220 § 7.01(f).)  Finally, the Destra Master

various limited liability companies. (ECF No. 286 at 120:11–14.) The Destra UITs initially consisted of three Series.[13] (Def. Ex. No. 38 at 00006362–00006377.) The face value came from the Destra UITs' underlying assets[14]: "Senior and mezzanine loans purportedly made to Premium Wine Acquisitions ("PWA"); Membership interest in ECIP [Extensor Capital Investment Partners] III ("ECIP"); an indirect interest in: (i) junior PWA loans TIO Series I, II, and III, (ii) preferred stock in Metcom through TIO Series V, (iii) other purported loans referred to as "Stock Loan Fund" loans related to Constellation, Massive, and PBEV through TIO Series IV, and (iv) TIO Art Funding which held the Caravaggio artwork; and Class A shares of Constellation." (ECF No. 265-

---

Trust Agreement states that U.S. Bank had no duty to investigate the facts in any document provided to it and no duty to recalculate, verify, or evaluate any information that AAS furnished. (*Id.* at 00006221 §§ 7.01 (n), (o).) Through its Fund Services business line, U.S. Bank provided accounting services to the UIT. (Def. Ex. No. 39 at 00006230–00006233; Tr. ECF No.286 at 120:21–24, 134:1–5.) Each quarter, AAS valued the Portfolio Securities and provided its valuations to Fund Services. (*See, e.g.*, Def. Ex Nos. 47, 48, 49, 50, 51, 52.) Acting in a limited role, Fund Services took the value provided by AAS and factored in any interest income and expenses, and then posted the resulting number on NASDAQ. (*Id.*) The Destra Master Trust Agreement specified that Fund Services was to make the calculation "based solely" on AAS's valuations of the underlying assets. (Def. Ex. No. 39 at 00006212 § 4.02.) U.S. Bank was entitled to rely on AAS's valuations and had "no responsibility" for their accuracy. (*Id.* § 4.04.) U.S. Bank's fees relating to the Destra UITs were commensurate with its limited scope of trustee and fund accounting services. U.S. Bank received a fixed annual fee of $6,000.00 per Series and a variable monthly fee of .035% of the monthly net asset value of each Unit. (*See, e.g.,* Def. Ex. No. 39 at 00004310, 00004317.)

[13] In November 2013, Southport established two more Series of Destra UITs, with a face value of $140 million. (Tr. ECF No. 286 at 135:2–18; Def. Ex. No. 105 at 00012536.) The underlying assets consisted of membership interests in limited liability companies. (*See* Def. Ex. No. 105.) Because the Destra Master Trust Agreement was in place and the parties were the same, Series IV and V closed quickly with the involvement of outside counsel. (Tr. ECF No. 286 at 135:19–136:3; Def. Ex Nos. 108, 109, 110.)

[14] Southport Specialty Finance, LLC, the sole member of AAS, contributed Destra UITs to the underlying assets. (*See, e.g.*, Pl. Ex Nos. 24, 25.) AAS, as Administrative Agent, gave these underlying assets—known as the UITs "Portfolio Securities"—to Destra Capital for deposit in the UIT. (Def. Ex. No. 39 at 00006202 § 1.01(22), 00006206 § 3.01.) While AAS and Southport Specialty Finance are part of the "Southport" assembly of companies, neither of them was a parent or subsidiary of Dallas National. (*See, e.g.*, Def. Ex. No. 158 at 115533; Def. Ex. No. 379 at 00086009.)

2 at 10 § B (citations omitted); *see also* Def. Ex. No. 38 at 00006362–00006377*.*)

28.    As to the Destra UITs, the January 2014 month-end statement conveyed that "[t]his asset is held or controlled by the customer or by a third party on behalf of the customer, and is reported for customer recordkeeping purposes only." (Def. No. 126 at 01 00000136.) "U.S. Bank does not have actual custody or control of this asset." (*Id.*) "With the exception of most marketable securities, the description of the asset and its price (or value) may have been provided to U.S. Bank by the customer or a third party and should not be relied upon for any purpose." (*Id.*) "No current price is available." (*Id.*)

29.    In February 2014, Dallas National withdrew $2,500,000.00 of Destra UITs and replaced them with $2,589,428.80 in Cook County, Illinois municipal bonds (CUSIP 213185FE6, CUSIP 213185FF3). (Def. Ex. No. 126 at 01-00000143, -146– - 147.)

30.    The February 2014 month-end statement reported $87.70 in cash, $6,891,423.29 in Destra UITs (various series), $193,000.00 in Camelot shares, and $2,604,408.05 in Cook County II Series A municipal bonds. (*Id.* at 00000143.)

31.    Additionally, as to the Destra UITs, the February 2014 month-end statement conveyed that "[t]his asset is held or controlled by the customer or by a third party on behalf of the customer, and is reported for customer recordkeeping purposes only." (*Id.* at 00000144.) "U.S. Bank does not have actual custody or control of this asset." (*Id.*) "With the exception of most marketable securities, the description of the asset and its price (or value) may have been provided to U.S. Bank by the customer or a third party and should not be relied upon for any purpose." (*Id.*) "No current price is available." (*Id.*)

32.    In March 2014, Dallas National deposited additional collateral of $2,730,048.95, consisting of two issues of municipal bonds identified as Kentucky St Property And Bldgs

Commission Revenues Refunding Project Number 76 (CUSIP 49151EMT7) and Virginia ST Hsg Dev (CUSIP 92812UF94), in response to Accident's request for additional collateral.  (*Id.* at 01-0000149–151, -153.)

33.    As of March 31, 2014, the Trust Account held collateral assets with a total market value of $12,444,460.87, consisting of:  Destra UITs with a market value of $6,896,781.99; Camelot shares of $193,000.00; and municipal bonds totaling $5,284,977.30.  (*Id.* at 01-0000148–150.)

34.    On April 15, 2014, Dallas National suspended writing new and renewal business policies.  (Def. Ex. No. 156 at 069548.)

35.    On April 28, 2014, Accident was informed that Dallas National had entered receivership with the Delaware Insurance Commissioner as Receiver.  (*See* Def. Ex. No. 170 at 079407.)  The Fronting Program was terminated and went into run-off, which meant that no new policies were written, and the operations focused on handling claims and premium payments.  (*Id.*)  There is no evidence before the court that Dallas National made any further contributions to the Trust Account after this date.

36.    In its account statement to Accident for the period from April 1, 2014 to April 30, 2014, U.S. Bank stated that the net asset value of Destra UITs were "N/A."  (Def. Ex. No. 126 at 00000157.)  U.S. Bank further stated that "[t]he accuracy of the Market Value/Price for the Destra units reflected in your account statement is uncertain and should not be relied upon for any purpose."  (*Id.*)

37.    On June 11, 2014, the Receiver filed a Verified Petition for the Entry of Liquidation and Injunction Order with the Delaware Court.

38.    With Dallas National insolvent and the Fronting Program in run-off, Accident

became responsible for paying the Fronting Program losses.   (Tr. ECF No. 227:8–228:24.) Accident administered and paid claims on existing policies and handled premium payments.  (*Id.*)

39.    Accident contacted U.S. Bank about the Trust Account on June 16, 2014, when Accident's Chief Financial Officer, Michael D. Hunter, called Robert Ruby, a U.S. Bank account manager, and wanted to know how Destra UITs made their way into the Trust Account.  (Def. Ex. No. 169; Tr. ECF No. 287 at 138:6–139:20.)  Ruby asked that Hunter send an email with his questions so that U.S. Bank could review and respond, but Hunter did not follow through.  (Tr. ECF No. 287 at 139:8-15.)

40.    On July 11, 2014, Hunter submitted to U.S. Bank (to the attention of its Vice President/Regional Coordinator Judy Staudermann) a request for delivery to Accident of all assets held in the Trust Account.  (Pl. Ex. No. 97; Def. Ex. No. 179; Tr. ECF No. 288 at 75:14–76:2; Tr. ECF No. 288 at 208:13–209:7.)

41.    On July 17, 2014, Staudermann sent an e-mail to Hunter providing the following information:

> We will transfer the municipal securities and the case in the account tomorrow.  The other securities Destra and Camelot will require additional paperwork.  We are working to accomplish the transfer of these assets as soon as possible.
>
> I have attached a list of the assets and cash that will be delivered tomorrow to Accident . . . per your instructions received on 7/11/2014.

(Pl. Ex. No. 103, Ex. 10.)

42.    On July 18, 2014, U.S. Bank transferred municipal bonds and cash valued at approximately $5,382,455.12, but did not transfer Destra UITs or Camelot shares because they required additional steps and paperwork.  (Tr. ECF No. 288 at 76:3–17; Tr. ECF No. 288 at 209:8–16; Def. Ex. Nos. 184, 186, 187, 189.)

43.    On July 21, 2014, Accident received the municipal bonds and cash and deposited

these collateral assets in an account at Regions Bank, which Accident designated for use in connection with the Fronting Program.  (Pl. Ex. No. 106 at 00000047;Tr. ECF No. 210:23–211:19.)

44.     On July 22, 2014, Dallas National was placed into Liquidation.  In addition, Hunter sent Staudermann an e-mail inquiring about the status of the Destra and Camelot funds.  (Def. Ex. No. 184 at 00013251.)

45.     On July 23, 2014, Staudermann reiterated to Hunter that "the Camelot and Destra assets require additional steps and we continue to work toward getting that in order."  (*Id.*)

46.     On July 25, 2014, Accident sold the municipal bonds netting $5,418,984.00.  (Pl. Ex. No. 106 at 00000048–00000049.)

47.     On July 31, 2014, Staudermann sent Hunter an e-mail providing the following information:

> Administrative Agency Services, the administrative agent for the Destra units held in the Freestone-Accident reinsurance trust, has asked to speak with someone at Accident [] regarding the Accident withdrawal request and the status of the Destra units.  You may want to contact Mr. Hugh Hill at Southport (parent company of Administrative Agency Services) regarding the Destra assets.  Hugh can be reached at (212)729-3319.

(Pl. Ex. No. 103, Ex. 11.)  In a subsequent e-mail sent in response to a question from Hunter about the Camelot stock, Staudermann stated that the process was "in the paperwork stage [and] I will advise you as soon as we have any additional information on this transfer."  (Def. Ex. No. 187 at 00013269.)

48.     On August 7, 2014, Staudermann sent Hunter an e-mail providing the following information:

> As a follow-up to my earlier email concerning Hugh Hill's interest in speaking with you about the Destra UIT investments, we have been advised by Mr. Hill that the best way to reach him is at his cell phone at (646)300-2811 or by email at hhill@southportlane.com.

(Def. Ex. No. 189 at 00013284.)

49.    On December 31, 2015, Southport Specialty Finance, LLC deposited Destra UITs with a value of $2,467,384.28 and $195,442.00 in cash into the Trust Account for a total of $2,662,826.28.  (Def. Ex. No. 254 at 01-00000284.)

50.    On or about March 2, 2018, various entities dissolved the Camelot Trust and issued certificates in Accident's name.  (*See* Def. Ex. No. 358.)

51.    Based on the April 2018 bank statement, Destra UITs were still in the Trust Account.  (Pl. Ex. No. 104-5 at 14.)

52.    On June 3, 2019, Accident received a wire for $169,738.55 related to a liquidation of the Camelot assets that were held in the Trust Account.  (Pl. Ex. No. 104 at 6.)

## IV.    CONCLUSIONS OF LAW

A.    The Court's Jurisdiction

1.    This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

B.    Actions Tried Without a Jury

2.    "In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."  Fed. R. Civ. P. 52(a)(1).

3.    Where the court serves as the trier of fact, it must determine the credibility of witnesses and the weight to be given their testimony.  *J.S.K. Realty Co. v. New Plan Realty Trust,* 9 Fed. Appx. 89 (4th Cir. 2001).  The court has both the right and the duty to weigh the evidence and to draw reasonable inferences and deductions.  *United States v. Bales,* 813 F.2d 1289 (4th Cir.

1987) (where jury trial is waived, judge weighs the evidence, determines the credibility of the witnesses, and finds the facts).

C.    Governing Law and Burden of Proof

4.    The substantive law of Delaware governs all claims in this action. (*See* Def. Ex. 89 at 008977 ¶ 13.) In a diversity suit, federal courts must apply the rules of the forum state when addressing choice-of-law questions. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). South Carolina choice-of-law rules dictate that the court must apply the law specified in a contract. *See Bannister v. Shepherd*, 4 S.E.2d 7, 9 (S.C. 1939); *Livingston v. Atl. Coast Line R.R. Co.*, 180 S.E. 343, 345 (S.C. 1935). The Trust Agreement between the parties contains a choice of law clause providing that "[t]his Agreement shall be subject to and governed by the laws of the State of Delaware." (Def. Ex. 89, § 13.)

5.    Accident has the burden of proving each element, including damages, of each of its claims by a preponderance of the evidence. *OptimisCorp v. Waite*, C.A. No. 8773-VCP, 2015 WL 5147038, at *55 (Del. Ch. Aug. 26, 2015). "Proof by a preponderance of the evidence means proof that something is more likely than not." *Id.* "It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *Id.* (citations and internal quotation marks omitted). "By implication, the preponderance of the evidence standard also means that if the evidence is in equipoise, Plaintiffs lose." *Id.* In deciding whether any fact has been proved by a preponderance of the evidence, the court may consider the testimony of all witnesses regardless of who called them, and all exhibits received into evidence regardless of who produced them. *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 570 (Del. Super. 2005) (citations omitted).

D.    Interpretation of the Trust Agreement

6.    Generally, the parties do not dispute that Delaware law substantively defines the

claims asserted by Accident.[15]

7.     The epicenter of the parties' dispute is their disagreement regarding how strict an adherence should be given to Delaware's general rules of contract interpretation, summarized as follows:

> For any court, the primary goal of contract interpretation is to satisfy the reasonable expectations of the parties at the time they entered into the contract.  When a contract is clear on its face, the court should rely solely on the clear, literal meaning of the words contained in the contract.  "Where parties have entered into an unambiguous integrated written contract, the contract's construction should be that which would be understood by an objective reasonable third party."  When the contract language is clear, the court may not consider parol or extrinsic evidence to determine the intent of the parties.  Essentially, when parties have agreed, and the contract is clear on its face, the court may look only to the words chosen by the parties to determine the contract's meaning.

> Situations arise however, where terms of the contract are not clear on its face, and the court is forced to look outside the contract for meaning.  When terms are "fairly susceptible [to] different interpretations", they are considered ambiguous.  "Ambiguity may exist if the terms of the contract are inconsistent, or when there is a reasonable difference of opinion as to the meaning of words or phrases."  When a court determines that there is ambiguity in the terms of a contract, the court is empowered to look to extrinsic evidence to determine the parties' reasonable intent at the time of the contract.  The extrinsic evidence the court may consider includes "overt statements and acts of the parties, the business context [of the contract], prior dealings between the parties, business custom and usage in the industry."

> Finally, situations arise when the contract itself is missing terms.  While it "is not the proper role of a court to rewrite or supply omitted provisions to a written agreement," "[i]n cases where obligations can be understood from the text of a written agreement but have nevertheless been omitted in the literal sense, a court's inquiry should focus on 'what the parties likely would have done if they had considered the issues involved.'"  Where a court cannot determine what the parties would have agreed to had they considered the issues and terms omitted, a court is not permitted to insert its own judgment and terms.  However, "in the narrow context governed by principles of good faith and fair dealing, this Court has recognized the occasional necessity of implying such terms in an agreement so as to honor the parties' reasonable expectations."

---

[15] The court observes that this assertion and others attributed to the parties in this section were extracted from their proposed Findings of Fact and Conclusions of Law.  Nonetheless, the court does not suggest that the parties failed to include these assertions in the trial of this matter.

*The Liquor Exchange, Inc. v. Tsaganos*, No. Civ.A.19312-NC, 2004 WL 2694912, at *2 (Del. Ch. Nov. 16, 2004) (internal citations omitted).

    i.     *Accident's Position*

    8.     Accident asserts that Delaware and New York's reinsurance regulations have required conditions that essentially supersede the express language of the Trust Agreement.

    9.     Accident asserts that even though the Trust Agreement references Delaware as the governing law, but defines the "Applicable Insurance Law" as the law of New York, there is no conflict of law problem because the regulations of these 2 states are substantively similar.[16]

    10.     Accident further asserts that these regulations effectively dispose of U.S. Bank's "directed trustee" defenses in this case.

    **a.     Delaware's Reinsurance Act Regulations**

    11.     Title 18, Chapter 9, Sections 910–916 are called the "Reinsurance Act."  18 Del. Admin. Code § 1003-2.0.

    12.     The Reinsurance Act provides that "[a]ny authorized insurer may reinsure all or any part of an individual risk or of a particular class of risks in any other insurer or accept such reinsurance from any other insurer."  18 Del. C. § 910.

    13.     Under the Reinsurance Act, the Delaware Insurance "Commissioner may adopt rules and regulations implementing the provisions of this law."  18 Del. C. § 915.

    14.     Accident asserts that the following regulations promulgated in section 1003[17] of Delaware's reinsurance regulations should control the court's interpretation of the Trust

---

[16] Every state is not going to necessarily have all the same requirements.  *See The Trustee's Role*, http://www.captiveinsurancetimes.com/specialistfeatures/specialistfeature.php?specialist_id=294 (last visited Apr. 7, 2020).
[17] Section 1003 is titled "Credit for Reinsurance."

Agreement's provisions:

| | |
|---|---|
| -7.3.1.2 | Legal title of the assets of the trust shall be vested in the trustee for the benefit of the grantor's U.S. ceding insurers, their assigns and successors in interest. |
| -11.2 | Required conditions. |
| -11.2.1 | The trust agreement shall be entered into between the beneficiary, the grantor and a trustee, which shall be a qualified United States financial institution as defined in § 913(b) of the Reinsurance Act. |
| -11.2.2 | The trust agreement shall create a trust account into which assets shall be deposited. |
| -11.2.3 | All assets in the trust account shall be held by the trustee at the trustee's office in the United States. |
| -11.2.4 | The trust agreement shall provide that: |
| -11.2.4.1 | The beneficiary shall have the right to withdraw assets from the trust account at any time, without notice to the grantor, subject only to written notice from the beneficiary to the trustee; |
| -11.2.4.2 | No other statement or document is required to be presented to withdraw assets, except that the beneficiary may be required to acknowledge receipt of withdrawn assets; |
| -11.2.4.3 | It is not subject to any conditions or qualifications outside of the trust agreement; and |
| -11.2.4.4 | It shall not contain references to any other agreements or documents except as provided for in Paragraphs 11.2.11 and 11.2.12 of this Section. |
| -11.2.10 | The trust agreement shall provide that the trustee shall be liable for its negligence, willful misconduct or lack of good faith. The failure of the trustee to draw against the letter of credit in circumstances where such draw would be required shall be deemed to be negligence and/or willful misconduct. |
| -11.2.6.1 | Receive assets and hold all assets in a safe place; |
| -11.2.6.2 | Determine that all assets are in such form that the beneficiary, or the trustee upon direction by the beneficiary, **may whenever necessary negotiate** any such assets, **without consent** or signature from the grantor or any other person or entity; *** |
| -11.2.6.5 | Upon written demand of the beneficiary, immediately take any and all steps necessary to transfer absolutely and unequivocally all right, title and interest in the assets held in the trust account to the beneficiary and deliver physical custody of the assets to the beneficiary; and |
| -11.2.6.6 | Allow no substitutions or withdrawals of assets from the trust account, except on written instructions from the beneficiary, except that the trustee may, without the consent of **but with notice to the beneficiary**, upon call or maturity of any trust asset, |

| | withdraw such asset upon condition that the proceeds are paid into the trust account. (emphasis added) *** |
|---|---|
| -11.3 | Permitted conditions. *** |
| -11.3.3 | The trustee may be given authority to invest, and accept substitutions of, any funds in the account, **provided that no investment or substitution shall be made without prior approval of the beneficiary**, unless the trust agreement specifies categories of investments acceptable to the beneficiary and authorizes the trustee to invest funds and to accept substitutions that the trustee determines are at least equal in current fair market value to the assets withdrawn and that are consistent with the restrictions in Paragraph 11.4.1.2 of this Section. *** |

18 Del. Admin. Code §§ 1003-7.0, -11.

15.     The foregoing regulations evidence the intent of the Delaware Commissioner of Insurance "to set forth rules and procedural requirements" necessary "to carry out the provisions of . . . the 'Reinsurance Act.'" *Id.* at § 1003-2.0

16.     The Trust Agreement at issue in this dispute provides that Dallas National may direct U.S. Bank "to accept substitute Assets for other Assets held in the Trust Account." (Def's Ex. No. 89 at 008971 ¶ 5(b).)

17.     This provision is not in agreement with the requirements of § 11.3.3. *See* 18 Del. Admin. Code §§ 1003-11.3.3.[18]

18.     Because it contains a provision contrary to the requirements of Reinsurance Act's regulation, the Trust Agreement is not acceptable under the Reinsurance Act.

> **b.    New York Regulation 114 Trust**

19.     A Regulation 114 Trust is a trust agreement governed by regulations promulgated

---

[18] The court observes that in its proposed Findings of Fact and Conclusions of Law, Accident also contends that paragraphs 5(a), 5(c), 8(b), 8(g), 8(h) have provisions that are not permitted by Delaware's reinsurance regulations.

by the New York Department of Insurance.

20.     Regulation 114 "sets forth the [New York] Department [of Insurance]'s requirements for trusts that are to be used by insurance companies, particularly those used in connection with reinsurance agreements."  Op. Gen. Counsel N.Y. Ins. Dep't No. 7-21-2005 (#2) (July 2005).

21.     The express purpose of Regulation 114 is to "inform[] all licensed insurers that [] [trust] agreements will not be acceptable to the [New York] [D]epartment [of Insurance] unless they meet certain required conditions."  11 N.Y.C.R.R. § 126.1 (West 2020).

22.     "Regulation 114 is intended to protect domestic insurers that have ceded business to unauthorized reinsurers by affording to cedants unfettered access to readily liquidatable collateral." Op. Gen. Counsel N.Y. Ins. Dep't No. 10-27-2008 (#2) (Oct. 2008).  "[T]he regulation prohibits any trust features that could possibly impair the use of the proceeds of an investment by the ceding company." *Id.*

23.     In accordance with the foregoing, Regulation 114 contains specific, required provisions that must be in a trust agreement to qualify as a Regulation 114 trust. *See* 11 N.Y.C.R.R. § 126.3.

24.     The Trust Agreement at issue in this dispute provides that (1) it is subject to and governed by the laws of the State of Delaware" and (2) Dallas National may direct U.S. Bank "to accept substitute Assets for other Assets held in the Trust Account."  (Def's Ex. No. 89 at 008971 ¶ 5(b), 008977 ¶ 13.)

25.     These provisions are not in agreement with the requirements of Regulation 114. *See* 11 N.Y.C.R.R. § 126.3(f)(6) ("The trust agreement must provide for the trustee to: . . . (6) allow no substitutions or withdrawals of assets from the trust account, except on written

instructions from the beneficiary.  This requirement shall not be deemed to prohibit substitutions permitted by section 126.4(c) of this Part."[19]), (h) ("The trust agreement must be made subject to and governed by the laws of the State of New York, except that, when the beneficiary is a licensed foreign insurer, such insurer's state of domicile may be substituted for New York.").

26.     Because it contains provisions contrary to the requirements of Regulation 114, the Trust Agreement is not acceptable under Regulation 114.

    ii.      *U.S. Bank's Position*

27.     U.S. Bank contends that the express language of the Trust Agreement establishes that it was a directed trustee functioning "as a custodian of assets and [allowed to] take[] direction from a third party."  (*E.g.*, Def. Ex. No. 363 at 15 ¶ 26, 18–19 ¶ 33.)

28.     In support of its directed trustee defense, U.S. Bank relies on the "Fiduciary Act," Title 12, Chapter 33, Sections 3301–3344.

29.     The Fiduciary Act defines a fiduciary to include a trustee and defines a governing instrument as including a trust agreement.  12. Del. C. §§ 3301(d), (3).

30.     Under the Fiduciary Act, the trust must "act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use to attain the purposes of the account."  *Id.* at § 3302(a).

31.     The Fiduciary Act expressly limits claims for breach of fiduciary duty when a trustee acts in good faith reliance on a governing instrument.  *See id.* at §3302(e).  In this regard, the standard of care may be expanded, restricted or eliminated by express provisions in a governing instrument.  *Id.*

---

[19] 11 N.Y.C.R.R. § 126.4(c) permitted substitutions only with prior approval of the beneficiary, unless the asset was preapproved for acceptance by the beneficiary.

32.    Additionally, the Fiduciary Act allows the terms of a trust agreement to expand, restrict, eliminate or otherwise define the rights of a beneficiary. *Id.* at § 3303(a).

33.    Moreover, the Fiduciary Act protects trustees from liability for following the directions of third parties authorized by the grantor and/or beneficiary. *See* 12 Del. C. § 3313.

> iii.    *The Court's Review*

34.    Upon its review, the court observes that the greater weight of the evidence demonstrates that the intent of the parties in drafting the Trust Agreement was not to satisfy all of the regulatory requirements of Delaware and/or New York insurance law.

35.    Accordingly, the court concludes that the greater weight of the evidence demonstrates that construing the Trust Agreement in accordance with the regulatory laws of Delaware and/or New York is not the same as finding that the Trust Agreement is acceptable in Delaware and/or New York.

36.    Moreover, the court was unable to discern relevant legal pronouncements expressly directing it to use the Reinsurance Act, its regulations, or Regulation 114 to rewrite the Trust Agreement to make it acceptable under Delaware and/or New York regulatory law.

37.    Finally, the court did not discern any evidence in the record that an opinion was sought from either the Delaware or New York Departments of Insurance regarding the acceptableness of the Trust Agreement under the relevant regulations. For example, if the parties truly wanted the Trust Agreement to satisfy Regulation 114, they could have gotten an opinion as to its sufficiency from the Office of General Counsel of the New York Department of Insurance, which they did not. *See* Op. Gen. Counsel N.Y. Ins. Dep't No. 10-19-99 (#2) (Oct. 1999).

38.    However, the court is persuaded that its application of the Fiduciary Act would be consistent with Delaware's general rules of contract interpretation. *See Why is Everyone Talking*

*about Delaware Trusts?*, https://webcache.googleusercontent.com/search?q=cache:eVIWvKpl

5ZkJ:https://www.gfmlaw.com/sites/default/files/pdfs/Why%2520is%2520Everyone%2520Talk

ing%2520About%2520Delaware%2520Trusts.pdf+&cd=5&hl=en&ct=clnk&gl=us&client=firef

ox-b-1-d#22 (last visited Apr. 8, 2020) ("The starting point for the creation of directed trusts is the

statutory framework that permits them coupled with the carefully worded language of the trust

instrument.").

E.     Accident's Claim for Breach of Contract

39.     In the Amended Complaint, Accident alleged that U.S. Bank breached paragraph

8(b) of the Trust Agreement, which provided:

> Paragraph 8(b): Before accepting any Asset for deposit to the Trust Account, the Trustee shall determine that such Asset is in such form that the Beneficiary whenever necessary may, or the Trustee upon direction by the Beneficiary will, negotiate such Asset without consent or signature from the Grantor or any person or entity other than the Trustee in accordance with the terms of this Agreement.

(ECF No. 154 at 21 ¶¶ 117–118 (referencing Def. Ex. No. 89 at 08972).)

40.     Through its expert, Accident further alleged that U.S. Bank breached paragraphs

2(b), 3(a), 3(b), and 8(i) of the Trust Agreement, which provided:

> Paragraph 2(b): The Assets shall consist only of cash (United States legal tender) and Eligible Securities (as hereinafter defined).  The Trustee shall have no duty or responsibility with respect to the qualification, character or valuation of the Assets deposited in the Trust Account, except to determine whether the Assets are in such form that the Beneficiary, or the Trustee upon direction by the Beneficiary, may whenever necessary negotiate any such Assets without consent or signature from the Grantor or any other person or entity.

> Paragraph 3(a): Without notice to or the consent of the Grantor, the Beneficiary shall have the right, at any time, to withdraw from the Trust Account, upon written notice to the Trustee (a "Withdrawal Notice"), such Assets as are specified in the Withdrawal Notice . . . . The Beneficiary need present no statement or document in addition to a Withdrawal Notice in order to withdraw any Assets.

Paragraph 3(b): Upon receipt of a Withdrawal Notice, the Trustee shall immediately take any and all steps necessary to transfer absolutely and unequivocally to the Beneficiary or to its order all right, title and interest in the Assets being withdrawn, and shall deliver the physical custody of such Assets to or for the account of the Beneficiary as specified in the Withdrawal Notice.

Paragraph 8(i): The Trustee shall not be liable for any loss, liability, costs or expenses, (including reasonable attorney's fees and expenses) incurred or made arising out of or in connection with the performance of its duties hereunder in accordance with the provisions of this Agreement, unless such loss, liability, costs or expenses are caused by its own negligence, willful misconduct or lack of good faith.

(Pl. Ex. No. 103 at 9 § B, 16 ¶ VII(2) (referencing Def. Ex. No. 89 at 008970, 008973).)

41.    Finally, at trial, Accident also alleged that U.S. Bank breached paragraphs 2(a) and 5(a) of the Trust Agreement, which provided:

Paragraph 2(a):  The Trustee shall receive Assets from the Grantor, deposit the Assets into the Trust Account and hold the Assets in the Trust Account for safekeeping, subject to the terms of this Agreement.  All Assets of the Trust Account shall be held by the Trustee in physical or customary book entry form at the Trustee's offices in the United States.  The Trustee shall notify the Beneficiary and Grantor within ten (10) days of any deposits into the Trust Account.

Paragraph 5(a): Following notice to the Beneficiary, the Trustee shall surrender for payment all maturing Assets and all Assets called for redemption and deposit the proceeds of any such payments into the Trust Account.  All such proceeds shall be Invested, as instructed by the Grantor or its designated investment advisor in Eligible Securities satisfying the requirements of Applicable Law regarding the investment of Assets in the Trust Account.  Any instruction or order concerning such investment of Assets shall be referred to as an "Investment Order".  The Trustee shall execute each Investment Order and settle securities transactions by itself or by means of an agent or broker.  The Trustee shall not be responsible for any act or omission, or for the solvency, of any such agent or broker.

(Def. Ex. No. 89 at 008969–008970, 008971.)

42.    Accident's attempt to add claims of breach after the Amended Complaint are governed by Rule 15 of the Federal Rules of Civil Procedure.

43.    Rule 15(b) authorizes amendment of the pleadings to conform to issues "tried by the parties' express or implied consent" or that do not "prejudice th[e opposing] party's action or

defense on the merits." Fed. R. Civ. P. 15(b).

44.     Upon its review, the court finds that U.S. Bank did not either expressly or impliedly consent to the aforementioned amendments. However, the court also finds that U.S. Bank was not prejudiced by the amendments because it was able to present its evidentiary defense to these additional claims. *See Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 761 (Del. Ch. 2014) ("The primary test for prejudice when a party seeks to assert a new theory 'is whether the opposing party was denied a fair opportunity to defend and to offer additional evidence on that different theory.'" (citations omitted)).

     *i.*     *Legal Standard*

45.     To prevail on a claim for breach of contract, "the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003) (citations omitted).

     *ii.*     *Existence of a Contract*

46.     "Under Delaware law, a contract has been defined 'as an agreement upon sufficient consideration to do or not to do a particular thing.'" *Freeman v. Scott*, C.A. No. CPU4-16-002251, 2017 WL 2633487, at *4 (Del. Ct. Com. Pl. June 19, 2017) (citations omitted). "In general, a contract is formed when one person ('offeror') makes an 'offer' to a second person ('offeree') to enter into a contract and the offeree accepts, intending to be bound by the terms of the contract." *Lee-Scott v. Shute*, C.A. No. CPU4-16-001459, 2017 WL 1201158, at *4 (Del. Ct. Com. Pl. Jan. 30, 2017) (citations omitted).

47.     Neither Accident nor U.S. Bank disputes that the Trust Agreement was a valid contract in existence binding Accident and U.S. Bank.

iii.     *Breach of a Contractual Obligation*

48.     "A breach of contract occurs by a party's non-performance, repudiation, or both."

*Batres v. Knight*, C.A. No. CPU4-18-002154, 2019 WL 1450160, at *2 (Del. Ct. Com. Pl. Mar.

28, 2019) (citation omitted).

49.     "A slight breach by one party, while giving rise to an action for damages, will not

necessarily terminate the obligations of the injured party to perform under the contract." *E. Elec.*

*& Heating, Inc. v. Pike Creek Prof'l Ctr.*, 1987 WL 9610, at *4 (Del. Super. Ct. Apr. 7, 1987)

(citing 11 Williston on Contracts § 1292, at 8 (3d ed. 1968)).

50.     "A material breach is "a failure to do something that is so fundamental to a contract

that the failure to perform that obligation defeats the essential purpose of the contract . . . ."

*Tektree, LLC v. Borla Performance Indus., Inc.*, C.A. No. CPU4-12-00291, 2013 WL 5230705, at

*4 (Del. Ct. Com. Pl. Sept. 16, 2013) (quoting *Shore Invs., Inc. v. Bhole, Inc.*, C.A. No. S09C-09-

013-ESB, 2011 WL 5967253, at *5-6 (Del. Super. Ct Nov. 28, 2011)).

51.     "[F]or a breach of contract to be material, it must 'go to the root' or 'essence' of

the agreement between the parties, or be 'one which touches the fundamental purpose of the

contract and defeats the object of the parties in entering into the contract.'" *Shore Invs.*, 2011 WL

5967253, at *5 (quoting 23 Williston *Contracts* § 63:3 (4th ed.)). "A breach is 'material' if a party

fails to perform a substantial part of the contract . . . ." *Id.* (quoting 23 Williston *Contracts* § 63:3

(4th ed.)).

### a.     First Unique Breach – Violation of Paragraphs 8(b) and 2(b)[20]

52.     Paragraphs 8(b) and 2(b) of the Trust Agreement both require U.S. Bank to

---

[20] The court observes that the Order addresses the alleged breaches in the order they are identified on pages 26 and 27.

determine if an asset is in a form that Accident can negotiate without Dallas National's consent or the consent of another entity.  (Def. Ex. No. 89 at 008970, 008972.)

53.    Accident asserts that U.S. Bank breached these provisions of the Trust Agreement because Destra UITs could not be negotiated without another entity's consent or signature.  (Pl. Ex. No. 102 at 15 § C ("The Destra trust indenture required Destra unit holders to procure the written consent of Administrative Agency Services, LLC (Burns) prior to redeeming any units.  As such, Destra clearly was not a freely negotiable security on its face."); Pl Ex. No. 103, Ex. 14 at 5 ("The registered holder of a Unit . . . may transfer all or a portion of its Units to a person who is a qualified purchaser . . . acceptable to the Administrative Agent, in its sole discretion."); Tr. ECF No. 291 at 76:17–77:12.)

54.    The express language of the Trust Agreement did not define "negotiate."

55.    There does not appear to be any dispute that the definition of "negotiate" is left to the discretion of this court.  (*See, e.g.*, Tr. ECF No. 291 at 198:1–3.)

56.    Negotiability depends on whether a security is a physical stock certificate (like Camelot) or journal book-entry (like the Destra UIT).  (Tr. ECF No. 291 at 49:7–11.)

57.    As to a journal book-entry like Destra UITs, there is no physical certificate to examine so the trustee has to rely on the trade instruction from the registered investment advisor that the security would be properly registered on the books and records of the transfer agent or registrar.  (Tr. ECF No. 291 at 525:9–53:2; Def. Ex. No. 363 at 27 ⁋ 59, 28 ⁋ 62.)

58.    Instructions regarding Destra UITs came from Dallas National's authorized signer and registered investment advisor.  (Tr. ECF No. 287 at 126:25–127:11, 132:22–133:3, 139:23–25, 146:18–148:22; *see also* Def. Ex Nos. 137, 138.)

59.    The Destra Master Trust Agreement further provided that units may not be

transferred without the approval of AAS, a Southport affiliate.  (*See* Def. Ex. No. 39 at 00006216–00006217 § 5.03.)

60.     The greater weight of the evidence does not suggest that U.S. Bank was unaware of this perceived limitation on the transferability of Destra UITs.  (*E.g.*, Tr. ECF No. 286 at 100:10–14.)

61.     To this point, once the determination regarding whether an asset could be negotiated was made, the express language of paragraphs 8(b) and 2(b) of the Trust Agreement did not require any further action from U.S. Bank.

62.     If Accident and Dallas National required U.S. Bank to act in a certain manner after determining whether an asset could be negotiated with or without the consent of another entity, that action was not expressly stated in the Trust Agreement.

63.     As a result, the court finds that U.S. Bank did not breach its obligations under paragraphs 8(b) and 2(b) of the Trust Agreement based on the perceived lack of negotiability of Destra UITs.

**b.     Second Unique Breach – Violation of Paragraph 3(a)**

64.     Paragraph 3(a) provides a right to Accident to withdraw assets from the Trust Account upon presentation of written notice to U.S. Bank.  (*See* Def. Ex. No. 89 at 008970.)

65.     Accident asserts a breach of paragraph 3(a) of the Trust Agreement because it accepted assets into the Trust Account that could not "be freely negotiated and liquidated without the written consent of a Burns controlled entity."  (Pl. Ex. No. 103 at 16 ¶ VII(2).)

66.     Upon its review, the court observes that the express language of paragraph 3(a) does not identify a specific action for U.S. Bank to perform to fulfill that provision of the Trust Agreement.  (*See* Def. Ex. No. 89 at 008970.)

67.    The court finds that the express language of Paragraph 3(a) serves as the parties' acknowledgement that Accident's expression of its right to withdraw assets from the Trust Account commences upon written notice to U.S. Bank.

68.    Therefore, considering the express language of paragraph 3(a) of the Trust Agreement, the court does not find a breach by U.S. Bank.

### c.    Third Unique Breach – Violation of Paragraph 3(b)

69.    Paragraph 3(b) of the Trust Agreement requires U.S. Bank to take all steps necessary to transfer right, title, interest, and/or physical custody of an asset to Accident upon receipt of a withdrawal notice.  (Def. Ex. No. 89 at 008970.)

70.    Accident asserts that U.S. Bank breached paragraph 3(b) of the Trust Agreement because the Trust Agreement's assets could not "be freely negotiated and liquidated without the written consent of a Burns controlled entity."  (Pl. Ex. No. 103 at 16 ¶ VII(2).)

71.    On July 11, 2014, U.S. Bank received the withdrawal notice from Accident seeking to withdraw all assets in the Trust Account.  (Pl. Ex. No. 97 at 009293.)

72.    On July 17, 2014, U.S. Bank conveyed to Accident:

We will transfer the municipal securities and the case in the account tomorrow.  The other securities Destra and Camelot will require additional paperwork.  We are working to accomplish the transfer of these assets as soon as possible.

I have attached a list of the assets and cash that will be delivered tomorrow to Accident . . . per your instructions received on 7/11/2014.

(Pl. Ex. No. 103, Ex. 10.)

73.    On July 18, 2014, U.S. Bank transferred municipal bonds and cash valued at approximately $5,382,455.12, but did not transfer Destra UITs or Camelot shares.[21]  (Tr. ECF No.

---

[21] Accident received a wire for $169,738.55 on June 3, 2019, related to a liquidation of the Camelot Holding assets that were held in the Trust Account.  (Pl. Ex. No. 104 at 6.)

288 at 76:3–17; Tr. ECF No. 288 at 209:8–16; Def. Ex. Nos. 184, 186, 187, 189.)

74.     On July 31, 2014, U.S. Bank conveyed the following to Accident:

> Administrative Agency Services, the administrative agent for the Destra units held in the Freestone-Accident reinsurance trust, has asked to speak with someone at Accident [] regarding the Accident withdrawal request and the status of the Destra units. You may want to contact Hugh Hill at Southport (parent company of Administrative Agency Services) regarding the Destra assets.

(Pl. Ex. No. 103, Ex. 11.)

75.     U.S. Bank followed up with Accident on August 7, 2014, reiterating the need to contact Hugh Hill regarding Destra UITs. (Def. Ex. No. 189 at 00013284.)

76.     Upon its consideration of the foregoing, the court first observes that the express language of paragraph 3(b) does not address negotiability, liquidity, or Burns:

> Paragraph 3(b): Upon receipt of a Withdrawal Notice, the Trustee shall immediately take any and all steps necessary to transfer absolutely and unequivocally to the Beneficiary or to its order all right, title and interest in the Assets being withdrawn, and shall deliver the physical custody of such Assets to or for the account of the Beneficiary as specified in the Withdrawal Notice.

77.     The Trust Agreement also did not specify what would be considered all necessary steps to transfer an asset.

78.     Upon its review, the court observes that the greater weight of the evidence demonstrates that a necessary step regarding Destra UITs occurred when U.S. Bank requested that Accident contact Hugh Hill at Southport on both July 31, 2014, and August 7, 2014.

79.     The court further observes that the question of whether U.S. Bank took all steps is dependent on the result of Accident's communication with Hugh Hill.

80.     Because the evidence in this matter fails to establish that Accident contacted Hugh Hill, the court observes that the greater weight of the evidence demonstrates that U.S. Bank did take all steps necessary to transfer assets requested in Accident's withdrawal notice.

81.     Accordingly, the court finds that U.S. Bank did not breach its obligations under

Paragraph 3(b) of the Trust Agreement.

### d.     Fourth Unique Breach – Violation of Paragraph 8(i)

82.     Paragraph 8(i) of the Trust Agreement requires U.S. Bank to be liable for any loss, liability, costs, or expenses caused by its own negligence, willful misconduct, or lack of good faith. (Def. Ex. No. 89 at 008973.)

83.     Accident asserts a breach of paragraph 8(i) of the Trust Agreement because U.S. Bank "acted carelessly [even though] it knew of the limitations and restrictions placed upon Destra units."  (Pl. Ex. No. 103 at 16 ¶ VII(2).)

84.     The court finds that the express language of paragraph 8(i) is not a provision that can be breached by U.S. Bank, but simply states the parties' acknowledgement that U.S. Bank can be held liable for acts of negligence, willful misconduct, or lack of good faith.

85.     Therefore, considering the express language of paragraph 8(i) of the Trust Agreement, the court finds that the provision was not breached by U.S. Bank.

### e.     Fifth Unique Breach – Violation of Paragraph 2(a)

86.     Paragraph 2(a) of the Trust Agreement requires U.S. Bank to receives assets from Dallas National, deposit the assets in the Trust Account, and hold the assets in the Trust Account for safekeeping, subject to the terms of this Agreement.  (Def. Ex. No. 89 at 008969.)

### <u>Desta UITs</u>

87.     Accident asserts that U.S. Bank breached paragraph 2(a) of the Trust Agreement because it never received, deposited, or held the Destra UITs.  (*See, e.g.*, Tr. ECF No. 291 at 62:3–16.)

88.     In support of this breach, Accident specifies that in its January 2014 account statement, U.S. Bank stated to Accident that Destra UITs are "held or controlled by the customer

or by a third party on behalf of the customer . . . . [and] U.S. Bank does not have actual custody or control of this asset."  (Def. Ex. No. 126 at 00000136.)

89.    Paragraph 2(a) requires U.S. Bank to hold assets for the Trust Account "in physical or customary book entry form" at its offices in the United States.  (Def. Ex. No. 89 at 008969–008970 ¶ 2(a).)

90.    Destra UITs are a "paper book-entry security."  (Tr. ECF No. 287 at 144:5–9; Tr. ECF No. 291 at 52:9–15; Def. Ex. No. 39 00006205 § 2.02.)

91.    There is no physical certificate that evidences unit ownership, so there is no hard-copy document for U.S. Bank to hold physically "in the Trust Account."  (*Id.*; *see also* Tr. ECF No. 291 at 87:19–88:8.)

92.    Instead, ownership is recorded as a journal entry in the books of the official registrar, and reported on U.S. Bank's account statements.  (*See* Tr. ECF No. 291 at 52:9–15, 87:19–88:8.)

93.    The Trust Account was maintained at U.S. Bank's office in Wilmington, Delaware.

94.    The account statements recorded units of Destra UITs as assets of the Trust Account.  (*See, e.g.*, Def. Ex. No. 126.)

95.    Data generated from S.A.I., which is U.S. Bank's internal accounting system for IT&C, also uniformly recorded the Destra UITs as account assets.  (*See* Def. Ex. No. 157; Tr. ECF No. 288 at 87:24–88:11.)

96.    Upon consideration of the foregoing, the court finds that U.S. Bank's records and activities reflect that it held the Destra UITs as a book entry as required by the Trust Agreement.

97.    Therefore, the court does not find a breach of paragraph 2(a) of the Trust Agreement based on the alleged failure of U.S. Bank to not have actual custody or control of Destra UITs.

**Municipal Bonds**

98.     Because New Mexico municipal bonds were sold on January 13, 2014, and Port of Seattle municipal bonds were sold on January 14, 2014 (*see* Def. Ex. No. 126 at 0000139; Tr. ECF No. 291 at 61:8–16), Accident asserts a breach of paragraph 2(a) by U.S. Bank because it did not hold onto the bonds in the Trust Account for safekeeping.  (*See* Tr. ECF No. 291 at 59:22–61:16.)

99.     The holding of assets under paragraph 2(a) is subject to the other terms of the Trust Agreement.

100.     The plain language of paragraph 5(b) expressly allowed Dallas National to direct U.S. Bank "to accept substitute Assets for other Assets held in the Trust Account."  (Def. Ex. No. 89 at 008971.)  However, Accident presented evidence that more likely than not a substitution did not occur in this January transaction.  (*See* Tr. ECF No. 291 at 68:5–69:4.)

101.     Paragraph 8(g) authorized U.S. Bank to follow and rely upon all instructions given by . . . authorized signers . . . ."  (Def. Ex. No. 89 at 008973.)

102.     The evidence presented at trial demonstrated that the municipal bonds were sold at the direction of Dallas National's authorized signers, Vogelsberg and Morrow.  (*See* Def. Ex Nos. 133, 134, 135, 136, 137, 138, 139.)

103.     Paragraph 8(g) further prohibited U.S. Bank from incurring liability resulting from the good faith reliance on instructions received from authorized signers.  (Def. Ex. No. 89 at 008973.)

104.     Considering the evidence presented at trial, the court finds that the greater weight does not demonstrate a lack of good faith by U.S. Bank in relying on the instructions received from Vogelsberg and Morrow.

105.     Therefore, considering the plain language of the Trust Agreement, the court does

not find a breach of paragraph 2(a) of the Trust Agreement based on U.S. Bank's failure to hold onto New Mexico municipal bonds and Port of Seattle municipal bonds.

**f.    Sixth Unique Breach – Violation of Paragraph 5(a)**

106.    Paragraph 5(a) of the Trust Agreement requires U.S. Bank to surrender for payment all maturing assets following notice to Accident.  (Def. Ex. No. 89 at 008971.)

107.    Accident asserts that U.S. Bank breached paragraph 5(a) of the Trust Agreement when it allowed New Mexico municipal bonds to be sold on January 13, 2014, and Port of Seattle municipal bonds to be sold on January 14, 2014.  (Def. Ex. No. 126 at 00000139.)

108.    The court observes that the uncontroverted evidence presented at trial demonstrated that these municipal bonds were not maturing assets.  (Tr. ECF No. 289 at 111:21–112:9.)

109.    Based on the express language of paragraph 5(a), the court concludes that this provision could only be breached if U.S. Bank either refused to surrender a maturing asset or did so without providing Accident with notice.

110.    Accordingly, considering the plain language of this provision of the Trust Agreement, the court does not find a breach of paragraph 5(a) based on the sale of municipal bonds.

*iv.    Damages Resulting from the Breach*

111.    Because the court did not find that U.S. Bank breached any provisions of the Trust Agreement, Accident is not entitled to any damages as to the claim for breach of contract.

F.    <u>Accident's Claim for Breach of Fiduciary Duty</u>

*i.    Legal Standard*

112.    "The core principle of a fiduciary duty is that 'one who controls property of another may not, without implied or express agreement, intentionally use that property in a way that

benefits the holder of the control to the detriment of the property or its beneficial owner.'" *Stewart*, 112 A.3d at 297 (quoting *In re USACafes, L.P. Litig.*, 600 A.2d 43, 48 (Del. Ch. 1991)).

113.    "Inherent in the fiduciary relationship, 'which derives from the law of trusts,' is that the fiduciary exercises control over the property of another, and by virtue of that control, is obliged to act with care and loyalty to interests of the beneficial owner." *Id.* (quoting *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 495 (Del. 2003)).

114.    To prevail on a claim for breach of fiduciary duty, the plaintiff must demonstrate the existence of a fiduciary duty and evidence of its breach. *Stewart v. Wilmington Trust SP Servs., Inc.*, 112 A.3d 271, 297 (Del. Ch. 2015); *Estate of Eller v. Bartron*, 31 A.3d 895, 897 (Del. 2011).

*ii.    Existence of a Fiduciary Duty*

115.    "The duties of a trustee may arise from statute, court rule, the document establishing the trust, or the common law." *Vincent v. Baize*, C.A. No. 3432-VCN, 2011 WL 4695622, at *2 (Del. Ch. Sept. 30, 2011) (citation omitted).

116.    "For a fiduciary duty to be created, there must be both (1) a property or other equitable interest; and (2) the ceding of legal control over the property interest, such that the owner "reposes special trust in and reliance on the judgment" of those in control." *In re NYMEX S'holder Litig.*, C.A. Nos. 3621-VCN, 3835-VCN, 2009 WL 3206051, at *14 (Del. Ch. Sept. 30, 2009).

117.    Accident alleged that it was owed a fiduciary duty based on its special relationship of trust with U.S. Bank.  (ECF No. 154 at 22 ¶ 122.)

118.    This special relationship arose from the Trust Agreement, which provides that U.S. Bank "agreed to act as Trustee [], and to hold such Assets in trust in the trust account for the sole use and benefit of" Accident.  (Def. Ex. No. 89 at 008969.)

119.    In Delaware at common law, the fiduciary of a trust has a duty of care and a duty

of loyalty.  *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1113 (Del. Ch. 2008) (citing *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1148 (1994)).  "In addition to the duties of care and loyalty, a trustee has other duties, including: (i) to keep and render accounts, (ii) to furnish information, (iii) to take and keep property, (iv) to preserve trust property, (v) to enforce claims, (vi) to defend actions, (vii) to keep trust property separate, (viii) to manage deposit accounts, (ix) to make the trust property productive, (x) to distribute or apply income and principal in accordance with the terms of the trust, and (xi) to remain impartial."  *Id.* at 1113 n.68.

120.    At common law, it is clear that the relationship of trust between Accident and U.S. Bank created fiduciary duties.

121.    However, the Trust Agreement is also governed by the statutory law of Delaware which provides that  a trust agreement may restrict, eliminate, or vary a fiduciary's powers, duties, standard of care, and liability.  *See* 12 *Del. C.* § 3303(a) (West 2020).

122.    A directed trustee[22] that acts in accordance with a direction "shall not be liable for any loss" resulting from the directed act, except in cases of "willful misconduct" on behalf of the trustee.  12 *Del C.* § 3313(b).[23]

---

[22] The express language of the Trust Agreement supports the conclusion that U.S. Bank was a directed trustee in that its "duties and responsibilities shall be entirely administrative and not discretionary and determined only with reference to this Agreement and Applicable Insurance Law."  (Def. Ex. No. 89 at 008974 ¶ 8(n).)  Furthermore, U.S. Bank was "not charged with knowledge of or any duties or responsibilities in connection with any other document or agreement."  (*Id.*)

[23] The various sections of § 3313 apply where the governing instrument provides that a fiduciary is to follow the direction of a specified party, including with respect to investment decisions. Specifically, the statute applies when the trustee is to follow the direction of an "adviser," which is defined as a person who is "given authority by the terms of a governing instrument to direct, consent to or disapprove a fiduciary's actual or proposed investment decisions, distribution decisions or other decision of the fiduciary."  12 *Del. C.* § 3313(a).  The definition of "adviser" encompasses Dallas National and its authorized signers.

### iii.     Breach of Fiduciary Duty

123.     "A violation by a trustee of a duty the trustee owes to a beneficiary is a breach of trust." *Paradee v. Paradee*, C.A. No. 4988-VCL, 2010 WL 3959604, at *9 (Del. Ch. Oct. 5, 2010) (quoting 12 *Del. C.* § 3581(a) (West 2020)).

124.     In the Amended Complaint, Accident alleged that U.S. Bank breached its fiduciary duty owed to Accident based on the following:

> Failing to determine and ensure that each Asset it accepted in the Trust Account was in such form that it could be negotiated whenever necessary without consent or signature from anyone besides U.S. Bank before it accepted the Asset; Failing to disclose the relationship between its affiliate, U.S. Trust, AAS, Burns, the Southport entities, the Destra Fund, and Freestone, in breach of the duty of loyalty U.S. Bank owed to AIC; Failing to disclose to AIC that the Destra Funds were valueless and did not constitute "Eligible Assets" when, upon information and belief, U.S. Bank was aware of such fact; and Misrepresenting the Destra UITs as "taxable bonds" in the bank statements to AIC.

(ECF No. 154 at 22 ¶ 123.)

125.     Through its expert, Accident asserted the following breaches of duty[24]:

> (1) the fiduciary duty of loyalty requiring the placement of Accident's interests above all others; (2) the duty of candor to exercise prudence, diligence, and due care when performing its responsibilities on behalf of Accident, and to honestly and in fair dealing refrain from conflicts or self-interested transactions; (3) the duty of loyalty and candor to disclose the nature and existence of Accident's relationship with Administrative Agency Services, LLC, Burns, Southport Lane, Freestone, and Destra; (4) the duty to determine and ensure that the assets, before acceptance into the trust, could be freely negotiated and liquidated without the written consent of any other party; (5) the duty to ensure that Accident could withdraw the trust's assets at any time upon notice given and demand made; (6) the duty to ensure that it would immediately transfer absolutely and unequivocally to Accident all of its rights, title, and interest in the trust's assets and deliver custody in physical form; (7) the duty to act with prudence, diligence, and due care when performing its responsibilities on behalf of Accident, and to honestly and in fair dealing refrain from conflicts or self-interested transactions; (8) the duties of prudence, diligence, and due care in selecting Southport Lane as Accident's delegated investment agent;

---

[24] As with Accident's amended breach of contract claims, U.S. Bank did not either expressly or impliedly consent to these amended claims of breach. However, U.S. Bank was also not prejudiced by these amendments because it was able to present its evidentiary defense to these additional claims.

and (9) the duty of care in negotiating the scope and terms of the Trust Agreement and in monitoring Southport Lane's performance, unless any of these duties were expressly disclaimed.[25]

(Pl. Ex. No. 103 at 7–10.)

    **a.**    **Reiterated Breaches – Failure to Ensure that Assets, before Acceptance into the Trust, could be Freely Negotiated without Written Consent of Any Other Entity; Failure to Ensure the Transfer to Accident All of the Rights, Title, Interest, and/or Physical Form of the Trust Account's Assets; Failure to Ensure the Ability to Withdraw Assets at Any Time**

126.    These breaches were also alleged as breaches in support of Accident's claim for breach of contract. (*See, e.g.*, ECF No. 154 at 21 ¶ 117; Pl. Ex. No. 103 at 9 § B, 16 ¶ VII(2).)

127.    "Under Delaware law, if the contract claim addresses the alleged wrongdoing by the director, 'any fiduciary duty claim arising out of the same conduct is superfluous.'" *Grayson v. Imagination Station, Inc.*, 2010 WL 3221951, at *7 (Del. Ch. Aug. 16, 2010) (quoting *Gale v. Bershad*, No. Civ. A. 15714, 1998 WL 118022, at *5 (Del. Ch. Mar.4, 1998)).

128.    Based on the foregoing, the court finds for U.S. Bank because these specified breaches of fiduciary duty are duplicative of Accident's breach of contract allegations.

    **b.**    **First Unique Breach – Failure to Disclose the Nature of its Relationships with Third Parties; Failure to Place Accident's Interests Above All Others; Failure to Convey Information Regarding AAS, Burns, the Southport entities, the Destra Fund, and Freestone; Failure to Promote Accident's Interests above Its Own Interests and Avoid Self-Dealing**

129.    Accident asserts that U.S. Bank breached duties of loyalty and candor (to exercise

---

[25] The court prohibited Accident's expert from expressly testifying regarding the existence of these purported breaches of fiduciary duty. (ECF No. 260 at 4–5 (citing *Tessier v. Moffatt*, C/A No. 98-0116, 2000 WL 35725886, at *1 (E.D. La. Feb. 25, 2000) ("[T]estimony of an attorney expert concerning whether there has been a breach of fiduciary duty offers a legal opinion and, as such, is inadmissible." (citing *Estate of Sowell v. United States*, 198 F.3d 169, 171 (5th Cir. 1999)); *Christiansen v. Nat'l Sav. & Tr. Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("The existence of fiduciary duties in the context of this case is a legal conclusion. The duty to issue such conclusions devolve on the courts and lay legal conclusions are inadmissible in evidence."))).)

prudence, diligence, and due care) owed by failing to disclose its relationships with specified third parties (AAS, Burns, the Southport entities, and the Destra Fund) and by not making Accident its most important concern.  (ECF No. 154 at 22 ¶ 123; *see also* Pl. Ex. No. 103 at 7–11.)

130.     The duty of loyalty requires a trustee "to deal fairly with the beneficiaries and not to place his personal interests . . . ahead of the interests of the Trust and its other beneficiaries" and "carry the burden of persuasion in justifying her self-interested transactions." *Vincent*, 2011 WL 4695622, at *2 (citations omitted).

131.     "The duty of candor requires 'corporate fiduciaries [to] disclose all material information relevant to corporate decisions from which they may derive a personal benefit.'" *Matter of Seidman*, 37 F.3d 911, 935 n.34 (3d Cir. 1994) (citation and internal quotation marks omitted).

132.     "A fiduciary's duty of candor is encompassed within the duty of loyalty." *Id.*  The duty of candor is also capable of "implicat[ing] either the duty of care or the duty of loyalty depending on the factual situation."  *OptimisCorp v. Waite*, C.A. No. 8773-VCP, 2015 WL 5147038, at *72 n.578 (Del. Ch. Aug. 26, 2015) (citation omitted).

133.     The Fiduciary Act limits common law duties to the extent that a directed trustee has no duty to monitor the conduct of the party giving direction, or to warn a beneficiary when the trustee might have acted differently if discretion rested with the trustee.  *See* 12 *Del C.* § 3313(e).

134.     The plain language of the "WHEREAS" paragraphs conveyed to U.S. Bank that the Trust Agreement's terms and conditions were determined in the "sole discretion" of Accident and Dallas National.  (*See* Def. Ex. No. 89 at 008969.)

135.     The plain language of paragraph 8(g) of the Trust Agreement authorized U.S. Bank to follow and rely upon all instructions given  by . . . authorized signers . . . ."  (Def. Ex. No. 89 at

008973.)

136.     The plain language of paragraph 8(n) informed U.S. Bank that it was not responsible for "any duties or responsibilities in connection with any other document or agreement." (*Id.* at 008974.)

137.     After applying § 3313(e) of the Fiduciary Act to the express language of the Trust Agreement, the court finds that the greater weight of the evidence supports finding that U.S. Bank did not breach its fiduciary duty by failing to either disclose the nature of its relationships with third parties or prioritize Accident's business interests.

        **c.**      **Second Unique Breach – Failure to Disclose Status of Destra UITs**

138.     Accident asserts that U.S. Bank breached its fiduciary duty by failing to disclose to Accident that Destra UITs neither had value nor constituted "Eligible Assets." (ECF No. 154 at 22 ¶ 123(c).)

139.     The court observed above that the Trust Agreement did not specify actions for U.S. Bank to take once a determination was made regarding whether an asset could be negotiated.

140.     Furthermore, the Trust Agreement did not expressly define the term "Eligible Assets." (*See* generally Def. Ex. No. 89.)

141.     In paragraph 12(c), the Trust Agreement did define "Assets" as "Eligible Securities" received from Dallas National or invested by U.S. Bank under the Trust Agreement. (*Id.* at 008976.)

142.     The Trust Agreement further defined "Eligible Securities" in paragraph 12(f) as "certificates of deposit issued by a United States bank and payable in United States legal tender and securities representing investments of the types specified in subsections (1), (2), (3), (4), (6), (8) and (10) of Section 1404(a) of the New York Insurance Law; . . . ."

143.     However, in defining "Eligible Securities," paragraph 12(f) of the Trust Agreement

permitted U.S. Bank to rely on Dallas National's representation that an asset was an "Eligible Security."  (Def. Ex. No. 89 at 008976–008977 ¶ 12(f).)

144.    Paragraph 8(c) of the Trust Agreement further stated that U.S. Bank did not have any responsibility for determining whether assets are or continue to be "Eligible Securities" or if their value is satisfactory to Accident.

145.    The Fiduciary Act expressly limits claims for breach of fiduciary duty when a trustee acts in good faith reliance on a governing instrument.  12 *Del C*. § 3302(e).

146.    The Fiduciary Act further allows a trustee to follow the direction of an authorized advisor if such direction is spelled out in the Trust Agreement.  *Id.* at § 3313(b).

147.    After applying the Fiduciary Act to the express language of the Trust Agreement, the court finds that U.S. Bank did not breach its fiduciary duty by failing to disclose Destra UITs value and/or status as "Eligible Assets."

> ### d.    Second Unique Breach – Misrepresenting Destra UITs as "Taxable Bonds"

148.    Accident asserts that U.S. Bank breached its fiduciary duty by misrepresenting Destra UITs as "taxable bonds."  (ECF No. 154 at 22 ¶ 123(d).)

149.    In the asset detail section of U.S. Bank's account statements, Destra UITs were placed under the heading "taxable bonds" and the subheading "fixed income funds."  (*See* Def. Ex. No. 126 at 00000135.)

150.    At trial, the court finds that the greater weight of the evidence demonstrates that U.S. Bank's usage of the heading "taxable bonds" in its account statements is neither a misrepresentation nor led to a breach of its fiduciary duty.

151.    As a result, the court finds for U.S. Bank as to this claim for breach of fiduciary duty.

iv.    *Damages Resulting from the Breach*

152.    Because the court did not find that U.S. Bank breached any duty to Accident in connection with the Trust Agreement, Accident is not entitled to any damages as to the claim for breach of fiduciary duty.

G.    Accident's Claim for Negligence/Gross Negligence

153.    For its negligence/gross negligence claim, Accident asserts that U.S. Bank owed it a duty to exercise reasonable care in its role as Trustee.  (ECF No. 154 at 23 ¶ 126.)

154.    The alleged breaches of duty asserted by Accident in support of the negligence claim are identical to the breaches of duty asserted in support of the breach of fiduciary duty claim, except that the breaches of duty as to the negligence claim have the following additional descriptive terms: "negligently, grossly negligently, recklessly, willfully, and wantonly." (*Compare* ECF No. 154 at 22 ¶ 123, *with* ECF NO. 154 at 23 ¶ 127.)

155.    Moreover, at trial, Accident did not present any evidence regarding negligence that was separate from the evidence regarding breach of fiduciary duty.

156.    Therefore, Accident's claim for negligence is a "duplicative breach of fiduciary duty claim." *Marshal T. Simpson Tr. V. Invicta Networks, Inc.*, 249 F. Supp. 3d 790, 793 (D. Del. 2017)

157.    As a result, the court finds in favor of U.S. Bank on Accident's claim for negligence/gross negligence for the same reasoning expressed by the court on Accident's claim for breach of fiduciary duty.

H.    Accident's Claim for Negligent Misrepresentation

158.    In the Amended Complaint, Accident alleged that U.S. Bank misrepresented "the value of the Destra UITs," that "Destra UITs were 'taxable bonds' and constituted 'Eligible

Assets,'" and "that it was acting as a fiduciary for A[ccident], when in fact, it was only looking out for the best interests of itself and U.S. Trust."  (ECF No. 154 at 24 ¶ 130.)

        *i.*       *Legal Standard*

159.  To prove negligent misrepresentation under Delaware law, a plaintiff must show: "(1) the defendant had a pecuniary duty to provide accurate information, (2) the defendant supplied false information, (3) the defendant failed to exercise reasonable care in obtaining or communicating the information, and (4) the plaintiff suffered a pecuniary loss caused by justifiable reliance upon the false information."  *Steinman v. Levine*, No. Civ. A. 19107, 2002 WL 31761252, at *15 (Del. Ch. Nov. 27, 2002), *aff'd*, 822 A.2d 397 (Del. 2003).  *See also Coleman v. PricewaterhouseCoopers LLC*, No. C.A. 03C-02-137 RRC, 2005 WL 1952844, at *3 (Del. Super. Ct. July 29, 2005) ("Plaintiffs must prove all the elements of their claim for negligent misrepresentation or the claim  fails.").

        *ii.*      *U.S. Bank's Duty*

160.  "Delaware common law embraces a 'pecuniary duty to provide accurate information.'"  *Outdoor Techs., Inc. v. Allfirst Fin., Inc.*, No. 99C-09-151-JRS, 2001 WL 541472, at *5 (Del. Super. Ct. Apr. 12, 2001) (citation omitted).

161.  "In each instance, the law contemplates that a duty of disclosure will arise when the parties are in the midst of a 'business relationship' from which they expect to derive 'pecuniary' benefits."  *Id.* (citation omitted).

162.  Based on the fee schedule for the Trust Account, U.S. Bank received three basis points (0.03%) on the first $50 million of asset value, two basis points (0.02%) on the next $100 million, and 1.5 basis points (0.015%) on the balance.  (Def. Ex. No. 95.)  The schedule provided for a $5,000.00 annual relationship minimum, and a $3,500.00 trustee fee.  (*Id.*)

163.    The fee schedule evidence establishes that U.S. Bank had a duty to provide accurate information because it did expect to receive pecuniary benefits from its relationship with Accident. *E.g.*, *Corp. Prop. Assocs. 14 Inc. v. CHR Holding Corp.*, C.A. No. 3231-VCS, 2008 WL 963048, at *9 (Del. Ch. Apr. 10, 2008) ("[A] bank has a pecuniary duty to provide accurate information to its account holders.")

iii.    *U.S. Bank's Submission of False Information*

164.    To demonstrate the false information element of a negligent misrepresentation claim, a plaintiff must present evidence of a "material misstatement" or false representation by the defendant. *Lundeen v. PricewaterhouseCoopers LLC*, C.A. No. 04C-03-200 RRC, 2006 WL 2559855, at *3 (Del. Super. Ct. Aug. 31, 2006).

**a.    First Unique Misstatement – The Value of Destra UITs**

165.    Accident asserts that U.S. Bank's account statements falsely overstated the value of the Destra UITs. (ECF No. 154 at 24 ¶ 130(a).)

166.    When Destra UITs were placed in the Trust Account, U.S. Bank communicated in its account statement that "the description of the asset and its price (or value) may have been provided to U.S. Bank by the customer or a third party and should not be relied upon for any purpose." (Def. Ex. No. 126 at 00000136.) The account statement further stated that "[n]o current price is available." (*Id.*)

167.    U.S. Bank listed the stated value and pricing information that it received from an external source, Mike Morrow at Southport Lane Advisors, Dallas National's authorized signer and registered investment advisor. (*See* Tr. ECF No. 287 at 133:17–134:21; Def. Ex. No. 81.)

168.    U.S. Bank did not verify the prices that it received. (Tr. ECF No. 288 at 87:24–88:11.)

169.    The express language of the Trust Agreement did not require U.S. Bank to verify the prices that it received from an authorized signer.  (Def. Ex. No. 89 at 008972 ¶ 8(c), 008973 ¶ 8(g).)

170.    Upon its review, the court finds that the greater weight of the evidence does not lead it to conclude that there were specific inaccuracies in Destra pricing information that U.S. Bank is responsible for conveying to Accident.

171.    Therefore, the court finds that the trial evidence supporting Accident's allegation regarding the value of Destra UITs does not establish the false information element of a claim for negligent misrepresentation.

### b.    Second Unique Misstatement – Destra UITs are "Taxable Bonds" and "Eligible Assets"

172.    Accident asserts that U.S. Bank misrepresented that Destra UITs were "taxable bonds" and "Eligible Assets."  (ECF No. 154 at 24 ¶ 130(a).)

173.    As observed above (at 43–44), not only did the Trust Agreement fail to define the term "Eligible Assets," paragraph 8(c) of the Trust Agreement conveyed that U.S. Bank did not have any responsibility for determining whether assets are or continue to be "Eligible Securities."

174.    Additionally, as observed above (at 44), the greater weight of the evidence did not persuade the court to find that U.S. Bank's use of the heading "taxable bonds" on its account statement was a misrepresentation.

175.    As a result of the foregoing, the court finds that the greater weight of the evidence does not establish the necessary falsity for a claim of negligent misrepresentation regarding Destra UITs as "Taxable Bonds" and/or "Eligible Assets."

### c.    Third Unique Misstatement – U.S. Bank was Accident's Fiduciary

176.    Accident asserts that U.S. Bank misled Accident into believing that it was acting as

a fiduciary for Accident, when in fact, U.S. Bank was only looking out for the best interests of itself and U.S. Trust.  (ECF No. 154 at 24 ¶ 130(c).)

177.    At trial, Accident did not expressly identify the affirmative false statement that supports this assertion, and U.S. Bank's silence regarding its interests does not create a misstatement under Delaware law.  *Conway v. A.I. DuPont Hosp. for Children*, C.A. No. 04-4862, 2007 WL 560502, at *7 (E.D. Pa. Dec. 14, 2007) (A negligent misrepresentation claim cannot be "premised on an omission of material fact" (interpreting Delaware law)).  *See* also *George v. Kuschwa*, 1986 WL 6588, at *4 (Del. Super. Ct. May 21, 1986) ("The Court finds no authority for the proposition that silence or non-action states a claim for negligent misrepresentation."), *aff'd*, 518 A.2d 983 (Del. 1986).

178.    The court finds that the evidence in support of the allegation regarding whether U.S. Bank acted as Accident's fiduciary does not establish the falsity element of a claim for negligent misrepresentation.

*iv.*    *U.S. Bank's Failure to Exercise Reasonable Care and Accident's Loss*

179.    Because the greater weight of Accident's evidence fails to establish that U.S. Bank supplied false information, the court finds for U.S. Bank on Accident's claim for negligent misrepresentation.

I.    <u>Accident's Claim for Civil Conspiracy</u>

*i.*    *Legal Standard*

180.    "Civil conspiracy requires the combination of two or more persons for an unlawful purpose or for the accomplishment of a lawful purpose by unlawful means, which conspiracy results in damages."  *In re Asbestos Litig.*, C/A No. 16-308-LPS-SRF, 2017 WL 6334980, at *6 (D. Del. Dec. 12, 2017) (citing *Nutt v. A.C. & S. Co.*, 517 A.2d 690, 694 (Del. Super. Ct. 1986)).

181.    Under Delaware common law, the elements for a claim of civil conspiracy are as follows: "(1) a confederation or combination of two or more persons[26]; (2) an unlawful act done in furtherance of the conspiracy[27]; and (3) damages resulting from the action of the parties to the conspiracy." *MacQueen v. Union Carbide Corp.*, C/A No. 13-831-LPS-CJB Consol., 2018 WL 2729122, at *3 (D. Del. June 6, 2018) (citing, *e.g.*, *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 437 n.8 (Del. 2005)).

182.    "Civil conspiracy is not an independent cause of action in Delaware, but requires an underlying wrong which would be actionable absent the conspiracy." *In re Asbestos Litig.*, 2017 WL 6334980, at *6 (citing, *e.g., Phoenix Canada Oil Co. v. Texaco, Inc.*, 560 F. Supp. 1372, 1388 (D. Del. 1983)).

183.    In this action, Accident alleged that U.S. Bank engaged in a scheme with U.S. Bank Fund Services, LLC, U.S. Trust and various Southport entities to withhold assets of the Trust Account from Accident.  (ECF No. 154 at 24 ¶¶ 137, 138.)

184.    Under Delaware law, an entity or individual that owes fiduciary duties cannot be liable for conspiracy to breach fiduciary duties. *OptimisCorp*, 2015 WL 5147038, at *57 ("In the fiduciary duty context, conspiracy is treated essentially as coterminous with aiding and abetting. . . . In those instances where a fiduciary takes actions that would amount to aiding and abetting by

---

[26] "A 'confederation or combination' of people for purposes of a civil conspiracy claim means that there is a 'meeting of the minds between or among such persons,' and that 'meeting of the minds' relates to the allegedly improper object or course of conduct to be accomplished." *Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC*, C.A. No. 7866-VCP, 2014 WL 897223, at *24 (Del Ch. Mar. 5, 2014) (quoting *Microsoft Corp. v. Amphus, Inc.*, C.A. No. 8092-VCP, 2013 WL 5899003, at *15 (Del. Ch. Oct. 31, 2013)).  "To prove a conspiracy, however, it is not necessary that there be an express agreement."  *Empire Fin. Servs., Inc. v. Bank of N.Y. (Del)*, 900 A.2d 92, 97 (Del. 2006).

[27] "Although the elements of a claim for civil conspiracy are flexible, it is essential that there be an underlying wrongful act, such as a tort or a statutory violation." *Tani v. FPL/Next Era Energy*, 811 F. Supp. 2d 1004, 1025 (D. Del. 2011) (citing *Empire Fin. Servs.*, 900 A.2d at 97.

a non-fiduciary, that conduct amounts to a direct breach of fiduciary duties.); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, No. Civ.A. 762-N, Civ.A. 763-N, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005) ("[C]ivil conspiracy is vicarious liability.  It holds a third party, not a fiduciary, responsible for a violation of fiduciary duty.  Therefore, it does not apply to the defendants which owe the unitholders a direct fiduciary duty.").

185.    The evidence presented in the bench trial of this matter establishes U.S. Bank as a fiduciary to Accident.

186.    Therefore, as a matter of law, civil conspiracy to breach fiduciary duty cannot apply to U.S. Bank.

187.    Accordingly, the court must grant a directed verdict to U.S. Bank on Accident's claim for civil conspiracy.

J.    Damages

188.    Based on the above findings, Accident is not entitled to any damages as to its claims for breach of contract, breach of fiduciary duty, negligence/gross negligence, negligent misrepresentation, and civil conspiracy.

K.    U.S. Bank's Counterclaim for Contractual Indemnification

189.    "Delaware courts will enforce a contract in which one party agrees to indemnify another party."  *Alcoa World Alumina LLC v. Glencore Ltd.*, 2016 WL 521193, at *7 (Del. Sup. Ct. Feb. 8, 2016) (citations omitted).

190.    "The indemnification clause 'must clearly and unambiguously express such an intention' through 'specific language that clearly manifest[s] such an intent.'"  *Id.* (quoting *Beloit Power Syss., Inc. v. Hess Oil Virgin Islands Corp.*, 757 F.2d 1431, 1434 (3d Cir. 1985)).

191.    U.S. Bank alleged a counterclaim for contractual indemnification against Accident asserting that the Trust Agreement prohibited U.S. Bank from suffering "any loss, liability, costs

or expenses (including reasonable attorney's fees and expense[s]) incurred or made arising out of or in connection with the performance of its duties.  (ECF No. 155 at 51 ¶ 9.)

192.    Because U.S. Bank prevailed in this action, it asserts that it is entitled to be contractually indemnified by Accident.  (*Id.* at 52 ¶ 10.)

193.    Paragraph 9(c) of the Trust Agreement states as follows:

[T]he Grantor and the Beneficiary jointly and severally hereby indemnify the Trustee for, and hold it harmless against, any loss, liability, costs or expenses (including reasonable attorney's fees and expense) incurred or made arising out of or in connection with the performance of its duties in accordance with the provisions of this Agreement, including any loss, liability, costs or expenses arising out of or in connection with the status of the Trustee and its nominee as the holder of record of the Assets, provided however, that such loss, liability, cost or expense has not been caused by the Trustee's negligence, willful misconduct or lack of good faith.

(Def. Ex. No. 89 at 008974 ¶ 9(c).)

194.    Upon its consideration of the plain language of paragraph 9(c), the court finds that it specifically demonstrates an unequivocal undertaking by Accident and Dallas National to indemnify U.S. Bank in serving as the trustee of the Trust Agreement.

195.    However, as a result of the instant Findings of Fact and Conclusions of Law, the court finds that the greater weight of the evidence does not establish that U.S. Bank suffered loss, liability, costs, or expenses arising out of the performance of its trustee duties.

196.    Accordingly, the court finds for Accident as to U.S. Bank's claim for contractual indemnification.

## V.    CONCLUSION

For the foregoing reasons, the court finds that judgment shall be entered in favor of Defendant U.S. Bank National Association on Plaintiff Accident Insurance Company, Inc.'s claims for breach of contract, breach of fiduciary duty, negligence/gross negligence, negligent

misrepresentation, and civil conspiracy.[28]  In addition, the court finds that judgment shall be

entered in favor of  Plaintiff Accident Insurance Company, Inc. on Defendant U.S. Bank National

Association's claim for indemnification.

**IT IS SO ORDERED.**[29]

*J. Michelle Childs*

United States District Judge

April  20, 2020
Columbia, South Carolina

---

[28] Because this decision is based on Accident's failure to substantiate its claims, the court need not and does not reach the issue of whether U.S. Bank's twenty affirmative defenses provide an adequate shield from liability.  (*See* ECF No. 155 at 46 ¶ 3–49 ¶ 22.)

[29] The court observes that U.S. Bank has a pending third-party action against Third-Party Defendants Southport Lane Advisors, Southport Specialty Finance, Administrative Agency Services, and Alexander Chatfield Burns.  (*See* ECF No. 80.)  U.S. Bank alleges that if it is liable to Accident, these Third-Party Defendants are liable to U.S. Bank for contribution and apportionment.  (*Id.* at 1.)  Based on its Findings of Fact and Conclusions of Law above that U.S. Bank is not liable to Accident, the court sua sponte dismisses U.S. Bank's Third-Party Complaint without prejudice.